MUS3012702.1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZURN INDUSTRIES, LLC, as Successor in Interest to Zurn Industries, Inc., | ) ) ) |
| | CIVIL ACTION NO. <u>1:18-CV-299</u> |
| Plaintiff, | ) ) |
| v. | ) ELECTRONICALLY FILED ) |
| ALLSTATE INSURANCE COMPANY, individually and as successor in interest to Northbrook Excess and Surplus Insurance Company (formerly Northbrook Insurance Company); TRAVELERS CASUALTY AND SURETY COMPANY, individually and as successor in interest to the Aetna Casualty and Surety Company); FIRST STATE INSURANCE COMPANY, a subsidiary of The Hartford Financial Services Group, Inc., d/b/a Arrowood Indemnity Company (formerly known as Royal Indemnity); NEW ENGLAND INSURANCE COMPANY, a subsidiary of The Hartford Financial Services Group, Inc.; THE HARTFORD FINANCIAL SERVICES GROUP, INC., f/k/a The Hartford, individually and as the parent to First State Insurance Company and New England Insurance Company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF AND JURY DEMAND

AND NOW COMES, Zurn Industries, LLC, as Successor in Interest to Zurn

Industries, Inc. (hereinafter referred to as "Zurn"), and for its Complaint for Declaratory

MUS3012702.1

Judgment and Other Relief against Defendants Allstate Insurance Company (hereinafter referred to as "Allstate"), Travelers Casualty and Surety Insurance Company (hereinafter referred to as "Travelers"), and The Hartford Financial Services Group, Inc. (hereinafter referred to as "Hartford" and collectively referencing Defendants First State Insurance Company and New England Insurance Company as subsidiaries of Hartford) hereby states as follows:

## INTRODUCTION

1.      Zurn Industries, Inc. purchased an umbrella liability insurance policy from Northbrook Insurance Company which provided umbrella coverage from April 1, 1978 to April 1, 1979 (the "Northbrook policy").

2.      Zurn Industries, LLC, the successor to the rights and responsibilities under the Northbrook policy, has requested that Allstate begin responding to thousands of asbestos bodily injury lawsuits that are alleged and pending against Zurn, and which trigger the Northbrook policy.

3.      Zurn asserts that, pursuant to endorsement 5 in the Northbrook Policy, Allstate must defend and indemnify Zurn in the asbestos bodily injury cases that trigger the policy period, and that costs associated with the defense of the cases will not erode the limits of liability under the Northbrook Policy.

4.      Despite Zurn's requests that Allstate respond to these lawsuits, Allstate has failed to do so pursuant to the terms of the Northbrook policy. Furthermore, Allstate has engaged in vexatious and unreasonable delay, and has yet to even set forth

2

MUS3012702.1

a substantive coverage position in writing with regard to how the policy should respond to the asbestos claims.

5.      Zurn also purchased umbrella liability insurance policies from Aetna Casualty and Insurance Company, which collectively provided umbrella coverage from April 1, 1980 to April 1, 1986 (collectively, the "Aetna policies").

6.      The obligations of the Aetna policies were assumed by Travelers Casualty and Surety Company ("Travelers"), and Travelers has paid those obligations pursuant to an agreement with Zurn since 2003. Travelers has recently represented that its available asbestos limits are exhausted.

7.      Additionally, Zurn purchased excess liability insurance policies from Royal Indemnity and New England Insurance Company, which provided umbrella coverage from April 1, 1983 to April 1, 1984 and April 1, 1984 to April 1, 1985, respectively (collectively, the "Hartford policies").

8.      All of the aforementioned policies are collectively referred to herein as the "Policies."

9.      Herein, Zurn seeks a declaration regarding the manner in which the Northbrook policy should respond to bodily injury asbestos claims that allege, or potentially allege, exposure to asbestos during the applicable policy period, and also for relief associated with Allstate's unreasonable delay in responding to Zurn's request for coverage.

MUS3012702.1

10.    Zurn also seeks a declaration that Travelers has exhausted, and that Hartford and Allstate must defend and indemnify Zurn in the asbestos claims and lawsuits.

11.    Alternatively, if Travelers has not properly exhausted, Zurn seeks an order preventing Travelers from withdrawing from Zurn's defense and indemnity until such time as exhaustion is proper, and Hartford and Allstate's duty to defend and indemnify Zurn is triggered.

## PARTIES, JURISDICTION AND VENUE

12.    Zurn Industries, LLC is a limited liability company. Rexnord-Zurn Holdings, Inc. is the sole member of Zurn Industries, LLC.

13.    Rexnord-Zurn Holdings, Inc. was incorporated in Delaware and has its principal place of business in Milwaukee, Wisconsin, and as such is a citizen of Delaware and of Wisconsin.

14.    Prior to 1998, Zurn Industries, Inc. was a corporation which was incorporated under the laws of the state of Delaware, and had its principal place of business in Erie, Pennsylvania.

15.    In 1998, Zurn Industries, Inc., the below-named policyholder, merged with USI, Inc.

16.    In 1998, USI, Inc. was restructured and renamed U.S. Industries, Inc. Zurn Industries, Inc. became a wholly owned subsidiary of U.S. Industries, Inc.

17.    In 2003, U.S. Industries, Inc. changed its name to "Jacuzzi Brands, Inc." At that time, it still owned Zurn Industries, Inc. as a wholly owned subsidiary.

4

MUS3012702.1

18.    In 2007, Jacuzzi Brands, Inc., along with its wholly owned subsidiary Zurn Industries, Inc. were sold to Rexnord.

19.    At that time, Zurn Industries, Inc. was converted to a limited liability company, and was renamed "Zurn Industries, LLC."

20.    Zurn Industries, LLC is the successor in interest to the rights and responsibilities of Zurn Industries, Inc., including any and all rights Zurn Industries, Inc. had or has under the Policies.

21.    Northbrook Insurance Company was a liability insurance company that issued an umbrella liability insurance policy to Zurn Industries, Inc. for the period beginning on April 1, 1978 through April 1, 1979.

22.    Aetna Casualty and Insurance Company was a liability insurance company that issued first layer umbrella liability insurance policies to Zurn Industries, Inc. for the period beginning on April 1, 1980 through April 1, 1986.

23.    Royal Indemnity was a liability insurance company that issued a second layer umbrella liability insurance policy to Zurn Industries, Inc. for the period beginning on April 1, 1983 through April 1, 1984.

24.    New England Insurance Company was a liability insurance company that issued a second layer umbrella liability insurance policy to Zurn Industries, Inc. for the period beginning on April 1, 1984 through April 1, 1985.

25.    During the policy periods, Zurn Industries, Inc. was headquartered in Erie, Pennsylvania, and policies described in this lawsuit were delivered to Zurn in Erie, Pennsylvania.

MUS3012702.1

26.    Upon information and belief, Allstate Insurance Company is an insurance company organized under the laws of the state of Illinois, with its principal place of business in Northbrook, Illinois, and therefore qualifies as a citizen of Illinois.

27.    Upon information and belief, Allstate Insurance Company is the successor in interest to Northbrook Excess and Surplus Insurance Company ("NESCO"), which was formerly known as Northbrook Insurance Company. Upon information and belief, in 1985, NESCO merged with Allstate, leaving Allstate as the sole survivor and successor in interest to all rights and responsibilities pursuant to historical policies issued by Northbrook Insurance Company.

28.    Upon information and belief, Travelers Casualty and Surety Company is an insurance company organized under the laws of the state of Connecticut, with its principal place of business in Hartford, Connecticut, and therefore qualifies as a citizen of Connecticut.

29.    Upon information and belief, Travelers is the successor in interest to Aetna Casualty and Surety Company.  Upon information and belief, in 1996, Aetna sold its property-casualty operations to Travelers, leaving Travelers as the sole survivor and successor in interest to all rights and responsibilities pursuant to historical policies issued by Aetna Casualty and Surety Company.

30.    Upon information and belief, The Hartford Financial Services Group, Inc. is an insurance company organized under the laws of the state of Delaware, with its principal place of business in Hartford, Connecticut, and therefore qualifies as a citizen of Connecticut.

MUS3012702.1

31.     Upon information and belief, Hartford is the parent company in control of both First State Insurance Company, who purchased Royal Indemnity, and New England Insurance Company, which companies have principal places of business in Hartford, Connecticut and Boston, Massachusetts, respectively.

32.     This Court has the power to declare the rights and obligations of the parties to this lawsuit because an actual controversy exists pursuant to 28 U.S.C. § 2201.

33.     Subject matter jurisdiction over exists in this Court pursuant to 28 U.S.C. § 1332 because: 1) the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and 2) Zurn and the Defendants are citizens of different states.

34.     Venue, pursuant to 28 U.S.C. § 1391, exists in the United States District Court for the Western District of Pennsylvania because the subject policies described in this lawsuit were issued and delivered to Zurn in Erie, Pennsylvania.

### FACTUAL ALLEGATIONS

A.      **The Northbrook Policy.**

35.     Northbrook Insurance Company issued an umbrella liability policy to Zurn Industries, Inc. and all of its divisions and subsidiaries for the policy period beginning April 1, 1978 through April 1, 1979 (hereinafter referred to as the "Northbrook Policy"). The Northbrook Policy bears policy number 63 004 463. A copy of the Northbrook Policy in Zurn's possession is attached hereto as **Exhibit A**.

36.     Endorsement 17 of the Northbrook Policy changed the identification of "Company" within the policy to "Northbrook Excess and Surplus Insurance

MUS3012702.1

Company." Upon information and belief, this endorsement coincided with Northbrook's change of name from "Northbrook Insurance Company" to "Northbrook Excess and Surplus Insurance Company."

37.    The Northbrook Policy had limits of $9 million per each occurrence and in the aggregate.

38.    The Northbrook Policy was excess over a primary commercial general liability policy, which was issued to Zurn by Liberty Mutual Insurance (hereinafter referred to as "Liberty Mutual"), and which had limits of $2,000,000 per occurrence and in the aggregate for bodily injury from asbestos (as described below) (the "Liberty Mutual Policy").

39.    The minimum deposit premium for the Northbrook Policy was $500,000. Endorsement 16 shows that the earned premium was only $482,335.00. Upon information and belief, since the minimum premium was $500,000, Northbrook received, accepted and retained the entire $500,000 premium paid by Zurn.

40.    The insuring agreement of the Northbrook Policy reads as follows:

    I.   Coverage.

        The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned to indemnify the insured for all sums which the insured shall be obligated to pay by reason of the liability

        A.  imposed upon the Insured by law; or

        B.  assumed under contract or agreement by the Named Insured;

        to damages on account of

        A.  Personal Injuries

        B.  Property Damage

MUS3012702.1

C.  Advertising Liability

caused by or arising out of each Occurrence happening anywhere in the world.

Exh. A, p. 031.

41.    Section II, Limit of Liability, states:

The Company shall be liable for Ultimate Net Loss in excess of either

A.  the limits of the underlying insurances as set out in the attached SCHEDULE OF UNDERLYING POLICIES in respect of each Occurrence covered by said underlying insurances, or

B.  the retained limit as stated in item 2 (c) if the Occurrence is not covered by said underlying insurances (hereinafter called underlying limits),

And then only up to a further sum as stated in Item 2(a) of the Declarations in all in respect of each Occurrence, subject to a limit as stated in Item 2(b) of the Declarations in the aggregate

A.  to each annual period during the currency of this policy; but

B.  separately in respect of Products Liability and in respect of Personal Injury (fatal or nonfatal) by occupational disease sustained by any employees of the Insured.

Exh. A, p. 031.

42.    Furthermore, the Northbrook Policy states that, in the event of exhaustion of the underlying policy, the Northbrook Policy will continue as underlying insurance:

II.  LIMIT OF LIABILITY

***

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying limits by reason of losses paid thereunder, this policy, subject to all of its terms and conditions shall:

A.  in the event of a reduction pay the excess of the reduced underlying limit; or

MUS3012702.1

>B. in the event of exhaustion continue in force as underlying insurance.

Exh. A, p. 031.

43. The Northbrook Policy defines Ultimate Net Loss to include the obligation to pay attorneys' fees associated with the defense of bodily injury lawsuits, as follows:

> VIII.    ULTIMATE NET LOSS
>
> "Ultimate Net Loss" shall mean the total sum which the Insured or the Insured's underlying insurance as scheduled or both, become obligated to pay by reason of Personal Injuries, Property Damage or Advertising Liability claims, either through adjudication or compromise, and shall also include expenses consisting of hospital, medical and funeral charges, all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any Occurrence covered hereunder. The salaries of the Insured's or of any underlying insurer's permanent employees shall be excluded.

Exh. A, p. 033.

44. The policy also contains a number of endorsements, including endorsement 5, which reads as follows:

> It is hereby understood and agreed that in the event the insured suffers a loss which is covered under the policies of the underlying insurances as set out in the schedule attached to this policy, the excess of which would be payable under this policy, except for the terms and conditions of this policy which are not consistent with the underlying insurances, then notwithstanding anything contained in this policy to the contrary this policy shall be amended to follow and be subject to the terms and conditions of such underlying insurances in respect of such paid loss.
>
> The foregoing shall not, however, apply to:

10

MUS3012702.1

1. Any coverage given under the underlying insurance for limits less than the full limit of the said underlying policy as stated in the schedule hereto.

2. Any nuclear incident exclusion clause attached to this policy.

3. Any seepage and pollution exclusion clause attached to this policy.

4. Exclusion (a) of this policy.

5. Exclusion (c) of this policy.

6. Exclusion (e) of this policy.

7. Any specific exclusions which are additional to those already incorporating the wording of this policy.

8. Any additional insured including hereunder subsequent to the inception date of this policy where separate underlying insurances are carried apart from those set out in the schedule of underlying insurances unless and until the details of the said underlying insurances have been approved by the company.

It is further understood and agreed that the coverage provided by the underlying general liability policy no. TBA with the Liberty Mutual Insurance Co. will not be further extended without obtaining agreement from the company. In the event the company does agree to such further extension, coverage will continue as if such extension had not been granted.

Exh. A, p. 008 (emphasis added).

**B.    The Underlying Liberty Mutual Policy.**

45.    Liberty Mutual issued a commercial general liability, policy number LG1-181-014745-168, to Zurn Industries, Inc. for the policy period April 1, 1978 to April 1, 1979 (hereinafter referred to as the "Liberty Mutual Policy"). The Liberty Mutual Policy carried a combined single limit of $2,000,000. A copy of the Liberty Mutual Policy in Zurn's possession is attached hereto as **Exhibit B**.

MUS3012702.1

46.   The Liberty Mutual Policy sits directly beneath, and is primary to, the Northbrook Policy for umbrella liability.

47.   Upon information and belief, the Liberty Mutual Policy contained the following insuring agreement:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A. bodily injury or
>
> Coverage B. property damage
>
> to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted.

The above language has been taken from the policy forms, which are included in other commercial general liability policies written by Liberty Mutual for Zurn. Upon information and belief, the policy forms attached hereto as **Exhibit C** would have formed a part of the Liberty Mutual Policy.

48.   Liberty Mutual had a duty to defend Zurn in addition to its limits of liability. In other words, amounts paid by Liberty Mutual for the defense of Zurn in the asbestos bodily injury claims did not erode Liberty Mutual's limit of liability. The relevant defense langue is as follows:

> Supplementary Payments.

MUS3012702.1

> The company will pay, in addition to the applicable limit of liability:
>
> (a) all expenses incurred by the company, all cost taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company liability thereon;

Exh. B, p. 2.

49.     Liberty Mutual in fact paid defense costs in addition to the limits of liability—the only payments made by Liberty Mutual which eroded the applicable limit of liability for the Liberty Mutual Policy were payments made to indemnify asbestos claimants.

**C.     The Aetna Policies.**

50.     Aetna Casualty and Insurance Company issued first layer umbrella liability insurance policies to Zurn Industries, Inc., and all of its divisions and subsidiaries for the policy period beginning April 1, 1980 to April 1, 1986.

51.     The Aetna policies bear policy numbers 03 XS 1787 SCA; 03 XS 1790 SCA; and 03 XS 1797 SCA.  Copies of the Aetna policies in Zurn's possession are collectively attached hereto as **Exhibit D**.

52.     The Aetna policies 03 XS 1787 SCA and 03 XS 1790 SCA had limits of $10 million per each occurrence and in the aggregate.

53.     The Aetna policy 03 XS 1797 SCA had limits of $20 million per each occurrence and in the aggregate.

MUS3012702.1

54. The Aetna policies were excess over primary commercial general liability policies, which were issued to Zurn by Travelers, and which had limits of $2,000,000 per occurrence and in the aggregate for bodily injury from asbestos (as described below) (the "Travelers policies").

55. Upon information and belief, Aetna received, accepted and retained the premiums paid by Zurn for the Aetna policies.

56. The insuring agreement of the Aetna policies 03 XS 1787 SCA and 03 XS 1790 SCA reads as follows:

> 2.1    Coverage.
>
> The Company will indemnify the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of:
>
> A. Personal Injury,
>
> B. Property Damage, or
>
> C. Advertising Offense
>
> to which this policy applies, caused by an occurrence anywhere in the world ... :
>
> ***

Ex. C, Section 2.1.

57. The insuring agreement of the Aetna policy 03 XS 1797 SCA reads as follows:

> 2.1    Coverage.
>
> The Company will pay on behalf of the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of:
>
> A. Personal Injury,

14

MUS3012702.1

B. Property Damage, or

C. Advertising Offense

to which this policy applies, caused by an occurrence anywhere in the world ... :

\*\*\*

Ex. C, Section 2.1.

58.　　Section 4, Limits of Liability in all of the Aetna policies, states:

> Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought on account of personal injury, property damage or advertising offence, the company's liability for ultimate net loss, including ultimate net loss for care and loss of services, resulting from any one occurrence shall be limited to the amount stated in Section 1 as applicable to "each occurrence": provided, however, that the company's liability shall be further limited to the amount stated in Section 1 as "aggregate annual" with respect to all ultimate net loss, including ultimate net loss for care and loss of services, because of personal injury or property damage which occurs during each annual period while this policy is in force commencing from its effective date, and arises out of (1) the products hazard or the completed operations hazard or (2) occupational disease of employees of the insured, such aggregate limit to apply separately to (1) and (2).

Ex. C, Section 4.

59.　　Section 6.7 of the Aetna policies state:

> The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance available to the insured and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise, unless such other insurance specifically applies as excess insurance over the limits of liability provided in this policy.

Ex. C., Section 6.7

MUS3012702.1

60.     The Aetna policies define "ultimate net loss" as follows:

> 5.13 "ultimate net loss" means the sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable by either adjudication or settlement with the written consent of the company, after making proper deduction for all recoveries and salvages collectible.

Ex. C, Section 5.13.

61.     The Aetna policies state as follows:

> 2.3 DEFENSE OF SUITS NOT COVERED BY OTHER INSURANCE
>
> (a) The company shall defend any suit seeking damages which are not payable on behalf of the insured under the terms of the policies of Underlying Insurance described in Section 1 or any other available insurance
>
>   (1) because such damages are not covered thereunder, or
>
>   (2) because of exhaustion of an underlying aggregate limit of liability by payment of claims
>
> ***
>
> (b) The company will pay with respect to any suit defended under Section 2.3(a) in addition to the amount of ultimate net loss payable:
>
>   (1) all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest on the entire amount of any judgment therein which accrues after the entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the amount of the company's liability thereon;

62.     Travelers has paid Zurn's asbestos claims and lawsuits since 2003 pursuant to a settlement agreement entered into with Zurn at that time. As of September 27, 2018, Travelers has represented exhaustion through payments of judgments and settlements for

MUS3012702.1

the relevant policies. Only payments for settlements (indemnity) eroded Travelers limits under the umbrella policies.

**D.      The Hartford Policies.**

63.      Royal Indemnity Company ("Royal") issued an excess umbrella liability insurance policy to Zurn Industries, Inc., and all of its divisions and subsidiaries for the policy period beginning April 1, 1983 to April 1, 1984 (the "Royal Policy").

64.      The Royal Policy bears policy number RED102439.  A copy of the Royal Policy in Zurn's possession is attached hereto as **Exhibit E**.

65.      The Royal Policy had limits of $15 million per each occurrence and in the aggregate.

66.      The Royal Policy was a second layer umbrella excess over the first layer umbrella insurance policy 03XS1790SCA, discussed above, which was issued to Zurn by Aetna.

67.      Upon information and belief, Royal received, accepted and retained the premiums paid by Zurn for the Royal Policy.

68.      The insuring agreement of the Royal Policy reads as follows:

> Coverage is amended to be read as follows:
>
>       To pay on behalf of the Insured the Limits of Liability in excess of the Underlying Limits of Liability, both as shown in the Declarations, for all sums which shall become legally obligated to pay by reason of the liability imposed upon the Insured by law, or assumed by the Insured under contract or agreement, on account of: (a) Personal Injury, (b) Property Damage, (c) Advertising Liability, arising out of the

MUS3012702.1

> hazards covered by and as defined in the Underlying
> Umbrella Policy(ies) as shown in Item 5 of the Declarations.

Ex. E, New York Amendatory Endorsement.

69. Revised Endorsement #5 provides that the Royal Policy "is warranted to the exact terms and conditions as the underlying Umbrella Liability policy issued by the Aetna Casualty & Surety Company, Policy No. 03XS1787SCA except with respect to limit of liability and premium."

Ex. E, Revised Endorsement #5.

70. Section 2, Maintenance of Underlying Umbrella Insurance, reads as follows:

> This policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in Item 5 of the Declarations prior to the happening of an occurrence for which claim is made hereunder.
>
> It is a condition of this policy that the Underlying Umbrella Policies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this policy or by the operation of Condition of the Underlying Umbrella policies.

Ex. E, Section 2.

71. Upon information and belief, First State Insurance Company assumed the liabilities and obligations of the Royal Policy, and First State Insurance Company is a subsidiary wholly controlled by its parent company, Hartford.

MUS3012702.1

72.     New England Insurance Company ("New England") issued an excess umbrella liability insurance policy to Zurn Industries, Inc., and all of its divisions and subsidiaries for the policy period beginning April 1, 1984 to April 1, 19845 (the "New England Policy").

73.     The New England Policy bears policy number NE000057.  A copy of the New England Policy in Zurn's possession is attached hereto as **Exhibit F**.

74.     The New England Policy had limits of $15 million per each occurrence and in the aggregate.

75.     The New England Policy was a second layer umbrella excess over the first layer umbrella insurance policy 03XS1790SCA, discussed above, which was issued to Zurn by Aetna.

76.     Upon information and belief, New England received, accepted and retained the premiums paid by Zurn for the New England Policy.

77.     The insuring agreement of the New England Policy reads as follows:

> The Company agrees to pay on behalf of the Insured for all sums excess of the applicable limits of liability of the underlying insurance inserted in Item 6 in the Declarations; provided that his policy shall apply only to those coverages shown in the Insuring Agreement; provided further that the limit of the Company's liability under this policy shall not exceed the applicable amount inserted in Item 4, Limits of Liability, as shown in the Declarations.

> The provisions of the immediate underlying policy are incorporated as a part of this policy except for any obligation to investigate and defend any pay for cost and expenses incident to the same, the amount of the limits of liability, any "other insured" provisions therein which hare inconsistent with the provisions of this policy.

MUS3012702.1

      ***

Ex. F, New York Amendatory Endorsement.

    78.    Endorsement #2 provides that the New England Policy "is warranted to the exact terms and conditions as the underlying Umbrella Liability policy issued by the Aetna Casualty & Surety Company, Policy No. 03XS1787SCA except with respect to limit of liability and premium."

Ex. E, Endorsement #2.

    79.    Section 2, Maintenance of Underlying Umbrella Insurance, reads as follows:

> This policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies stated in Item 5 of the Declarations prior to the happening of an occurrence for which claim is made hereunder.

> It is a condition of this policy that the Underlying Umbrella Policies shall be maintained in full effect during the currency hereof except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this policy or by the operation of Condition of the Underlying Umbrella policies.

Ex. F, Section 2.

    80.    Upon information and belief, New England Insurance Company is a subsidiary wholly controlled by its parent company, Hartford.

MUS3012702.1

E.     **The Asbestos Bodily Injury Claims Against Zurn.**

81.     A complaint typical of the asbestos claims against Zurn is attached as **Exhibit G**.

82.     Zurn is a defendant in thousands of such lawsuits, primarily based upon Zurn's historical manufacture of boilers which allegedly incorporated asbestos parts.

83.     The vast majority of these lawsuits contain allegations in which the plaintiff claims exposure to asbestos that either pre-dates the Northbrook Policy, coincides with the Northbrook Policy, or is unknown. In any case, these allegations trigger Northbrook's obligations under the Northbrook Policy.

84.     The same is true of the all the Policies described above.

F.     **Zurn's attempts to get Allstate to respond to its policy obligations.**

85.     In 2003, Zurn, Liberty Mutual and Travelers finalized a cost sharing agreement whereby Liberty Mutual and Travelers shared in the cost of defense and indemnity related to the asbestos bodily injury lawsuits.

86.     Liberty Mutual fully exhausted its limits of liability pursuant to that cost sharing agreement in 2009.

87.     Since 2009, Travelers has largely funded Zurn's asbestos defense program alone with its remaining policy limits.

88.     On October 10, 2016, Zurn initiated a conference call with Allstate in order to commence discussions about including Allstate in a cost sharing agreement with Travelers to fund the asbestos lawsuits. Representatives of Travelers also participated in that conference call.

MUS3012702.1

89.     On that call, Zurn and Travelers provided Allstate with basic information about the nature of the asbestos claims against Zurn, and information about Zurn's defense program. Also on that call, Allstate requested loss runs demonstrating exhaustion of all underlying policies.

90.     On November 1, 2016, Zurn mailed loss runs from Liberty Mutual to Allstate which demonstrated the exhaustion of the underlying policies, including the Liberty Mutual Policy.

91.     After sending Allstate the loss runs, Zurn did not hear from Allstate for approximately five months.

92.     On April 11, 2017, Zurn contacted Allstate to remind Allstate about the loss runs it previously provided and of Zurn's request that it begin defending and indemnifying Zurn in the underlying asbestos lawsuits along with Travelers.

93.     After a few e-mails and phone calls, Allstate agreed to meet with Zurn and Travelers on May 23, 2017. Prior to the meeting, Zurn inquired whether Allstate needed additional information in order to be prepared to discuss the general structure of a cost sharing agreement at the May 23, 2017 meeting.

94.     Allstate did not respond to that request. Instead, Allstate appeared at the May 23, 2017 meeting and indicated that, prior to joining in a cost sharing agreement, Allstate would have personnel audit a random selection of Zurn's historical cases in the office of national coordinating defense counsel.

95.     At the May 23, 2017 meeting, Zurn communicated its position that the Northbrook Policy follows the form of the Liberty Mutual Policy beneath it and, as

such, the Northbrook Policy should pay defense costs without erosion of the limit of liability. Allstate indicated that it disagreed. Both sides reserved their rights on that argument, but agreed to move forward with the process of eliminating other potential disputes, such as underlying exhaustion.

96.     On May 23, 2017, just after the meeting ended, Zurn e-mailed its national coordinating defense counsel (Cosmich Simmons) and copied Allstate on the e-mail. In that e-mail, Zurn introduced Allstate's representative to its national coordinating defense counsel, and instructed Cosmich Simmons to provide Allstate with data per the request of Allstate. It was agreed that Allstate would determine which data it wanted.

97.     Also, at the May 23, 2017 meeting, Allstate communicated that it was interested in auditing old files to confirm that the Liberty Mutual Policy, underlying the Northbrook Policy, was exhausted. Allstate indicated that it would first review data to make certain that an audit of old files was necessary.

98.     Upon information and belief, Allstate and Cosmich traded voicemails in the weeks thereafter. Ultimately, Allstate informed Cosmich that it would be in touch once it determined what data it wanted.

99.     On June 16, 2017, Zurn sent an e-mail following up on the provision of data by Cosmich Simmons to Northbrook, indicating that Cosmich Simmons can provide Allstate with a list of data fields that it tracks, and that Allstate should follow up directly with Cosmich with regard to which data it was interested in reviewing.

100.    Also, on June 16, 2017, Zurn provided Allstate with the 2016 costs for defense and indemnity associated with its asbestos program.

MUS3012702.1

101.    On June 19, 2017, Cosmich Simmons provided Allstate with the list of data fields referred to in the June 16, 2017 e-mail from Zurn representatives.

102.    On July 28, 2017, Allstate provided Cosmich Simmons with a list of data fields which it wished to review.

103.    Upon information and belief, the data requested by Allstate was provided to Allstate by Cosmich Simmons on or about August 3, 2017.

104.    Zurn did not hear from Allstate again until October 2017, when Zurn followed up regarding the status of Allstate's review of the data that it provided. At that time, Allstate advised that they had not yet completed their review of the data provided on August 3, 2017, but that Allstate did believe that it would travel to Jackson, Mississippi to conduct an audit of certain files.

105.    At that time, Zurn again proposed a meeting for November 2017 to discuss the general structure of a cost sharing agreement between Allstate and Travelers. The meeting was ultimately scheduled for November 10, 2017, and with Travelers and Allstate attending.

106.    At the meeting on November 10, 2017, Zurn and Travelers communicated to Allstate that Allstate's delay (it had been over a year since Zurn initially asked Allstate to become involved in a cost sharing agreement) was vexatious and unreasonable.

107.    At that meeting, Allstate confirmed its intent to travel to Jackson, MS for an audit of 300 random files to confirm exhaustion. Zurn communicated that it had no

24

MUS3012702.1

objection, but that the audit needed to occur quickly given Allstate's already unreasonable period of delay.

108.    Also, at the November 10, 2017 meeting, Zurn requested that Allstate formally set forth any coverage positions that it had (and Zurn indicated its belief that no coverage issues existed).

109.    By the end December 2017, Allstate had not set forth any formal coverage position with regard to the Northbrook Policy. Nor had Allstate arranged for any individuals to travel to Jackson, MS to audit historical Zurn files.

110.    Therefore, Zurn e-mailed Allstate on December 29, 2017, to remind Allstate of the importance of getting its audit accomplished rapidly due to Allstate's delay. The e-mail explicitly stated, "As we discussed, if Allstate intends to conduct an audit of old Zurn settlements, it is imperative that Allstate makes arrangements with Clif Jeffries to do so as soon as possible. Allstate personnel may contact Mr. Jeffries directly to set up a meeting. Documentation of exhaustion which enables an audit was provided months ago, yet no action has been taken to this point. The delay is unreasonable."

111.    The December 29, 2017 e-mail further stated, with regard to a suggested meeting in January of 2018, "As Zurn does not believe any coverage issues exist, Zurn requests that, prior to the meeting, Allstate provide a list of issues so that Zurn and Allstate can be as productive as possible at that meeting."

112.    The meeting was ultimately scheduled for January 23, 2018.

MUS3012702.1

113.    Because Zurn had not received any formal coverage position from Allstate, Zurn e-mailed again on January 11, 2018, stating, "Just a reminder that Zurn does need a letter/e-mail prior to the upcoming meeting listing any coverage issues that [Allstate] believes exists. We'd like the meeting to be a productive exchange of ideas."

114.    Zurn did not receive any e-mail or letter setting forth the coverage issues according to Allstate.

115.    During the meeting on January 23, 2018, Allstate expressed its view that endorsement 5 of the Northbrook Policy did not obligate Northbrook to pay defense costs without erosion to the limits of liability. Zurn and Allstate discussed various options for potential resolution.

116.    At that meeting, Allstate confirmed that it would be sending representatives to Jackson, MS, to the office of national coordinating defense counsel to audit historical case files to confirm exhaustion.

117.    Also, at the meeting, Zurn expressed its desire for Northbrook to involve itself in the cost sharing agreement, albeit pursuant to its own view of its policy obligation, and to simultaneously enter into a reservation of rights agreement whereby both parties would reserve their arguments to be resolved by either agreement or litigation at a later time. In doing so, Zurn sought a way to avoid a break in its defense program if Travelers exhausted its limits prior to reaching an agreement with Allstate.

118.    Allstate would not commit to any arrangement, but another meeting was scheduled for February 13, 2018.

MUS3012702.1

119.    Upon information and belief, on January 29, 2018, more than a year after Zurn initiated communications with Allstate, Allstate representatives finally traveled to Jackson, MS to conduct an audit of old Zurn files.

120.    At the February 13, 2018 meeting, Zurn and Allstate again discussed the same topics: how defense costs paid by Allstate affected the limits of the Northbrook Policy, and whether Allstate would agree to fund Zurn's defense and indemnity according to its own view of coverage and the parties could litigate the obligation at a later date. Again, Allstate never provided a formal coverage position (although shortly after that meeting, the parties exchanged case citations supporting each of their positions).

121.    At the conclusion of the February 13, 2018 meeting, Allstate agreed to consider various options for resolution, including coming into the cost sharing agreement, eroding its limits for payment of defense costs, and reserving rights to argue about the policy obligations later.

122.    As of the date of the filing of this complaint, Allstate has not indicated one way or the other whether it will fund Zurn's defense and indemnity under its own theory of coverage and agree to a mutual reservation of rights.

123.    As of the date of the filing of this complaint, nearly two years after initiating discussions with Allstate about Zurn's defense and indemnity in its asbestos bodily injury lawsuits, Allstate has never provided a formal coverage position to Zurn and has only provided Zurn with a rudimentary reservation of rights/progress type of

MUS3012702.1

communication. Therefore, at this point, any coverage issue asserted by Allstate other than how the Northbrook Policy pays defense costs is disingenuous.

124.   As demonstrated by the above, the pace of Allstate's investigation has been unreasonably slow.

125.   Upon information and belief, Allstate has deliberately been slow in its investigation in an effort to apply pressure to Zurn to get Zurn to capitulate to Allstate's coverage positions.

126.   If Zurn was not receiving defense and indemnity from other insurers, the result of Allstate's unreasonable delay would be catastrophic for Zurn: between the last quarter of 2016 (when Zurn initially made contact with Allstate) and the first quarter of 2018, $4,449,704 has been paid toward settlements of Zurn asbestos bodily injury claims and $13,160,504 has been spent defending those claims.

G.   **Travelers informs Zurn it has exhausted its policy obligations.**

127.   As set forth above, in 2003, Zurn, Liberty Mutual and Travelers entered into a cost sharing agreement whereby Liberty Mutual and Travelers shared in the cost of defense and indemnity related to the asbestos bodily injury lawsuits.

128.   Liberty Mutual exhausted its coverage years ago and since 2009, Travelers has largely funded Zurn's asbestos defense program alone with its remaining policy limits.

129.   In or about 2015, Travelers represented that all of its available limits had been exhausted under Aetna Policies 03 XS 1787 SCA and 03 XS 1790 SCA, and that the only Aetna Policy with any remaining limits was Aetna Policy 03 XS 1797 SCA.

MUS3012702.1

Travelers continued its defense and indemnity of Zurn for the asbestos claims and lawsuits using limits available under Aetna Policy 03 XS 1797 SCA.

130.    However, on September 27, 2018, Travelers represented to Zurn that it has exhausted its full limit of liability, including all amounts remaining under Aetna Policy 03 XS 1797 SCA.

131.    As such, Allstate's unreasonable delay and actions have put Zurn in a position where it may be exposed to incurring massive out-of-pocket defense and settlement costs in defending asbestos-bodily injury claims.

132.    In the alternative, if Travelers is not in fact exhausted, Travelers must continue to defend and indemnify Zurn until Travelers can show proper exhaustion.

133.    On October 3, 2018, Zurn sent communications to Allstate and Hartford demanding that each undertake to defend and indemnify Zurn in the asbestos claims and lawsuits, pursuant to authority contained in *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29 (1993) and *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1454 (3d Cir. 1996).

134.    Neither Allstate nor Hartford has affirmatively represented that it will defend and indemnify Zurn in the asbestos claims and lawsuits.

## COUNT I – DECLARATORY JUDGMENT

### (Against Allstate only)

135.    Zurn hereby realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

MUS3012702.1

136.    The vast majority of asbestos bodily injury claims allege bodily injury based on the claimant's contact with asbestos that allegedly came from Zurn boilers.

137.    So long as an asbestos claimant's allegations allege either: 1) potential first exposure to asbestos from Zurn boilers which pre-dates the inception of the Northbrook Policy; 2) potential first exposure to asbestos that coincides with the Northbrook Policy's policy period; or 3) potential first exposure which is unknown, but which could plausibly have occurred prior to or during the Northbrook Policy's policy period; then Allstate has an obligation to defend Zurn without erosion to its limit of liability pursuant to the Northbrook Policy.

138.    Endorsement 5 of the Northbrook Policy, reads in relevant part as follows:

> It is hereby understood and agreed that in the event the insured suffers a loss which is covered under the policies of the underlying insurances as set out in the schedule attached to this policy, the excess of which would be payable under this policy, except for the terms and conditions of this policy which are not consistent with the underlying insurances, **then notwithstanding anything contained in this policy to the contrary this policy shall be amended to follow and be subject to the terms and conditions of such underlying insurances in respect of such paid loss.**

Ex. A, p. 7 (emphasis added).

139.    Pursuant to the following policy language, Liberty Mutual's defense obligation did not erode the limit of liability under its policy:

> Supplementary Payments.
>
> The company will pay, in addition to the applicable limit of liability:
>
> (a) all expenses incurred by the company, all cost taxed against the insured in any suit defended by the company and all

MUS3012702.1

> interest on the entire amount of any judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company liability thereon;

Ex. B, p. 2.

140.    Pursuant to the language of Endorsement 5 in the Northbrook Policy, Allstate's obligation to pay for Zurn's defense costs is in addition to the limits of its liability. This is because **Allstate's policy is amended—notwithstanding anything contained in the policy to the contrary—to be identical to Liberty Mutual's obligation to pay defense costs.**

141.    Liberty Mutual's obligation to pay defense costs was in addition to the limits of liability and did not erode the available limits of liability.

142.    Because the Northbrook policy follows form to Liberty Mutual's, Northbrook's obligation to defend Zurn should not erode its limit of liability. Only Allstate's obligation to indemnify Zurn under the Northbrook policy should erode the policy's limit of liability.

WHEREFORE, Zurn Industries, LLC, seeks an order from this Honorable Court in its favor and against Allstate declaring:

A.    For a declaration finding that asbestos bodily injury claims against Zurn Industries, LLC, are covered under the Northbrook Policy so long as those claims allege bodily injury from contact with asbestos 1) where potential first exposure to asbestos from Zurn boilers pre-dates the inception of the Northbrook Policy; 2) where potential first exposure to asbestos coincides with the Northbrook Policy's policy period; or 3) where potential first exposure which is unknown, but which could plausibly have occurred prior to or during the Northbrook Policy's policy period;

MUS3012702.1

B.      For a declaration finding that the Northbrook Policy follows the form of the Liberty Mutual Policy, and finding that as such, the Northbrook Policy's payment obligation for defense costs will not erode Allstate's limits of liability; and

C.      Any other relief that this Honorable Court deems necessary and proper.

## COUNT II – ALTERNATIVELY, AMBIGUITY

### (Against Allstate only)

143.    Zurn hereby realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

144.    The allegations contained within Count II are pled in the alternative and without prejudice to Zurn's previous allegations, or subsequent allegations, in this complaint.

145.    Endorsement 5 of the Northbrook Policy, reads in relevant part as follows:

> It is hereby understood and agreed that in the event the insured suffers a loss which is covered under the policies of the underlying insurances as set out in the schedule attached to this policy, the excess of which would be payable under this policy, except for the terms and conditions of this policy which are not consistent with the underlying insurances, **then notwithstanding anything contained in this policy to the contrary this policy shall be amended to follow and be subject to the terms and conditions of such underlying insurances in respect of such paid loss.**

Ex. A, p. 7 (emphasis added).

146.    The above-referenced provision of Endorsement 5 of the Northbrook Policy unequivocally obligates Allstate to respond to asbestos losses in exactly the same way that Liberty Mutual did, including, but not limited to, following Liberty Mutual's

32

MUS3012702.1

defense obligations, under which Liberty Mutual had an obligation to defend Zurn without erosion to its limit of liability associated with defense payments.

147.    Assuming *arguendo* that this honorable Court finds Endorsement 5 language is not unequivocal, Zurn avers that the language of Endorsement 5 is ambiguous because it is reasonably susceptible to different meanings, including, but not limited to, the meaning asserted by Zurn.

148.    When an insurance policy term is ambiguous, it is to be construed in favor of the insured and against the insurer.

WHEREFORE, Zurn Industries, LLC, seeks an order from this Honorable Court in its favor and against Allstate declaring:

A.    For a declaration finding that asbestos bodily injury claims against Zurn Industries, LLC, are covered under the Northbrook Policy so long as those claims allege bodily from contact with asbestos 1) where potential first exposure to asbestos from Zurn boilers pre-dates the inception of the Northbrook Policy; 2) where potential first exposure to asbestos coincides with the Northbrook Policy's policy period; or 3) where potential first exposure which is unknown, but which could plausibly have occurred prior to or during the Northbrook Policy's policy period;

B.    For a declaration finding that the Northbrook Policy follows the form of the Liberty Mutual Policy, and finding that as such, the Northbrook Policy's payment obligation for defense costs will not erode Allstate's limits of liability; and

C.    Any other relief that this Honorable Court deems necessary and proper.

## COUNT III – BREACH OF CONTRACT

### (Against Allstate only)

149.    Zurn hereby realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

MUS3012702.1

150.    Pursuant to the terms of the Northbrook Policy, Allstate must defend and indemnify Zurn in the asbestos bodily injury claims where: 1) the underlying Liberty Mutual primary policy has been exhausted; and 2) the asbestos bodily injury claim comes within the coverage of the Northbrook Policy.

151.    The Liberty Mutual Policy, policy no. LG1-181-014745-168, which directly underlies the Northbrook Policy, has been exhausted through payment of all limits available under that policy.

152.    The vast majority of asbestos bodily injury claims alleged against Zurn trigger the obligations of the Northbrook Policy.

153.    Zurn has requested, on numerous occasions, and over the course of a two years that Allstate involve itself in the defense and indemnity of the asbestos bodily injury lawsuits pending against Zurn that trigger the Northbrook Policy.

154.    In response to those requests, Allstate indicated that it must investigate Zurn's defense program, and confirm exhaustion of the Liberty Mutual Policy.

155.    After nearly two years of investigation, Allstate has never defended or indemnified Zurn in any of the asbestos bodily injury lawsuits pending against Zurn.

156.    After nearly two years of investigation, Allstate has never even set forth, formally, its position with regard to the coverage available under the Northbrook Policy.

157.    Allstate has breached its obligation to defend and indemnify Zurn in the asbestos bodily injury claims and lawsuits.

MUS3012702.1

158.   Zurn has been damaged by Allstate's breach of its obligations because the limits of liability available to Zurn from insurers currently defending and indemnifying Zurn have been depleted, thereby exposing Zurn to an uncovered period.

159.   Upon information and belief, other insurers who have paid for Zurn's defense and indemnity in the asbestos bodily injury lawsuits and claims also have a right of equitable contribution against Allstate based on Allstate's failure to defend and indemnify Zurn pursuant to the Northbrook Policy.

WHEREFORE, Zurn Industries, LLC, seeks an order from this Honorable Court in its favor and against Allstate finding:

A.   That Allstate has breached its obligation to defend Zurn in the asbestos bodily injury claims and lawsuits, or, alternatively, to pay for Zurn's defense in the asbestos bodily injury claims and lawsuits;

B.   That Allstate has breached its obligation to indemnify Zurn in the asbestos bodily injury claims and lawsuits;

C.   That Allstate must pay Zurn compensatory damages in an amount to be proven at trial; and

D.   That Allstate is liable for any other relief deemed by the Court to be necessary and proper.

## COUNT IV – BAD FAITH LIABILITY - 42 Pa. Stat. Stat. Ann. § 8371

### (Against Allstate only)

160.   Zurn hereby realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

MUS3012702.1

161.   As Zurn's insurer, Allstate has an obligation to act with good faith and fair dealing toward Zurn and afford Zurn's interests the same weight as it gives its own when making determinations about its handling of claims against Zurn.

162.   At the time of filing of this complaint, it has been approximately two years since Zurn first requested that Allstate defend and indemnify Zurn as part of a cost sharing agreement.

163.   On April 27, 2018, for the first time since being notified of Zurn's requests that Allstate defend and indemnify Zurn in this case, Allstate offered to defend and indemnify Zurn, but only if Allstate's defense eroded its policy limits.

164.   Allstate's delay in setting forth its coverage position to Zurn is patently unreasonable. *See, e.g.*, 31 Pa. Code § 146.6.

165.   Allstate's delay in responding to whether it will enter into an interim funding/reservation of rights agreement is patently unreasonable.

166.   Upon information and belief, Allstate's delay is intentional.

167.   Upon information and belief, Allstate maximizes its own profits by holding onto monies longer, instead of paying those monies out on behalf of their insureds.

168.   Upon information and belief, Allstate's delay is also calculated to put its insured at a negotiating disadvantage. It is designed to put Zurn in a situation in which Zurn is doubtful about whether the thousands of claims and lawsuits pending against Zurn will be covered by insurance, thereby causing the insured financial hardship, and

MUS3012702.1

compelling the insured to accept less than what the insured is contractually entitled to from Allstate.

169.     Moreover, by trying to coerce the insured into a compromise deal, Allstate knowingly puts its insured at a disadvantaged position with regard to other insurers. If other insurers perceive that Zurn made an agreement with Allstate which compromised some of Allstate's coverage responsibility, those carriers will hold Zurn responsible in Allstate's place.

170.     Further, upon information and belief, Allstate's delay is intentional, because it has a financial interest in retaining monies over a longer period of time.

WHEREFORE, Zurn Industries, LLC, seeks an order from this Honorable Court in its favor and against Allstate finding:

A.     That Zurn and/or any other insurer funding Zurn's defense and indemnity in the asbestos bodily injury claims and lawsuits, is entitled interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%; (42 Pa. Stat. and Cons. Stat. Ann. § 8371);

B.     That Zurn is entitled to punitive damages in an amount to be determined by the Court; (42 Pa. Stat. and Cons. Stat. Ann. § 8371);

C.     That Zurn is entitled to the court costs and attorneys fees associated with bringing this action. 42 Pa. Stat. and Cons. Stat. Ann. § 8371; and

D.     Any other relief that this Court deems necessary and proper.

## COUNT V– DECLARATORY JUDGMENT

### (Against Travelers and Hartford)

171.     Zurn hereby realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

MUS3012702.1

172.   The vast majority of asbestos bodily injury claims allege bodily injury based on the claimant's contact with asbestos that allegedly came from Zurn boilers.

173.   So long as an asbestos claimant's allegations falls within the coverage of the primary and umbrella policies issued by Travelers to Zurn, then Hartford's excess policies have an obligation to defend and indemnify Zurn in the exact manner as Travelers.

174.   All of the excess policies at issue contain language providing that the terms of the excess policies are subject to the terms and conditions of the underlying insurances when the underlying policies are exhausted.

175.   Indeed, the Hartford policies provided that they are "warranted to the exact terms and conditions as the underlying Umbrella Liability policy issued by the Aetna Casualty & Surety Company, Policy No. 03XS1787SCA except with respect to limit of liability and premium."

176.   Zurn tendered Travelers' loss runs to Hartford on June 22, 2018.

177.   Said loss runs showed that the Travelers policies immediately underlying the Hartford policies were exhausted through payment of settlements.

178.   Because the Travelers policies immediately underlying the Hartford policies are exhausted, Hartford has an obligation to undertake Zurn's request for defense and indemnity pursuant to *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29 (1993) and *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1454 (3d Cir. 1996).

179.   Hartford is aware that Travelers has represented that its liability limits have been exhausted yet Hartford has not tendered a defense to Zurn to date.

MUS3012702.1

180.    Harford has a duty to defend and indemnify Zurn pursuant to the Royal and New England policies (i.e., the Hartford policies).

181.    In the alternative, if Travelers has not exhausted pursuant to its obligations, Travelers is obligated to defend and indemnify under the Aetna policies until said policies are properly exhausted.

WHEREFORE, Zurn Industries, LLC, seeks an order from this Honorable Court in its favor and against Travelers and Hartford declaring:

A.    For a declaration finding that asbestos bodily injury claims against Zurn Industries, LLC, are covered under the Hartford policies and that Hartford must immediately tender a defense to Zurn;

B.    Any other relief that this Honorable Court deems necessary and proper; or, in the alternative,

C.    Alternatively, for a declaration that Travelers is obligated to continue to defend and indemnify Zurn under the Aetna policies until such time as Travelers is properly exhausted and Hartford's obligation to initiate its defense and indemnity of Zurn begins.

## COUNT VI – INTERIM FUNDING ORDER – ALTERNATIVE RELIEF FROM TRAVELERS

182.    Zurn hereby realleges and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

183.    Allstate's unreasonable delay in initiating any offer to come on and defend and indemnify Zurn will cause Zurn irreparable harm as the available limits of the currently defending and indemnifying insurer run out prior to the resolution of this lawsuit, and Zurn is now placed in the position of potentially having to fund the defense and indemnity of the underlying asbestos claims and lawsuits itself.

MUS3012702.1

184.    Zurn previously provided Allstate with loss runs demonstrating Liberty Mutual's exhaustion in the policy underlying the subject Northbrook policy.

185.    Allocating substantial monies toward the defense and indemnity of the asbestos claims and lawsuits will impede Zurn from taking advantage of other business opportunities and could cause serious damage to Zurn's stability and profitability.

186.    Even if Zurn's argument regarding the implications of Endorsement No. 5 is unsuccessful, Allstate will still have to defend and indemnify Zurn pursuant to the terms of the Northbrook Policy. In other words, how much coverage Allstate owes is at issue, but whether Allstate owes some amount of coverage is not.

187.    Failing to grant an order obligating Allstate to begin defending and indemnifying Zurn for the asbestos claims and lawsuits during the pendency of this declaratory lawsuit would cause great prejudice to Zurn; whereas, imposing an obligation on Allstate to defend and indemnify Zurn prior to the resolution of this lawsuit would not cause prejudice to Allstate.

188.    The relief that Zurn seeks – an order obligating Allstate to undertake Zurn's defense and indemnity, while the parties litigate whether the defense obligation erodes the limits of liability – is reasonably tailored to remedy the threatened harm to Zurn.

189.    Zurn is likely to prevail on the merits in this case—even if the language of Endorsement No. 5 is susceptible to more than one reasonable interpretation, Zurn's interpretation should apply.

MUS3012702.1

190.    In addition, Zurn seeks relief in the form of an interim order obligating Hartford to immediately undertake Zurn's defense and indemnity. Alternatively, if Travelers has not properly exhausted, Zurn seeks an order obligating Travelers to continue to defend and indemnity until proper exhaustion is demonstrated.

191.    An interim funding order would not adversely impact any public policy.

192.    Furthermore, Travelers has represented to Zurn that it is exhausted, and can no longer authorize any new settlements. Zurn, in turn, has represented to Hartford that Travelers is exhausted and can no longer authorize new settlements.

193.    Zurn has tendered its defense and indemnity to Hartford, and requested that Hartford undertake same.

194.    In the form of loss runs, Zurn has provided *prima facie* evidence that Hartford has an immediate obligation to undertake Zurn's defense and indemnity in the asbestos claims and lawsuits.

195.    Zurn should not have to fund its own defense and indemnity if there is a disagreement between Travelers, Hartford and Allstate about whether Travelers and/or Liberty Mutual has exhausted.

196.    Allstate and Hartford have had the opportunity to examine Travelers and/or Liberty Mutual's payments related to exhaustion and assert any issues either may have with those proofs, and have failed to assert any issues.

197.    Allocating substantial monies toward the defense and indemnity of the asbestos claims and lawsuits will impede Zurn from taking advantage of other business opportunities and could cause serious damage to Zurn's stability and profitability.

MUS3012702.1

198.     Zurn seeks an order from this court that will either obligate Allstate and Hartford to immediately defend and indemnify Zurn, or, alternatively, will obligate Travelers to continue to defend and indemnify Zurn in the event that Hartford and Allstate have any issue with regard to Travelers' or Liberty Mutual's exhaustion.

199.     The relief that Zurn seeks—an interim order obligating Allstate and Hartford to immediately begin defending and indemnifying Zurn for the asbestos claims and lawsuit while the parties litigate any potential exhaustion issue—is reasonably tailored to remedy the threatened harm to Zurn.

200.     Imposing an obligation on Hartford to immediately defend and indemnify Zurn during the pendency of litigation surrounding exhaustion would not cause prejudice to Hartford, since there are no coverage issues in dispute.

WHEREFORE, Zurn Industries, LLC, seeks an order from this Honorable Court in its favor and against Allstate, Hartford and Travelers requiring as follows:

A.     Allstate and Hartford must immediately begin defending and indemnifying Zurn for the asbestos claims and lawsuits immediately under complete reservation of right pending the outcome of this lawsuit;

B.     Obtain Zurn's consent before making any settlement payments; and

C.     Alternatively, an order against Travelers preventing Travelers from withdrawing from Zurn's defense and indemnity in the event that Travelers has not properly exhausted its limit of asbestos liability;

D.     Provide any other relief to Zurn that this court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

MUS3012702.1

Respectfully submitted,


/s/ Beth A. Slagle
_____
Beth A. Slagle
PA I.D. No. 59683
E-mail: bas@muslaw.com
Ashley L. Wilkinson
PA I.D. No. 320537
E-mail: alw@muslaw.com

MEYER, UNKOVIC & SCOTT LLP
Henry W. Oliver Building
535 Smithfield Street, Suite 1300
Pittsburgh, PA  15222-2315
(412) 456-2800

Benjamin J. Galloway
Email: bjg@mcveyparsky-law.com
Mark Parsky
Email: mep@mcveyparsky-law.com
*To be admitted pro hac vice*

MCVEY & PARSKY LLC
30 N. LaSalle St.
Suite 2100
Chicago, IL 60602
(312) 551-7674