**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ZURN INDUSTRIES, LLC,** | ) | |
| **as Successor in Interest to** | ) | |
| **Zurn Industries, Inc.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:18-cv-299-SPB** |
| | ) | |
| **ALLSTATE INSURANCE COMPANY,** | ) | |
| **individually and as successor in interest** | ) | |
| **to Northbrook Excess and Surplus** | ) | |
| **Insurance Company (formerly** | ) | |
| **Northbrook Insurance Company),** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This action arises out of an insurance coverage dispute between Plaintiff Zurn Industries,

LLC, as Successor in Interest to Zurn Industries, Inc. (hereafter, "Zurn")[1] and certain insurance

carriers that provided secondary or excess insurance coverage to Zurn for asbestos-related

personal injury claims. Presently pending before the Court is Zurn's Motion for an Expedited

Interim Funding Order against Defendants First State Insurance Company ("First State") and

New England Insurance Company ("New England" and, collectively with First State,

"Hartford"). For the reasons set forth below, Zurn's motion will be denied.

---

[1] Some or all of the policies at issue in this case were purchased by Zurn Industries, Inc.; however, Zurn Industries, LLC is the successor in interest to the rights and responsibilities that Zurn Industries, Inc. had under the subject policies. For the sake of simplicity, the Court will refer simply to "Zurn" when discussing the company's acquisition of, and assertion of rights under, the subject policies.

# I.     Background[2]

Zurn is a company that has historically been engaged in the construction business and the manufacturing, sale and distribution of boilers.  Because of its use over the years of products that allegedly contained asbestos, it is now, and has been, a defendant in thousands of asbestos-related bodily injury lawsuits.  Over the years, Zurn has insured against these risks through a number of layered insurance policies.  For present purposes, however, the Court is concerned with several layers of insurance that Zurn maintained during the mid-1980s.

During the period April 1, 1983 through April 1, 1986, Zurn had a primary commercial general liability insurance policy with Travelers Casualty and Surety Company ("Travelers").  This primary insurance policy had a combined single limit of $2 million per occurrence and in the aggregate for asbestos-related bodily injury claims.

Directly above the Travelers primary insurance policy were two first-layer umbrella policies issued to Zurn by Aetna Casualty and Surety Company ("Aetna").  The first of these was a $10 million policy (Policy No. 03 XS 1790 SCA) that covered the period April 1, 1983 through April 1, 1985 (referred to hereafter as the "Aetna 1983-85 Policy").  The second was a $20 million policy (Policy No. 03 XS 1797 SCA) covering the period April 1, 1985 to April 1, 1986 (referred to hereafter as the "Aetna 1985-86 Policy").  Aetna's rights and obligations under these first-layer umbrella insurance policies were later assumed by Travelers.

Above the Aetna 1983-85 Policy were two second-layer liability insurance policies that Zurn purchased from subsidiaries of the Hartford Financial Services Group, Inc. (collectively, the "Hartford Policies").  These two excess insurance policies are the subject of the instant

---

[2] The following background facts are gleaned from the allegations in the complaint, the briefs submitted in support of, and in opposition to, the pending motion, and the parties' exhibits.  The Court's recitation of background facts is for purposes of context only and does not constitute formal findings of fact.

motion.  The first is a $15 million policy that Zurn purchased from Royal Indemnity (hereafter, the "Royal Policy") to cover the period April 1, 1983 through April 1, 1984.  First State, a subsidiary of the Hartford Financial Service Group, Inc., is the successor in interest to all rights and liabilities that Royal Indemnity had under the Royal Policy.

The second policy at issue is a $15 million policy that Zurn purchased from New England Insurance Company; this policy (hereafter, the "New England Policy") provided second layer umbrella liability coverage for the period April 1, 1984 through April 1, 1985.  Like First State, New England is a subsidiary of the Hartford Financial Service Group, Inc.

At other times relevant to this lawsuit, Zurn purchased a number of other policies that provided primary, umbrella, or excess coverage.  Among these was a $2 million commercial general liability policy that Zurn purchased from Liberty Mutual Insurance Company ("Liberty Mutual") to cover the period April 1, 1978 to April 1, 1979 (hereafter, the "Liberty Policy"). Directly above the Liberty Policy was an umbrella policy that Zurn purchased from Northbrook Insurance Company to cover the same period, *i.e.,* April 1, 1978 through April 1, 1979 (hereafter, the "Northbrook Policy").  Allstate Insurance Company ("Allstate") is currently the sole survivor and successor in interest to all rights and responsibilities formerly held by Northbrook Insurance Company pursuant to the Northbrook Policy, which has limits of $9 million per each occurrence and in the aggregate.

In 2003, Zurn, Liberty Mutual, and Travelers entered into a cost-sharing agreement pursuant to which Liberty Mutual and Travelers shared in the cost of defense and indemnity related to Zurn's asbestos bodily injury lawsuits.  According to Zurn, Liberty Mutual fully exhausted its limits of liability in or around 2009 and, since that time, Travelers has largely funded Zurn's asbestos defense program by itself with its remaining policy limits.  In or about

2015, Travelers represented to Zurn that it had exhausted the limits of the Aetna 1983-85 Policy (which underlay the Royal and New England Policies) and as well as the limits of another Aetna policy that covered the earlier period April 1, 1980 to April 1, 1983. Travelers further represented that the only Aetna Policy with any remaining limits was the Aetna 1985-86 Policy. Travelers has been funding Zurn's asbestos litigation defense under that policy until the present time.

According to Zurn, Travelers has represented that exhaustion of the remaining limits of the Aetna 1985-86 Policy is imminent. Based on this representation, Zurn sought additional defense and indemnity funding from Allstate (through the Northbrook Policy) and Hartford (through the Royal and New England Policies); to that end, Zurn proposed that Allstate and Hartford enter into a cost-sharing agreement. On October 3, 2018, Zurn sent correspondence to Allstate and Hartford formally tendering its defense and indemnity relative to the underlying asbestos litigation. *See* Doc. No. 29-6. Thereafter, Zurn invited all carriers to Chicago for a meeting to discuss a possible interim funding agreement; however, Hartford and Allstate have not reached any agreement to date on the issue of cost-sharing.

In the meantime, Zurn commenced this civil action with the filing of a 6-count complaint for Declaratory Judgment and Other Relief. ECF No. 1.[3] The named defendants include Allstate, Travelers, First State, and New England.[4] Of particular relevance is Count VI of the complaint, pursuant to which Zurn seeks interim relief. As it relates to Hartford, Zurn seeks an interim order "obligating Hartford to immediately undertake Zurn's defense and indemnity" or,

---

[3] The Court's subject matter jurisdiction is predicated on 28 U.S.C. §1332, as the parties appear to be diverse and the matter in controversy, exclusive of interest and costs, exceeds $75,000.00.

[4] The complaint originally named The Hartford Financial Services Group, Inc. f/k/a The Hartford as a defendant. That entity has since been dismissed from this lawsuit and Plaintiff is proceeding only against Hartford's subsidiaries, First State and New England.

alternatively, "an order obligating Travelers to continue to defend and indemni[fy] until proper exhaustion is demonstrated." Compl. ¶190.

On October 31, 2018, Zurn filed the pending motion for an expedited interim funding order, along with a supporting memorandum (ECF Nos. 28 and 29). Because Allstate has recently agreed to undertake Zurn's defense and indemnification within the limits and terms of the Northbrook Policy, Zurn's motion is directed solely at Hartford. On November 8, 2018, Hartford filed its joint response to the pending motion on behalf of First State and New England. *See* ECF No. 42. Thereafter, the parties submitted additional replies and sur-replies (ECF Nos. 48, 56, and 60.) In rendering its ruling, the Court has taken into account all of the foregoing filings.

## II. Discussion

Central to Zurn's motion are two Pennsylvania decisions,[5] *J.H. France Refractories Co. v. Allstate Ins. Co.,* 626 A.2d 502 (Pa. 1993), and *Koppers Co., Inc. v. Aetna Cas. and Surety Co.,* 98 F.3d 1440 (3d Cir. 1996). Because Zurn purports to base its request for interim relief on the rules established by these decisions, the Court will discuss them in some detail.

*J.H. France* involved a declaratory judgment action in which the insured sought a determination concerning its insurers' duty to defend and indemnify against lawsuits involving asbestos-related bodily injury claims. Following a trial and subsequent appeals, the Pennsylvania Supreme Court was confronted with the question of how to allocate the coverage responsibilities of numerous primary insurers, each of which had issued comprehensive general liability policies that would be triggered upon the occurrence of "bodily injury" during their

---

[5] Because this Court is exercising diversity jurisdiction, we apply the relevant state law on substantive issues. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). Here, both parties agree, as does this Court, that Pennsylvania law is applicable.

respective policy periods. As an initial point, the court had to consider the types of events that would constitute an occurrence of bodily injury and thereby trigger liability; to that end, the court endorsed the "multiple-trigger" theory whereby an insurer's liability is triggered if, during the term of the subject policy, any of three phases of bodily injury— *i.e.,* exposure to asbestos, progression of the pathology, or manifestation of the disease -- occurred. *See* 626 A.2d at 39 ("[E]very insurer which was on the risk at any time during the development of a claimant's asbestos-related disease has an obligation to indemnify"). The court next ruled that, once an insurer's liability is triggered, that insurer is potentially responsible for the entire amount of the underlying claim. *Id.* at 508. Thus, "each insurer which was on the risk during the development of an asbestosis-related disease is a primary insurer." *Id.* That being the case, the court ruled that the insured, J.H. France, was "free to select the policy or policies under which it is to be indemnified." *Id.* Moreover,

> [w]hen the policy limits of a given insurer are exhausted, [the insured] is entitled to seek indemnification from any of the remaining insurers which was on the risk during the development of the disease. Any policy in effect during the period from exposure through manifestation must indemnify the insured until its coverage is exhausted.

*Id.* at 509. The court observed, however, that the insurers with "triggered" policies still retained the right to pursue a share of the indemnification or defense costs from other insurers based on equitable principles of contribution or language in "other insurance" clauses. *Id.* Finally, the court addressed allocation of the insurers' duty to defend in situations where liability under more than one policy is triggered with regard to a claim based on asbestos-related disease. The court held that "the selection of the insurer or insurers to undertake a defense is to be made by the insurers" in the first instance, 626 A.2d at 510; if the insurers are unable to agree as to the conduct of the defense, however, then the insured is entitled to select the insurer who will undertake the defense. *Id.*

In *Koppers Co.,* the U.S. Court of Appeals for the Third Circuit applied the rule of *J.H. France* in the context of a dispute involving excess insurance carriers who were called upon to indemnify their insured on property damage claims stemming from environmental contamination. The court began by observing that environmental property damage, like asbestos-related bodily injury, is a progressive and indivisible harm; therefore, "it [was] appropriate to hold the triggered policies jointly and severally liable," because there was no practical basis for apportioning responsibility among them. 98 F.3d at 1451. In addition, the subject insurance policies, like those at issue in *J.H. France,* provided "occurrence"-based coverage and defined as one "occurrence" all of the effects or injuries flowing from a single causative event. The court therefore predicted that the Pennsylvania Supreme Court would apply the rule of *J.H. France* to the case at hand and hold all triggered policies jointly and severally liable to cover a single, indivisible loss. *Id.* Given the fact that some of the insurers had settled prior to trial, the court made the further prediction that the Pennsylvania Supreme Court would hold that each non-settling insurer whose policy was triggered to cover an individual loss was jointly and severally liable, up to the limits of its policy, for the full amount of the judgment, *less* the settling insurers' apportioned shares. *Id.* at 1453 (emphasis in the original).

Inasmuch as *Koppers* involved both primary and excess insurance policies, the court of appeals had to make further predictions about how the Pennsylvania Supreme Court would apply the rule of apportionment in *J.H. France* in the excess insurance context. The court first noted that a true excess or secondary policy is not "triggered" or required to pay until the underlying primary coverage has been exhausted. 98 F.3d at 1454. The court held that an insured's settlement with a primary insurer functionally "exhausts" primary coverage and thereby triggers the excess policy, but if the insured settles for an amount below the primary policy's limits, the

insured loses any right to obtain the difference from the excess carrier, since "the excess insurer never agreed to pay for losses below a specified floor (i.e, below the limits of the underlying primary policies)." *Id.* The court further held, in relevant part, that "the existence of other primary policies applicable to the indivisible loss was irrelevant for the purpose of resolving the threshold issue of whether the [excess] policies were triggered," *id.* at 1455-56, although such policies were relevant to the ultimate issue of apportionment and might therefore be determinative of the excess insurer's ultimate liability. *Id.* at 1456 (observing that "the district court may be required to deduct from the total loss the combined limits of all settled primary policies").

Relying on the foregoing authority, Zurn asserts that: (a) it has properly designated Allstate and Hartford as the policies under which it will seek additional defense and indemnity funding in the asbestos litigation and, (b) as a result, it is incumbent upon Allstate and Hartford to share the defense and indemnity costs, subject to their right – at some later point in time – "'to redistribute the burden among themselves.'" ECF No. 29 at 7 (quoting *Koppers,* 98 F.3d at 1454). Zurn contends that, because it has provided Hartford evidence of Travelers' exhaustion of the Aetna 1983-1985 Policy in the form of loss runs, it has thereby made a *prima facie* showing that the Hartford excess insurance policies were triggered. Having designated the Northbrook and Hartford policies as the ones from which it seeks indemnity, Zurn claims that both insurers have a complete obligation to defend and indemnify Zurn in the underlying asbestos claims and lawsuits. According to Zurn, "*J.H. France* exists as a tool to be employed by insureds who find themselves in the exact situation in which Zurn finds itself"; *i.e,* because its two excess insurance carriers cannot agree on the correct apportionment of their responsibilities, Zurn should be "'entitled to select.'" ECF No. 29 at 7 (quoting *J.H. France,* 626 at 510). Zurn

thus seeks an order that directs Hartford to immediately assume fifty percent (50%) of those costs until Allstate and Hartford reach a permanent cost-sharing agreement.

Hartford contends that it is both premature and procedurally inappropriate to grant the relief that Zurn is requesting. According to Hartford, significant questions remain about the accuracy of Travelers' representation of exhaustion of the underlying Aetna policy, and these questions should be resolved following discovery and motions practice.

"Ordinarily in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009). Under Pennsylvania law, there is a distinction between the duty to defend and the duty to indemnify.

> [A]n insurer's duty to defend an action against the insured is measured, in the first instance, by the allegations in the plaintiff's pleadings.... In determining the duty to defend, the complaint claiming damages must be compared to the policy and a determination made as to whether, if the allegations are sustained, the insurer would be required to pay [the] resulting judgment.... [T]he language of the policy and the allegations of the complaint must be construed together to determine the insurer['s] obligation.

*Id.* (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)); *see also Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.,* 609 F.3d 223, 238 (3d Cir. 2010) (courts may examine "only the allegations in the complaint when determining whether the insurance company must defend the insured"). This limited scope of review is commonly referred to the "four corners" rule. *See Homesite Ins. Co. on behalf of Ins. Counselor's v. Neary*, No. CV 17-2297, 2018 WL 4405886, at *1 (E.D. Pa. Sept. 17, 2018).

Drawing on these principles, Zurn contends that it has satisfied its *prima facie* burden of demonstrating that the underlying asbestos claims fall within the grant of coverage afforded by

the Hartford policies. This case presents two extenuating circumstances, however, which complicates application of the usual "four corners" rule. First, the underlying litigation involves not one, but allegedly "thousands" of claims against Zurn, making it impracticable for the Court to conduct a literal "four corners" analysis. Second, because this case involves a dispute about excess insurance coverage, it is not enough for Zurn to show that the subject policies cover the types of injuries alleged in the underlying asbestos litigation; in addition, -- as both sides acknowledge – Zurn must establish that the Hartford Policies were triggered by the exhaustion of the Aenta 1983-85 Policy, which provided the first layer of umbrella coverage directly beneath the Hartford Policies.

Zurn, of course, contends that it has satisfied its *prima facie* burden by establishing -- through Travelers' loss runs – that the Aetna 1983-85 Policy was exhausted. But exhaustion is inherently a factual issue, and the record before the Court is both limited and underdeveloped. Although Zurn alludes to a settlement agreement involving the underlying Aetna policy, the particulars of that agreement have not been provided. Hartford's submissions in opposition to the pending motion suggest to the Court that factual disputes (or at least uncertainties) exist concerning the accuracy of Travelers' loss run calculations and representation of exhaustion. Given that the pleading phase of this litigation has not yet closed (*e.g.,* Travelers has not yet answered the complaint or cross-claims against it), it is premature for the Court to make any declaration concerning exhaustion. To the extent that Zurn cites *State Farm Fire & Cas. Co. v. Estate of Mehlman,* 589 F.3d 105 111 (3d Cir. 2009), for the proposition that it has satisfied its *prima facie* evidentiary burden by supplying loss runs, the Court believes that Zurn is misconstruing the law and conflating two distinct concepts. The fact that Zurn's ultimate evidentiary burden is light – requiring only *prima facie* evidence of coverage – does not

necessarily mean that the Court can or should determine whether that burden has been met in the opening stages of litigation, before discovery has occurred. In fact, in *Estate of Mehlman* and other cases cited by Zurn, the district court's decision concerning coverage was rendered well after the pleading stage of litigation. *See, e.g., Estate of Mehlman, supra* (insurer's duty to defend and indemnify addressed on appeal from partial grants of summary judgment); *Koppers, supra* (addressing proper allocation of liability of non-settling excess insurers on appeal from entry of judgment following jury trial); *General Refractors Co. v. First State Ins. Co.,* Civil Action No. 04-3509, 2015 WL 3643568, at *2 (E.D. Pa. June 12, 2015) (discussing the evidentiary value of the underlying insurer's Claims Database and Queue for purposes of establishing exhaustion at time of trial); *Continental Cas. Co. v. Peerless Indus. Inc.,* Civil No. 06-4621, 2008 WL 4058698, at *2 (E.D. Pa. Aug. 29, 2008) (granting, for purposes of discovery, the defendant insurers' motion to compel more detailed loss runs from plaintiff co-insurer and information concerning the plaintiff's allocation of payments to its policies); *Mine Safety Appliances Co. v. AIU Ins. Co.,* C.A. No. N10C–07–241 MMJ, 2015 WL 5829461, at *12 (De. Super. Ct. Aug. 10, 2015) (discussing Pennsylvania's rule allowing proof of exhaustion through submission of loss runs in the context of summary judgment rulings); *J.H. France, supra* (addressing, on appeal following jury trial, the allocation of liability as among six insurers who issued comprehensive liability insurance policies). Notably, none of the cases cited by Plaintiff involved the type of interim relief being sought here in the opening stage of litigation, and this Court has been unable to find any Pennsylvania case in which such relief has been requested or granted at the outset.

In essence, Zurn is attempting to obtain a form of injunctive relief through its request for an interim funding order. Such relief is generally sought under Federal Rule of Civil Procedure 65. The standards for such relief are well established:

> [T]o obtain a preliminary injunction the moving party must show as a prerequisite (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alterations in original) (internal quotation marks and citation omitted).

Here, Zurn has not formally invoked Rule 65, much less attempted to show an entitlement to relief thereunder. In any event, it is not clear to this Court based on the record before it that, *e.g.,* irreparable injury will result in the absence of the requested relief. *Fulton v. City of Phila.*, 320 F. Supp. 3d 661, 701 (E.D. Pa. 2018) ("It is hornbook law that the 'irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages. . . this is not an easy burden.'") (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000)).

As matters currently stand, Zurn's defense is being undertaken by Allstate pursuant to the terms of a $9 million umbrella policy. Although Zurn states that this policy will eventually be exhausted, that contingency is not characterized as imminent. Zurn also hypothesizes that some of the lawsuits at issue may involve bodily injuries whose onset date post-dates the period of coverage involved in the Allstate policy. However, there is no evidence before the Court to confirm this hypothetical possibility, much less is there evidence that Zurn will be irreparably harmed if Hartford does not immediately assume its defense. At most, Zurn alleges that

"[a]llocating substantial monies toward the defense and indemnity of the asbestos claims and lawsuits will impede Zurn from taking advantage of other business opportunities and could cause serious damage to Zurn's stability and profitability." Compl. ¶197. Moreover, by Zurn's own admission, the "vast majority of these lawsuits contain allegations in which the plaintiff claims exposure to asbestos that either pre-dates the Northbrook Policy, coincides with the Northbrook Policy or is unknown. In any case, these allegations trigger [Allstate's] obligations under the Northbrook Policy." *Id.* ¶83.

Nevertheless, even if irreparable injury has not been sufficiently demonstrated on the present record, the matter of Zurn's defense in thousands of lawsuits is a serious matter that deserves prompt attention. The factual issue in contention – whether Travelers has exhausted its obligations under the Aetna 1983-85 Policy, thereby triggering Hartford's defense and indemnity obligations -- is a narrow one. The Court is therefore amenable to allowing a period of expedited discovery, to commence immediately. To that end, the Court will direct Hartford to confer with counsel for Zurn and submit, on or before December 11, 2018, a proposal for expedited discovery on the issue of exhaustion. To the extent the parties believe it would be helpful, this Court would entertain the use of a master to assist in the discovery process. At the completion of the discovery process, Zurn may renew its motion for relief in the form of an expedited motion for summary judgment.

### III.  Conclusion

For the reasons set forth above, Zurn's Motion for an Expedited Interim Funding Order will be denied without prejudice to be reasserted as a motion for summary judgment on a more developed record.  An appropriate Order follows.

/s/ Susan Paradise Baxter

SUSAN PARADISE BAXTER
United States District Judge

Dated:  November 20, 2018