## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZURN INDUSTRIES, LLC,                          )
as Successor in Interest to                    )
Zurn Industries, Inc.,                         )
                                               )
            **Plaintiff,**            )
                                               )
            **v.**                   )     **Case No. 1:18-cv-299-SPB**
                                               )
ALLSTATE INSURANCE COMPANY,                    )
individually and as successor in interest      )
to Northbrook Excess and Surplus               )
Insurance Company (formerly                    )
Northbrook Insurance Company), *et al.,*       )
                                               )
            **Defendants.**           )

### MEMORANDUM OPINION ADDRESSING RULE 56 MOTIONS
### FILED AT ECF NOS. 218, 237, 239, 240, 246

## I.     INTRODUCTION

Pending before the Court in the above-captioned case are a series of motions filed by the parties seeking partial summary judgment on various legal issues that are material to a resolution of this case.  In this Memorandum Opinion, the Court addresses, in whole or in part, the following motions:

1.  Zurn's Motion for Partial Summary Judgment as to Counts III, VI, VII, and VIII of its Amended Complaint, ECF No. 218;

2. American Home Assurance Company's Motion for Partial Summary Judgment on the Issue of Defense and Defense Costs, ECF No. 237;

3. Allstate Insurance Company's Motion for Partial summary Judgment Regarding the Limit of Liability of Northbrook Policy No. 63 004 463, ECF No. 239;

4. The Hartford Defendants' Motion for Partial Summary Judgment that the Other Insurers Must Pay Defense Costs in Addition to Limits Under Certain Policies, ECF No. 240; and

5. Allstate's Motion for Partial Summary Judgment Regarding Allocation of Defense Costs, ECF No. 246.

Because the Court is writing primarily for the parties who are extremely familiar with the history of this litigation and all pertinent issues, the Court will not discuss the procedural or historical facts of this case, except as they relate to the rulings set forth herein.  For present purposes, it will suffice to note that the parties have been engaged in protracted negotiations over disputed coverage issues relative to Zurn's liability for asbestos-related personal injury claims. The parties have reached an impasse in negotiations over issues that are purely legal in nature – issues that primarily revolve around interpretation of the subject insurance policies.  Because of the number of issues involved, the parties' familiarity with the underlying record, and the expectation that a timely resolution of the disputed issues will aid in settlement discussions, the Court's discussion and analysis herein will be relatively succinct.

This opinion will address questions as to whether certain insurers have a contractual duty to reimburse Zurn for the costs of defending asbestos personal injury lawsuits, whether such defense costs erode relevant policy limits, and whether certain policies are excess to others.  The policies that are at issue for present purposes include the following:

- American Home's Policy No. SCLE 80-65386, covering the time period December 17, 1974 through December 17, 1977 (hereafter, "American Home 1974-1977");

- Granite State's Policy No. SCLD 80-93353 covering the time period December 17, 1977 to April 1, 1979 ("Granite State 1977-1979");

- Granite State's Quota Share Policy No. 6485-6210 covering the time period April 1, 1985 to April 1, 1986 ("Granite State 1985");

- Northbrook Insurance Company's Policy No. 63-004-463 for policy period April 1, 1978 to April 1, 1979 ("Northbrook 1978");

- Northbrook Policy No. 63-005-622 covering the time period April 1, 1979 to April 1, 1980 ("Northbrook 1979");

- Northbrook Policy No. 63-006-579 for policy period April 1, 1980 to April 1, 1981 ("Northbrook 1980");

- Northbrook Policy No. 63-007-775 for policy period April 1, 1981 to April 1, 1982 ("Northbrook 1981");

- Northbrook Policy No. 63-008-633 for policy period April 1, 1982 to April 1, 1983 ("Northbrook 1982");

- Aetna Casualty and Surety Company Policy No. 01 XN 673 WCA, issued for the policy period December 17, 1974 to December 17, 1977 ("Aetna 1974-1977");

- Aetna Policy No. 01 XN 5183 WCA, covering the policy period April 1, 1985 to April 1, 1986 ("Aetna 1985");

- Royal Indemnity Company Policy No. RED 102439, issued for the policy period April 1, 1983 to April 1, 1984 ("Royal 1983"); and

- New England Insurance Company Policy No. NE 000057, issued for the period April 1, 1984 to April 1, 1985 ("New England 1984").

The Court's standard of review and analysis follows.

## II.    STANDARD OF REVIEW

A federal court sitting in diversity applies the relevant state law to insurance contract interpretation. *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 390 (3d Cir. 2012). Under Pennsylvania law, which all parties agree governs this dispute, the interpretation of an insurance policy is a question of law. *Hanover Ins. Co. v. Urban Outfitters, Inc.*, 806 F.3d 761, 764–65 (3d Cir. 2015) (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006)). The task of interpreting an insurance policy is to "ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 390 (3d Cir. 2012).

Consequently, when interpreting an insurance policy under Pennsylvania law, courts must look to the language and terms of the policy, while construing any ambiguities in favor of the insured. *Indalex Inc. v. Nat'l Union Fire Ins. Co.*, 83 A.3d 418, 420–21 (Pa. Super. Ct. 2013).

"When the policy language is clear and unambiguous, the court must give effect to the language of the contract." *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997). "However, if the policy provision is ambiguous, the policy provision must be construed in favor of the insured and against the insurer as the drafter of the instrument." *Id.* Terms are ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts," but courts "will not . . . distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Const. Co. v. Harleysville Mut. Ins. Co.,* 735 A.2d 100, 106 (Pa. 1999).  "Moreover, an insurance policy, like every other written contract, must be read in its entirety and the intent of the policy is gathered from consideration of the entire instrument." *Riccio*, 705 A.2d at 426.

### III.   WHETHER, UNDER CERTAIN NORTHBROOK POLICIES, DEFENSE COSTS ERODE LIABILITY LIMITS (ECF Nos. 218, 239, and 240)

Allstate has filed a motion for summary judgment, ECF No. 239, seeking a declaration that Northbrook Insurance Company's Policy No. 63-004-463, covering the period April 1, 1978 to April 1, 1979 ("Northbrook 1978"), pays defense costs only *within* the policy's $9 million liability limit. ECF No. 239.  Zurn and Hartford oppose this motion.  They have also filed separate cross-motions for summary judgment in which they each seek a declaration that the Northbrook 1978 Policy, and certain other Northbrook policies, pay defense costs *outside of* the applicable policy limits.  ECF Nos. 218, 240.  We consider the relevant policies in turn.

A.  Northbrook 1978

Northbrook 1978 is an excess policy that lies directly above, and is excess to, Liberty Mutual primary policy no. LG1-181-014745-168 ("Liberty Mutual Primary 1978").  It is undisputed that Liberty Mutual Primary 1978 paid Zurn's defense costs in addition to the policy's $9 million liability limit.  Liberty Mutual has claimed that the limits of Primary 1978 and other relevant primary policies are now exhausted.  In November 2018, Allstate began paying defense costs and indemnity costs for certain asbestos personal injury claims under Northbrook 1978, subject to a reservation of rights.

Under Northbrook 1978's "Coverage" provision, the insurer "agrees, subject to the limitations, terms and conditions hereinafter mentioned to indemnify the insured all sums which the insured shall be obligated to pay by reason of the liability . . . imposed . . . by law or  . . . assumed [by Zurn] under contract or agreement . . . [f]or damages on account of . . . Personal Injuries . . . caused by or arising out of each occurrence . . . ."  ECF No. 219-3 at 31.  Northbrook is "only . . . liable for the Ultimate Net Loss" in excess of the limits of underlying insurance or the applicable retained limit, up to $9 million for each occurrence, and subject to an aggregate limit of $9 million.  Id.  "Ultimate Net Loss" is defined to include sums that Zurn is "obligated to pay . . . through adjudication or compromise" and "shall also include" certain enumerated expenses, including defense costs.  Id. at 33.  Under the policy's "Supplemental Defense" provision, Northbrook agreed to defend Zurn and pay related expenses, and "the amounts so incurred" are included in "Ultimate Net Loss in computing the limit of the [insurer's] liability but shall not be payable in addition to the [liability limit]."  Id. at 32.

Based upon the foregoing language, Allstate contends that its payments for Zurn's defense costs erode the $9 million liability limit of Northbrook 1978.  Allstate presently

maintains that it has paid amounts sufficient to exhaust the $9 million limit and, therefore, it has

no further duty to pay for Zurn's asbestos-related losses under the policy.

Zurn and Hartford dispute Allstate's assertion. They point to "Endorsement No. 5" in the

Northbrook policy, which states:

> It is hereby understood and agreed that in the event the insured suffers a loss which
> is covered under the policies of the underlying insurances as set out in the schedule
> attached to this policy, the excess of which would be payable under this policy,
> except for terms and conditions of this policy which are not consistent with the
> underlying insurance, then notwithstanding anything contained in this policy to the
> contrary this policy shall be amended to follow and be subject to the terms and
> conditions of such underlying insurance in respect of such paid loss.

ECF No. 219-3 at 8. According to Zurn and Hartford, this endorsement overrides the pre-printed

provisions of Northbrook 1978 and requires Allstate to abide by the conflicting terms of the

underlying primary policy as they relate to the payment of defense costs. Because the underlying

policy (Liberty Mutual Primary 1978) paid Zurn's defense costs *in addition to* liability limits,

Zurn and Hartford contend that Northbrook 1978 must follow suit and do the same.

Allstate disagrees. It insists that Endorsement No. 5 merely broadens the scope of

covered claims to match the scope of losses covered by the underlying Liberty Mutual primary

policy. Based on this interpretation, Allstate concludes that Endorsement No. 5 is facially

inapplicable to the asbestos claims at issue here, because both Zurn's asbestos indemnity

payments and associated defense costs are already covered by Northbrook 1978. Having fully

considered the arguments offered by Allstate, Zurn, and Hartford, the Court finds Allstate's

position to be more persuasive.

The cornerstone of the Court's analysis is the language of the policy itself. *Westminster

Am. Ins. Co. v. Sec. Nat'l Ins. Co.*, No. CV 20-2195, 2021 WL 3630464, at *4 (E.D. Pa. Aug. 16,

2021) ("In interpreting a policy, the court's primary consideration is 'to ascertain the intent of the

parties as manifested by the language of the written instrument.'") (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)).  To that end, the Court notes that Hartford construes Endorsement No. 5 as a generic "broad as primary" provision, pursuant to which Northbrook 1978 essentially provides coverage which is just as broad as the coverage afforded by Liberty Mutual Primary 1978.  Under Hartford's reasoning, the Liberty Mutual primary policy provides coverage for defense costs in addition to the policy limits, so Northbrook must do the same.

The language of Endorsement 5 is more nuanced than Hartford represents, however.  In order for Endorsement No. 5 to have effect, the following conditions must be met: (i) Zurn must suffer a "loss," (ii) which is covered by the underlying policy, (iii) Northbrook 1978 must be triggered by exhaustion of the underlying policy limits such that the excess portion of the loss is potentially "payable" under Northbrook 1978, and (iv) there must be an inconsistency between the terms and conditions of Northbrook 1978 and the underlying policy which prevents Northbrook 1978 from paying the excess portion of Zurn's loss.  The term "loss" is not specifically defined in Endorsement No. 5, but the pre-preprinted insurance contract defines "Ultimate Net Loss" to include defense costs; thus, it is reasonable to assume that Zurn's defense costs constitute a "loss" for purposes of Endorsement No. 5.  But as Allstate points out, both Zurn's asbestos indemnity payments and its related defense costs are covered under Northbrook 1978, so both types of "losses" will be (and have been) paid by Allstate under Northbrook 1978. On its face, Endorsement No. 5 is inapplicable to the situation presented here.

Zurn interprets the Endorsement differently, construing "loss" as a subset of defense costs that will not be covered by Northbrook 1978 if Allstate's prior defense payments erode policy limits.  Zurn insists that, under its interpretation, Allstate's limit of liability remain the

same -- $9 million.  According to Zurn, what changes is that certain payments (namely, defense costs) do not count against and erode that limit.  Zurn insists that this change is in no way unreasonable or unfair but is instead the bargained-for result of enforcing the plain language of Endorsement No. 5, to which Allstate agreed.

The Court is not persuaded.  To pursue Zurn's theory, a "loss" (in the form of defense costs) only becomes non-payable under Northbrook 1978 when the limits of the policy have been exhausted by combined indemnity and defense-related payments.  Up until that point, the "loss" is fully payable under Northbrook 1978, and Endorsement No. 5 is facially inapplicable. Stated differently, it is only when Northbrook 1978's policy limits have been paid in full, in accordance with the policy's express terms, that the differing policy terms concerning erosion of policy limits results in the non-payment of Zurn's defense costs.  Of course, once policy limits are exhausted, Allstate can have no further legal obligations under Northbrook 1978.  The Court therefore finds the proposed interpretation proffered by Zurn to be unreasonable and contrary to the plain language of the policy.

Instead, the Court construes Endorsement No. 5 as explained above.  Based upon that interpretation, the types of "losses" that would trigger Endorsement No. 5 cannot include legal expenses or costs of defense, which are payable under Northbrook 1978 in the first instance. Construing the endorsement in this fashion allows the Court to give effect to the policy's other provisions, including those pertaining to "Coverage," "Limit of Liability," "Supplemental Defense," and "Ultimate Net Loss." *Riccio,* 705 A.2d at 426 (an insurance policy must be read in its entirety, and the policy's intent is "gathered from consideration of the entire instrument"); *Hillmer v. Esurance Prop. & Cas. Ins. Co*., No. CV 21-2182, 2021 WL 4132301, at *6 (E.D. Pa.

Sept. 10, 2021) (courts "must interpret an insurance policy to avoid ambiguities and give effect to all policy provisions").

The Court's interpretation also accounts for the fact that Northbrook 1978 and Liberty Mutual Primary 1978 each have their own terms, conditions, definitions, exclusions, and endorsements. As each policy has its own set of terms and conditions, situations may arise where a loss is covered by the Liberty Mutual primary policy, while the excess of that loss is not covered by Northbrook 1978 because of a particular exclusion or other condition. Where such circumstances exist, the endorsement ensures that Northbrook 1978 will cover the excess loss, thereby preventing any gap in coverage relative to the types of losses that will be paid.

The Court will therefore grant Allstate's motion for partial summary judgment regarding the limit of liability of Northbrook 1978. The Court will deny the cross-motions of Zurn and Hartford to the extent those motions request a declaration that Allstate must pay defense costs under Northbrook 1978 separate and apart from the $9 million policy limit.

B. <u>Northbrook 1979</u>

The parties also dispute Allstate's defense cost obligations under another Northbrook policy covering the period April 1, 1979 to April 1, 1980 ("Northbrook 1979"). This policy has a $20 million limit and sits directly excess of Liberty Mutual Umbrella Policy No. 181-0280088-149 ("Liberty Mutual Umbrella 1979").

The coverage provision of Northbrook 1979 states that the insurer

agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify [Zurn] for all sums which [Zurn] shall be obliged to pay by reason of the liability imposed upon [Zurn] by law, or assumed under contract or agreement by [Zurn] for damages, direct or consequential and expenses on account of: . . . Personal Injuries . . . caused by or arising out of each occurrence . . . and arising

9

out of the hazards covered by and as defined in the Underlying Umbrella Policies .
. . ."

ECF No. 240-16 at 3.  Upon exhaustion of the underlying policy's limits, Allstate's liability

under Northbrook 1979 attaches, and the insurer will pay up to "$20,000,000 ultimate net loss in

respect of each occurrence - subject to a limit of . . . $20,000,000 in the aggregate for each

annual period . . . ."  *Id.*  Unlike Northbrook 1978, Northbrook 1979 neither capitalizes nor

defines the term "ultimate net loss."  Among the conditions contained in Northbrook 1979 is

"Maintenance of Underlying Umbrella Insurance," which states:

> This policy is subject to the same terms, definitions, exclusions and conditions
> (except as regards the premium, the amount and limits of liability and except as
> otherwise provided herein) as are contained in or as may be added to the Underlying
> Umbrella Policies listed in Item 7 of the Declarations and referred to in Insuring
> Agreement 1 prior to the happening of an occurrence for which claim is made
> hereunder . . . .

*Id.* at 4.

Zurn argues that the term "ultimate net loss," as used in Northbrook 1979's "Limit of

Liability" provision, is ambiguous as to whether or not it includes defense costs, because the

term is not specifically defined in either Northbrook 1979 or Liberty Mutual Umbrella 1979.  As

a result, Zurn argues, "ultimate net loss" should be construed in Zurn's favor and against

Allstate, such that "ultimate net loss" *excludes* defense costs.  Construing the policy in this

manner would mean that Allstate must pay defense costs in addition to "ultimate net loss."  Zurn

contends that this proposed construction is supported by the terms of Liberty Mutual Umbrella

1979 which, Zurn claims, are incorporated into the Northbrook policy through the "Maintenance

of Underlying Umbrella Insurance" provision.  ECF No. 218-7.  Zurn notes that, under Liberty

Mutual Umbrella 1979, the insurer will "defend any suit against the insured" and "pay all

expenses incurred . . . in any suit defended by [the insurer]," and "the amounts so incurred,

except settlement of claims and suits, . . . are payable by [the insurer] in addition to the applicable limits of liability of this policy." ECF No. 313, ¶38; ECF No. 219-23 at 3, ¶12 and *id.* at 12-13.  Because Northbrook 1979 is "subject to" the foregoing terms, Zurn argues, the term "ultimate net loss" cannot include defense costs.

Like Zurn, Hartford contends that Allstate's payment of defense costs under Northbrook 1979 does not erode the policy's limits. Hartford views the "Maintenance of Underlying Umbrella Insurance" provision in Northbrook 1979 as a "follow-form provision that incorporates the terms and conditions of Liberty Mutual Umbrella 1979 as they relate to the payment of defense costs.  See ECF No. 242 at 8 ("Because [Northbrook 1979] does not contain any language that otherwise specifically addresses the manner in which defense costs are treated, it will treat defense costs the same way as the underlying umbrella policy treats defense costs."). Hartford further posits that Liberty Mutual Umbrella 1979 contains a "broad as underlying" provision[1] that incorporates the underlying primary policy's duty to pay Zurn's defense costs outside of the policy's liability limit.

Thus, Zurn and Hartford both insist that Allstate must similarly pay defense costs separate from Northbrook 1979's $20 million limit.  They have each filed motions for partial summary judgment seeking a declaration to that effect.

---

[1] This provision states:

"Underlying Policy"  Notwithstanding anything contained herein to the contrary, it is hereby understood and agreed that where underlying policies are written under terms and conditions providing greater protection or indemnity to the insured than the terms and conditions of this policy, this insurance shall indemnify the insured upon the same terms, conditions and limitations of the applicable underlying insurance.

ECF No. 240-17 at 41, ¶7.

11

Allstate disputes Zurn's and Hartford's interpretation of the "Maintenance of Underlying Umbrella Insurance" condition vis-a-vis other relevant policy provisions.  Allstate argues that, under the "Coverage" section of Northbrook 1979, Northbrook agreed to indemnify Zurn for damages *and expenses*, collectively, up to the policy's clearly stated limitation of "$20,000,000 each occurrence and in the aggregate." To the extent Zurn views the term "ultimate net loss" as ambiguous, Allstate maintains that Zurn is manufacturing an ambiguity by considering the phrase in isolation, rather than interpreting the policy as a whole.  Allstate also contends that Zurn and Hartford misconstrue the "following form" language in the "Maintenance of Underlying Umbrella Insurance" provision.  Allstate notes that the provision "does not include a wholesale deletion of Northbrook's policy language in favor of that contained in the underlying policies." ECF No. 305 at 12.  Instead, the provision "excepts from adoption terms and conditions regarding 'the amount and limits of liability,' as well as the many other terms, conditions, definitions, and exclusions" set forth in the pre-printed form. *Id*.  To the extent Zurn cites its own "reasonable expectation" of uniform coverage as a factor supporting its proffered interpretation of Northbrook 1979, Allstate argues that the "reasonable expectations" doctrine has no application in the context of sophisticated commercial entities.  And, in any event, Allstate asserts that this line of argument is inherently fact based and inapposite to the circumstances present in this case.

Based on its review of the subject policies, the Court agrees with Allstate that the defense costs available to Zurn under Northbrook 1979 must be included within the policy limits.  Two provisions are key to the Court's analysis.  First, the "Coverage" section makes clear that, "subject to" the policy's "limitations, terms and conditions," Allstate will indemnify "all sums" that Zurn is "obliged to pay . . . *for damages . . . and expenses* on account of . . . Personal

Injuries . . . ." ECF No. 240-16 at 3. The clear intent of this language is to include "expenses"
within the $20 million policy cap. Thus, like payments made for Zurn's settlements and
judgments, defense costs and legal expenses erode the policy limits.

Second, the "Maintenance of Underlying Umbrella Insurance" provision makes clear that
the "terms, definitions, exclusions and conditions" of the underlying Liberty Mutual Umbrella
policy cannot override the more specific terms of Northbrook 1979, pursuant to which damages
and expenses are collectively paid out of the $20 million policy limit. The "Maintenance of
Underlying Umbrella Insurance" condition expressly states that Northbrook 1979 follows form
to the underlying policy "*except as regards* the premium, *the amount and limits of liability and
except as otherwise provided herein. . . .*" ECF No. 240-16 at 4 (emphasis added). Thus, any
terms and conditions that are specifically spelled out in the Northbrook policy -- including those
pertaining to the amount and limits of liability -- take precedence over potentially conflicting
terms that might otherwise be incorporated from the underlying policy.

In light of the foregoing, the Court cannot agree that "ultimate net loss" is ambiguous
as to whether or not it includes defense costs. In this Court's view, defense costs and other
"expenses" are plainly included within the ultimate net loss that Northbrook agreed to pay. Nor
does Northbrook 1979 "follow form" to the provisions in Liberty Mutual Umbrella 1979 that
require payment of defense costs *outside of* the liability limits. That particular term in the Liberty
Mutual umbrella policy cannot be incorporated into Northbrook 1979 because it conflicts with
the Northbrook policy's express treatment of "expenses" as subject to the $20 million policy
limit and, as discussed, the Northbrook term takes precedence. Insofar as Zurn contends that it
has a "reasonable expectation" of achieving uniform coverage, the Court notes that it must
enforce the plain terms of the policy as they are written, not as Zurn may wish they were written.

In light of the foregoing, the Court will deny the Rule 56 motions of Zurn and Hartford to the extent those motions request a declaration that Allstate must pay defense costs under Northbrook 1979 separate and apart from the $20 million policy limit.

C. <u>Northbrook 1980-1983</u>

Finally, the parties dispute Allstate's defense cost obligations under a series of materially identical Northbrook policies covering the periods April 1, 1980 to April 1, 1981 ("Northbrook 1980"), April 1, 1981 to April 1, 1982 ("Northbrook 1981"), and April 1, 1982 to April 1, 1983 ("Northbrook 1982").  Each of these policies (collectively referred to as the "Northbrook 1980-1983 Policies") has a $15 million limit and sits directly excess of Aetna Policy No. 03XS1787 SCA ("Aetna 1980-1983").

Like Northbrook 1979, the Northbrook 1980-1983 Policies' coverage provision states that the insurer

> agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify [Zurn] for all sums which [Zurn] shall be obliged to pay by reason of the liability imposed upon [Zurn] by law, or assumed under contract or agreement by [Zurn] for damages, direct or consequential and expenses on account of: . . . Personal Injuries . . . caused by or arising out of each occurrence . . . and arising out of the hazards covered by and as defined in the Underlying Umbrella Policies . . . ."

*See, e.g.,* ECF No. 240-19 at 3.  Upon exhaustion of the underlying policy's limits, Northbrook's liability under the Northbrook 1980-1983 Policies attaches, and the insurer will pay up to "$15,000,000 ultimate net loss in respect of each occurrence - subject to a limit of . . . $15,000,000 in the aggregate where applicable for each annual period . . . ." *Id.*  Like Northbrook 1979, the Northbrook 1980-1983 Policies do not capitalize or define the term "ultimate net loss."  These policies also contain a "Maintenance of Underlying Umbrella Insurance" condition that is very similar to the one set forth in Northbrook 1979, *to wit*:

14

> This policy is subject to the same terms, definitions (except for those terms defined in paragraph III), exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies listed in Section I. Coverage prior to the happening of an occurrence for which claim is made under this policy . . . .

*Id.* at 4.

The parties' respective positions concerning Allstate's defense obligations under the Northbrook 1980-1983 Policies are largely the same as previously discussed relative to Northbrook 1978 and Northbrook 1979. There is no dispute that the underlying policy (Aetna 1980-1983) required the insurer to pay Zurn's defense costs *in addition to* the policy's liability limits. Zurn and Hartford contend that the Northbrook 1980-1983 Policies follow form to those underlying terms and conditions, requiring Allstate to also pay for Zurn's defense costs separate and apart from the limits of the Northbrook 1980-1983 Policies.

Zurn, however, points to one additional fact: Aetna 1980-1983, unlike Liberty Mutual Umbrella 1979, *does* define the term "ultimate net loss," and does so in a manner that expressly *excludes* defense costs. *See* ECF No. 219-11 at 6 ("**ultimate net loss**" means the sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the **insured** is liable either by adjudication or settlement . . . after making proper deduction for all recoveries and salvages collectible.") (bold print in the original). Under Aetna 1980-1983, the insurer pays defense-related expenses in addition to ultimate net loss. *See id.* at 4 (§2.3(b)) (stating the insurer "will pay with respect to any suit defended . . . *in addition to the amount of ultimate net loss payable* . . . all expenses incurred by [the insurer], all costs taxed against the insured in any such suit and all interest on the entire amount of the judgment therein . . . ."). A separate provision makes clear that liability limits apply only to "ultimate net loss," not defense costs. *Id.* at 5 (Section 4.1). According to Zurn, each of the Northbrook 1980-1983 policies

15

"unambiguously incorporate[s] all of these 'same terms, definitions, exclusions and conditions'" from Aetna 1980-1983, including Aetna's definition of "ultimate net loss," which excludes defense costs. Thereby, Zurn argues, Allstate acquired the obligation to pay Zurn's defense costs outside of the Northbrook policy limits.

For the same reasons previously discussed with respect to Northbrook 1979, the Court concludes that Zurn's and Hartford's arguments lack merit. The plain language of the "Coverage" provision of Northbrook 1980-1983, like that of Northbrook 1979, shows that defense costs are subject to the policies' $15 million limits. Under the "Coverage" provision, Northbrook agreed to indemnify Zurn for "all sums" that Zurn would be "obliged to pay" for damages "and expenses" on account of asbestos-related personal injuries. *See* ECF No. 240-19 at 3, 240-20 at 3, and 240-21 at 3. This agreement to pay is "subject to the limitations, terms, and conditions hereinafter mentioned," including the policy's $15 million limit. *Id.*

Moreover, the "Maintenance of Underlying Umbrella Insurance" condition is materially identical to the version in Northbrook 1979. The Northbrook 1980-1983 Policies incorporate the terms, definitions, exclusions and conditions of Aetna 1980-1983, *except* as regards . . . the amount and limits of liability *and except* as otherwise provided herein . . . ." ECF No. 240-19 at 4, 240-20 at 4, and 240-21 at 4. As the Court has stated previously, the original Northbrook policy terms are intended to take precedence over the incorporated underlying terms to the extend those terms conflict or relate to the "amount and limits of liability." In this Court's view, the Northbrook 1980-1983 Policies express a clear intent that Zurn's defense-related "expenses" should be deducted from the available policy limits. This policy term must be given effect, as it overrides the conflicting terms in the underlying Aetna umbrella policy, which require that defense costs be paid outside of the umbrella policy's liability limits. Accordingly, the Court

will deny Hartford's and Zurn's respective motions for partial summary judgment insofar as they seek declarations that any defense costs paid under the Northbrook 1980-1983 Policies do not erode the relevant policy limits.

### IV. WHETHER AIG AND TRAVELERS HAVE A DUTY TO PAY ZURN'S DEFENSE COSTS OUTSIDE OF POLICY LIMITS PURSUANT TO CERTAIN POLICIES (ECF NOS. 218, 237 and 240)

The next disputed issue is whether Travelers Casualty and Surety Company ("Travelers")[2] and two AIG subsidiaries -- American Home Assurance Company ("American Home") and Granite State Insurance Company ("Granite State") -- have a duty to pay defense costs under the terms of certain excess insurance policies. The two policies pertaining to Traveler's contractual obligations are Aetna 1974-1977 and Aetna 1985. The two AIG policies presently at issue are American Home 1974-1977 and Granite State 1977-1979.[3]

### A. American Home 1974-1977

The Court first considers the provisions of American Home 1974-1977. This excess policy lies above a series of Liberty Mutual umbrella policies spanning the periods April 1, 1974 to April 1, 1975 ("Liberty Mutual Umbrella 1974"), April 1, 1975 to April 1, 1976 ("Liberty

---

[2] For purposes of this litigation, Travelers is proceeding in its own individual capacity and also as successor in interest to Aetna Casualty and Surety Company.

[3] The Court notes that there is a third policy -- Granite State's Quota Share Policy No. 6485-6210 ("Granite State 1985"), under which AIG agrees that Zurn has the right to payment of its defense costs in addition to the policy's limit for the subject asbestos claims; however, AIG asserts that nothing is owed to Zurn at the present time because Zurn has not yet tendered any claims to Granite State under the 1985 policy. Because there is no dispute concerning the meaning of the terms of Granite State 1985 as it relates to Granite State's duty to pay defense costs outside of the policy limits, the Court will enter judgment in favor of Zurn and Hartford to the extent they seek a declaration construing the policy's terms.

Mutual Umbrella 1975"),  April 1, 1976 to April 1, 1977 ("Liberty Mutual Umbrella 1976"),

and April 1, 1977 to April 1, 1978 ("Liberty Mutual Umbrella 1977").  All of these umbrella

policies (collectively referred to as the "Liberty Mutual Umbrella Policies") contain materially

identical terms and have a $9 million policy limit.  Each of the umbrella policies lies above a

Liberty Mutual primary policy spanning the same time period (April 1, 1974 to April 1, 1975,

April 1, 1975 to April 1, 1976, and so on).  There is no genuine dispute that each of the Liberty

Mutual primary policies paid Zurn's defense costs separate and apart from the $1,000,000

liability limit.  *See* ECF No. 316, ¶¶ 13, 14.

     At issue is whether the American Home 1974-1977 policy pays defense costs in a similar

fashion.  Several contractual provisions are potentially relevant to the Court's analysis.

     The first is the "follow form" provision of American Home 1974-1977, which states that,

"subject to all the terms and conditions set forth below . . . the insurance afforded by this policy

shall follow all the terms and conditions of [Liberty Mutual Umbrella 1974[4]], including all

renewals and rewrites thereof."  ECF No. 219-12 at 1.[5]  The American Home policy also

contains a "broad as underlying" endorsement ("Endorsement No. 1"), which states, in relevant

part:

> Notwithstanding anything contained herein to the contrary, it is hereby understood
> and agreed that where the policies listed as underlying are written under terms and
> conditions providing greater protection or indemnity to the insured than the terms
> and conditions of this policy, this insurance shall indemnify the insured upon the
> same terms, conditions and limitations of the applicable underlying insurance.
>                                   * * *

---

[4] *See* Liberty Mutual Umbrella Policy No. LE1-181-014745-174.  ECF No. 219-13.

[5] Insurance contract provisions that appear in all-capital letters in the subject policy will be
reprinted herein in normal typeface for the purpose of enhanced readability.  Similarly, where
insurance policies use boldface type to indicate that a particular term is defined elsewhere in the
policy, the boldface will be omitted unless otherwise indicated.

> Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy, except as hereinabove set forth.

ECF No. 219-12 at 4.

Liberty Mutual Umbrella 1974, in turn, contains a "coverage" clause whereby the insurer agrees "to pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company, agrees to pay, as damages, direct or consequential, because of: (a) personal injury, (b) property damages, or (c) advertising injury or damages . . . caused by an occurrence." ECF No. 219-13 at 66.  The policy also includes a section entitled "Investigation, Defense, Settlement, Assistance and Cooperation," which provides:

> With respect to personal injury, property damage or advertising injury or damages covered under this policy (or which would be covered but for the insured's retention as stated in the declarations), but not covered under any underlying policy or other insurance, the company will
>
> (1) defend any suit against the insured seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation and settlement of any claim or suit as it deems expedient; . . .
>
> (4) pay all reasonable expenses incurred by the insured at the company's request in assisting the company in the investigation or defense of any claim or suit, . . .
>
> and the amounts so incurred, except settlement of claims and suits, are not subject to the insured's retention as stated in the declarations and are payable by the company in addition to the applicable limits of liability of this policy.

*Id.* (bolded print omitted).  Finally, Liberty Mutual Umbrella 1974 contains an amendatory endorsement ("Endorsement No. 3 ("Underlying Policy")), which is identical to Endorsement No. 1 to American Home 1974-1977.  ECF No. 219-13 at 51, 62.  Because Liberty Mutual Umbrella 1974 is materially identical to the other Liberty Mutual Umbrella Policies that were subsequently issued between 1975 and 1977, the latter policies include all of the foregoing provisions.

### 1. The Parties' Positions

Although the parties agree that American Home 1974-1977 "follows form" to the underlying Liberty Mutual umbrella policies, that is essentially where their agreement ends. Fundamentally, the parties disagree about whether, pursuant to the terms of the Liberty Mutual Umbrella Policies, Zurn is owed defense costs in the underlying asbestos cases.

AIG argues that a "plain reading" of the coverage grant in Liberty Mutual Umbrella 1974-1975 (and its renewals) compels the conclusion that the policy does not provide a defense or reimbursement of defense costs, because the coverage grant expressly indemnifies the insured only when Zurn is "legally obligated" to pay "damages." AIG reasons that, by definition, "damages" owed to third parties does not include defense costs; therefore, "where there is no legal obligation to pay damages, and/or there are no damages to pay, and/or there is no occurrence as defined by the policy, there is no insuring obligation at all under the American Home policy." ECF No. 320 at 9. AIG maintains that this interpretation is supported by the language in the American Home Policy's Endorsement No. 1, because the "broad as underlying" clause in the endorsement speaks to the insurance company's promise to "*indemnify*" Zurn upon the same terms, conditions and limitations set forth in the underlying policy. According to AIG, the term "indemnify" reflects the parties' intent to restrict the insurer's obligations to repayment of settlement and judgment amounts only, not defense costs.

Hartford, on the other hand, argues that American Home is bound to pay defense costs, in addition to policy limits, by virtue of the "follow form" provision in its policy, along with the "broad as underlying" endorsement in American Home 1974-1977, and the identical "broad as underlying" endorsement in the underlying Liberty Mutual umbrella policies. Hartford reasons that: (i) the Liberty Mutual primary policies indisputably pay defense costs in addition to policy

limits; (ii) the Liberty Mutual umbrella policies promise to provide "protection or indemnity" as broad as that afforded by the underlying primary policies and, thus, the umbrella policies incorporate the duty to pay defense costs outside of policy limits; and (iii) the American Home policy "follows form" to the Liberty Mutual umbrella policies and promises to provide "protection or indemnity" as broad as those policies. Hartford points out that, consistent with this interpretation, Liberty Mutual paid defense costs for years under its various umbrella policies, separate and apart from the relevant policy limits.

Like Hartford, Zurn contends that American Home has a duty to pay defense costs in addition to the limits of its 1974-1977 excess policy.  Zurn, however, relies (in part) on the "Investigation, Defense, Settlement, Assistance and Cooperation" section in the underlying Liberty Mutual Umbrella Policies.  Zurn interprets this provision as an express promise by the insurer to "defend any [personal injury] suit against the insured" and "pay all expenses incurred by the company . . . in any suit defended by the company" "in addition to the applicable limits of liability."  ECF No.  220 at 16; CSMF ¶¶49-50.  Because the American Home excess policy "follows form" to the Liberty Mutual Umbrella Policies -- and thereby incorporates their "Investigation, Defense, Settlement, Assistance and Cooperation" clause, Zurn concludes that American Home also has a duty to pay defense costs in addition to policy limits.

AIG maintains that the positions of Hartford and Zurn are unfounded.  AIG argues that Hartford misconstrues the so-called "broad as underlying" language in the identical Liberty Mutual and the American Home endorsements.  According to AIG, the endorsement "clearly states that 'this insurance shall indemnify the insured'; it does **not** state that the umbrella policy must defend the insured, as the underlying primary policy must."  ECF No. 320 at 24 (emphasis in the original).  Further, AIG views Liberty Mutual's history of paying for defense costs as: (a)

irrelevant to matters of contract interpretation, and (b) a factual issue that has not yet been fully explored through discovery.

AIG also insists that Zurn's reliance on the "Investigation, Defense, Settlement, Assistance and Cooperation" provision in Liberty Mutual Umbrella 1974 is misplaced. AIG asserts that the provision, "by its unambiguous terms, applies *only* to claims 'not covered under any underlying policy or any other insurance.'" ECF No. 320 at 23 (emphasis in the original). AIG maintains that the subject asbestos claims *are,* in fact, "covered" by other insurance, because "Zurn has been afforded both defense and indemnity for many decades from its primary and other insurers, and continues to be so defended and indemnified to this day." *Id.* Thus, AIG argues, the "Investigation, Defense, Settlement, Assistance and Cooperation" clause has no applicability in this instance.

Zurn counters that AIG has misconstrued the "Investigation, Defense, Settlement, Assistance and Cooperation" clause. According to Zurn, the phrase "'not covered' under any underlying policy or any other insurance" refers to injury or damage as to which no *collectible* insurance proceeds are available due to, *e.g.,* the exhaustion of the underlying policy's limits. Because the underlying Liberty Mutual primary and umbrella policies have all been exhausted, Zurn contends that its injuries are "not covered" by any underlying policies. In support of its position, Zurn points to the "Coverage" section of Liberty Mutual Umbrella 1974-1975. There, the insurer agrees to pay "all sums in excess of the **retained limit**," which is further defined to include only "valid and *collectible* insurance . . . available to the insured." ECF No. 219-13 at 66, 68 (boldface in original; italics added). In Zurn's view, the "Coverage" section "confirms that injuries are 'covered' by the umbrella policies where other insurance is not 'collectible.'" ECF No. 283 at 9.

Zurn concedes that its "other" unexhausted excess policies might technically "cover" the subject asbestos injuries.  But Zurn asserts that each unexhausted policy includes an "other insurance" provision -- like the one in the "Investigation, Defense, Settlement, Assistance and Cooperation" section of the underlying Liberty Mutual Umbrella Policies -- whereby the insurer purports to make its own policy excess to "any other valid and collectible insurance available to the insured."  Zurn contends that these "provisions are mutually repugnant and must be disregarded, leaving American Home to share in paying defense costs with Zurn's other insurers."  ECF No. 283 at 8.

To the extent that AIG's interpretation of the "Investigation, Defense, Settlement, Assistance and Cooperation" clause prevails, Zurn argues that the "broad as underlying" endorsement in the American Home and Liberty Mutual umbrella policies still triggers a duty on the part of American Home to pay defense costs outside of the policy limits.  Zurn reasons that, if AIG's interpretation of the "Investigation, Defense, Settlement, Assistance and Cooperation" clause is correct -- and no defense is available under the umbrella policy's terms, then the Liberty Mutual primary policies plainly provide "greater protection" to Zurn.  The Liberty Mutual umbrella policies would then be deemed to incorporate this "greater protection" through the "broad as underlying" endorsement.  American Home 1974-1977 "follows form" to the Liberty Mutual umbrella policies, and also includes the same "broad as underlying endorsement."  Therefore, Zurn concludes, American Home must pay defense costs outside of policy limits.

### 2. Analysis

Having fully reviewed the subject insurance policies, as well as the parties' filings and cited authorities, the Court agrees with the positions articulated by Zurn and Hartford.  As noted,

the American Home policy follows form to the underlying Liberty Mutual Umbrella Policies, thereby incorporating "all [their] terms and conditions." ECF No. 219-12 at 1. Turning then to the terms and conditions of the Liberty Mutual Umbrella Policies, the Court finds that they require American Home to indemnify Zurn's defense costs relative to any claims as to which American Home was on risk during the policy period. Moreover, these costs must be paid in addition to the policy limits.

First, the Court agrees with Zurn that America Home must assume defense costs pursuant to the "Investigation, Defense, Settlement, Assistance and Cooperation" provision. Under that provision, defense obligations arise as to personal injuries "covered under this policy . . . but not covered under any underlying policy or any other insurance . . . ." ECF No. 219-13 at 66. Because the parties disagree about the meaning of the phrase "not covered," the Court refers to the policy's "Coverage" section. The "Coverage" grant states that "coverage" is afforded for "all sums in excess of the retained limit" that Zurn is obligated to pay as damages for personal injuries "to which this policy applies and caused by an occurrence." *Id.* The "retained limit" is essentially defined as (i) the applicable limits in an underlying policy (to the extent the limits are not exhausted); (ii) "all amounts payable under other insurance" (meaning "valid and collectible insurance" that is "available" to Zurn); and (iii) at a minimum, the insured's retention amount. *Id.* at 6. A personal injury is thus "covered" under the Liberty Mutual Umbrella Policies when the insured has exhausted the limits of any underlying policy and has collected all available "other insurance," but still must pay damages in excess of those amounts. Viewing the term "covered" in this light supports Zurn's interpretation that, for purposes of the "Investigation, Defense, Settlement, Assistance and Cooperation" provision, a personal injury claim is "not

24

covered" by underlying insurance or by "other insurance" if the policy's limit has been exhausted.

Still, this begs the question whether American Home has defense payment obligations in the subject asbestos cases where, notwithstanding the apparent exhaustion of American Home's underlying primary and umbrella policies,[6] Zurn's other excess policies have not yet been exhausted. In this Court's view, the question turns primarily on the meaning of "other insurance," rather than the term "covered."

The pre-printed umbrella policy form language states only that, "[f]or the purpose of determining the retained limit, "other insurance" means any other valid and collectible insurance (except under an underlying policy) which is available to the insured, or would be available to the insured in the absence of this policy, it being the intention that this policy shall not apply under or contribute with such other insurance unless the company's agreement thereto is endorsed hereon." ECF No. 219-13 at 68. An endorsement providing "Additional and Amended Definitions" states, with respect to "Other Insurance":

> It is agreed that this insurance . . . shall not duplicate or apply concurrently with other forms of property damage insurance available to the named insured such as, but not limited to, Fire and Extended Coverage, Builders Risk coverage or Installation Risk coverage and . . . shall not inure to the benefit of any insurer issuing any such other forms of insurance to the named insured.

ECF No. 29-13 at 52. If "other insurance" is defined only in terms of "other forms of property damage insurance," then the subject personal injury claims are "not covered" by such "other insurance," and American Home's defense obligations are thereby triggered.

---

[6] The Court notes that Allstate has assumed payment for Zurn's defense, with a reservation of rights, under Northbrook Policy No. 63-004-463. However, Allstate represents that it has satisfied the limits of that policy. *See* ECF No. 239 at 3.

On the other hand, both AIG and Zurn appear to assume that "other insurance" might include Zurn's other excess insurance policies that were issued for subsequent policy periods. But if this construction is adopted, it does not change the Court's conclusion that American Home is liable for defense costs. When the coverage provision of the Liberty Mutual Umbrella Policies is read in conjunction with the related definition of "retained limit," and the pre-printed definition of "other insurance," the effect of these provisions is to make the Liberty Mutual Umbrella Policies excess to all "other (collectable) insurance." American Home would essentially be a payor of last resort and any claim "covered" by the Liberty Mutual terms would, by definition, *not* be "covered" by any other insurance. And, because the policies' defense obligations apply only with respect to "covered" injury or damage, those defense obligations also would be excess to other insurers' obligations. But requiring the insured to horizontally exhaust all other extant policies in this fashion is contrary to the rule of *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507 (Pa. 1993), whereby "a policy which promises to pay 'all sums' must provide for *full* coverage once triggered, without regard for such 'other insurance' clauses." *Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440 (3d Cir. 1996). As the U.S. Court of Appeals for the Third Circuit observed in *Koppers*:

> The [Pennsylvania Supreme Court] held [in *J.H. France*] that it was irrelevant whether other policies were also triggered, concluding that, "The insurer in question must bear potential liability for the entire claim." [626 A.2d] at 508. Here, the London Insurers agreed to pay "all sums"[ ] in excess of the specified limits of the directly underlying policies. Once the directly underlying coverage has been exhausted, then, each excess policy must indemnify the insured for the full excess loss up to policy limits. Under *J.H. France*, the insured gets indemnified first (pursuant to the insuring agreements) and then the insurers may seek to redistribute the burden among themselves. It is only at this latter stage that the "other insurance" clauses become relevant, so the London Insurers' exhaustion argument based on the "other insurance" clauses must be rejected.

98 F.3d at 1454 (footnote omitted).  Thus, the "other insurance" language in the Liberty Mutual

Umbrella Policies can not be applied in a manner that would frustrate Zurn's efforts to vertically

exhaust its otherwise triggered excess insurance coverage.

There is a second basis for disregarding the "other insurance" language in the Liberty

Mutual Umbrella Policies.  Namely, Zurn asserts that each of its unexhausted insurance policies

contains an "other insurance" provision that purports to make the subject policy excess to others

in similar fashion.  ECF No. 283 at 8.  That is plainly true with respect to the various Northbrook

excess policies spanning the period April 1, 1979 through April 1, 1983.  *See* ECF Nos. 219-3,

240-16, 240-19, 240-20, 240-21; *see also* ECF No. 249 at 2 (Allstate arguing that the Northbrook

policies "each contain a true 'excess' other insurance clause, which explicitly states that the

coverage applies only in excess of other insurance"). And, as discussed in more detail below, it is

also true with respect to the Royal and New England policies that are the subject of Allstate's

Rule 56 motion concerning allocation of defense costs. The Court's perusal of the other

unexhausted insurance policies of record appears to confirm Zurn's representation. Under

Pennsylvania law, however, insurance policy clauses that purport to make competing policies

"excess" to one another must be disregarded and deemed stricken if they are "mutually

repugnant."  *St. Paul Fire & Marine Ins. Co. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, No. 2:19-

CV-05471-JDW, 2021 WL 859407, at *5 (E.D. Pa. Mar. 8, 2021).  Excess clauses are mutually

repugnant where "'following the express dictates of one policy . . . would be in direct conflict

with the dictates of the other.'"  *Id.* (quoting *Am. Case. Co. of Reading, Pa. v. PHICO Ins. Co.*,

702 A.2d 1051, 1054 (Pa. 1997)).  Here, the "other insurance provisions" in the Liberty Mutual

Umbrella Policies are in direct conflict with the excess provisions in the other policies of record;

consequently, any language in the Liberty Mutual policies purporting to make the insurance excess to other indemnity or defense insurance must be disregarded.[7]

As noted, AIG advocates a different interpretation of injury "covered under this policy . . . but not covered under any underlying policy or any other insurance." Under AIG's interpretation, the term "covered" refers to the *scope* of coverage, i.e., whether the subject injury involves the type of risk covered by the policy in question. Thus, in AIG's view, the asbestos claims at issue in this litigation *were* covered by the underlying policies and *are presently* covered by the other policies currently paying such claims. If this interpretation is adopted, then the "Investigation, Defense, Settlement, Assistance and Cooperation" clause in Liberty Mutual Umbrella Policies does not apply. But American Home still incurs defense costs under this line of analysis by virtue of the endorsements in the American Home and Liberty Mutual Umbrella Policies which provide "protection or indemnity" as broad as their underlying policies.

As discussed, the underlying primary policies in effect from April 1, 1974 through April 1, 1978 all provided Zurn a defense and/or reimbursement of defense costs, separate and apart from the policy limits, and no party appears to contend otherwise.[8] Amendatory Endorsement

---

[7] As the Court discusses *infra* in connection with the Court's consideration of Allstate's motion for summary judgment on the allocation of defense costs, it is not even clear that "other insurance" clauses can validly be applied to policies that cover a subsequent risk period. However, the Court need not address that question because, even if the Liberty Mutual Umbrella Policies could theoretically be excess to other, subsequent insurance policies, the "other insurance" clauses are mutually repugnant and must be disregarded.

[8] The primary policies state:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A:  bodily injury
>
> Coverage B:  property damages

No. 3 in the Liberty Mutual Umbrella Policies states that, "[n]otwithstanding anything contained herein to the contrary, . . . where policies listed as underlying are written under terms and conditions providing greater protection or indemnity to the insured than the terms and conditions of this policy, this insurance shall indemnify the insured upon the same terms, conditions and limitations of the applicable underlying insurance." ECF No. 219-13 at 52.  To the extent the preprinted terms of the Liberty Mutual Umbrella Policies can be construed as denying Zurn defense costs for the underlying asbestos claims, the overriding endorsement requires that the policy be read to indemnify Zurn upon the "same terms, conditions and limitations of the applicable underlying insurance." *Id.*

AIG insists that the amendatory endorsement was intended only to indemnify Zurn for liabilities related to settlements and judgments.  It maintains that the phrase "shall indemnify" necessarily relates to the insurer's promise to pay "all sums" that Zurn "shall become legally obligated to pay" -- meaning settlement and judgments -- under the initial coverage grant. According to AIG, nothing in the endorsement states or implies that the policies will also defend the insured.

AIG's argument is not persuasive.  The endorsement speaks not just to situations where the underlying primary policy provides greater "indemnity"; rather, it applies to situations where

---

> to which this policies applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage[.]

In a separate provision entitled "Supplementary Payments," Liberty Mutual agreed "[to] pay, in addition to the applicable limit of liability: all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein[.]" *See* ECF No. 316, ¶¶13-14; *see also* ECF No. 240-4 at 122-123.

the primary policy provides "greater protection or indemnity."  These terms are not defined in

the policy, but under Pennsylvania law, "[w]ords of 'common usage' in an insurance policy are

to be construed in their natural, plain, and ordinary sense, and a court may inform its

understanding of these terms by considering their dictionary definitions." *Wall Rose Mut. Ins.*

*Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. Ct. 2007).   To that end, the Court notes that the

term "protect" means "to cover or shield from exposure, injury, damage or destruction," to

"guard" or "defend," "to maintain the status or integrity of especially through financial or legal

guarantees: such as . . . to save from contingent financial loss." *See* https://www.merriam-

webster.com/dictionary/protect.  The term "indemnify" means "to secure against hurt, loss, or

damage" or "make compensation to for incurred hurt, loss or damage." *See*

https://www.merriam-webster.com/dictionary/indemnify.  "Indemnity" is commonly defined as

"security against hurt, loss, or damage" or "exemption from incurred penalties or liabilities." *See*

https://www.merriam-webster.com/dictionary/indemnity.

In this Court's view, a policy that imposes a duty on the insurer to defend or to pay

defense costs outside of policy limits provides "greater protection" to the insured than one that

does not impose defense obligations at all.  And the umbrella policy's promise that the insurer

"shall indemnify" Zurn "upon the same terms [and conditions]" set forth in the primary policy

logically means, in this context, that Liberty Mutual agreed to pay or reimburse Zurn for those

expenses covered in the primary policies, which included legal expenses and not simply

judgments or settlements.  *See, e.g., Siltronic Corp. v. Emps. Ins. Co. of Wausau*, No. 3:11-CV-

1493-YY, 2017 WL 6943151, at *6 (D. Or. Dec. 29, 2017) ("Wausau's policies, which provide

for defense costs above and beyond policy limits, necessarily provide greater protection than

Granite State's policies, which provide only for defense costs limited by policy limits."), *report*

30

*and recommendation adopted,* No. 3:11-CV-01493-BR, 2018 WL 1535474 (D. Or. Mar. 29, 2018)

Critically, the American Home policy follows form to the underlying Liberty Mutual Umbrella Policies, subject to certain "terms and conditions" which consist solely of the named insured, its address, the policy period, the type of coverage ("Excess Third Party Liability Including Products"), the liability limits, and the premium amount. Nothing else in the policy's terms and conditions serves to qualify the "follow form" language. Thus, American Home 1974-1977 follows the terms and conditions of the underlying Liberty Mutual Umbrella Policies, which promise to indemnify Zurn in accordance with the more favorable terms in the underlying primary policies, which terms include the insurer's agreement to pay defense costs.

Moreover, Pennsylvania law requires that ambiguous policy provisions be construed in favor of coverage, particularly when an amendatory endorsement favoring the insured conflicts with less favorable language found in pre-existing policy language. *See Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co.*, Civil Action No. 11-247, 2013 WL 5436934, at *33 (W.D. Pa. Sept. 27, 2013) (holding that excess carrier's defense obligations were coextensive with its underlying policies, where amendatory endorsement "following form" to underlying policies was ambiguous). Consequently, to the extent the Liberty Mutual "broad as underlying" endorsement gives rise to an ambiguity, it must be construed in favor of broader coverage. This rule of construction also supports the interpretation proffered by Zurn and Hartford.

Based upon the foregoing considerations, the Court concludes, as a matter of law, that American Home has the duty to indemnify Zurn's defense costs under the terms of American Home 1974-1977. Moreover, the policy requires that defense costs be paid separate and apart from the indemnity limits.

B. Granite State 1977-1979

When the American Home Policy expired on December 17, 1977, it was replaced by Granite State Policy No. 80-93353, which covers the period December 17, 1977 to April 1, 1979. This policy (hereafter, "Granite State 1977-1979") provides Excess Liability Insurance up to a limit of "$5,000,000 each occurrence subject to an aggregate of $5,000,000."   ECF No. 219-17 at 1.

Like the American Home policy which preceded it, Granite State 1977-1979 contains a "following form" provision stating that, "subject to all the terms and conditions set forth below ... the insurance afforded by this policy shall follow all the terms and conditions" of the underlying umbrella policy.  ECF No. 219-17 at 1.  The only "terms and conditions" to which the following form language is "subject" are the insured's name and address, the policy period, the type of coverage (i.e., "Excess Liability Insurance"), the liability limits, the premium amount and the "flat charge" rate.  *Id.*

The underlying umbrella policy, Liberty Mutual Umbrella 1977, is materially identical to the other Liberty Mutual Umbrella Policies that underlie American Home 1974-1977. Accordingly, Granite State 1977-1979 incorporates all of the same umbrella policy provisions that were incorporated into American Home 1974-1977.  In addition, Granite State 1977-1979 contains a "broad-as-underlying" endorsement ("Endorsement No. 2"), which is identical to Endorsement No. 1 in the American Home Policy.  Thus, Granite State agreed,

> [n]otwithstanding anything contained herein to the contrary, . . . that where policies listed as underlying are written under terms and conditions providing greater protection or indemnity to the Insured than the terms and conditions of this policy, this insurance shall indemnify the insured upon the same terms, conditions and limitations of the applicable underlying insurance.

ECF No. 219-17 at 3.

On April 1, 1978, three and a half months after the Granite State policy term began, Zurn replaced the underlying Liberty Mutual umbrella insurance with Northbrook 1978. This change, effective April 1, 1978, was noted in Endorsement No. 3 to the First Granite State Policy, pursuant to which Granite State "agreed that the terms and conditions of this policy shall conform to [Northbrook 1978]." ECF No. 219-17 at 4.

The parties' arguments relative to defense costs under Granite State 1977-1979 largely mirror their arguments concerning defense obligations under American Home 1974-1977 and Northbrook 1978. Zurn and Hartford both contend that, because Granite State 1977-1979 follows form to Liberty Mutual Umbrella 1977, it incorporates the umbrella policy's obligation to pay defense costs outside of policy limits. Zurn focuses on the Liberty Mutual "Investigation, Defense, Settlement, Assistance and Cooperation" provision, while Hartford focuses on the identical "broad-as-underlying" endorsements in the Granite State and Liberty Mutual policies. Both Zurn and Hartford argue that the amendments to Granite State 1977-1979 that were effectuated by Endorsement No. 3 did not alter Granite State's defense cost obligations. They contend that, by virtue of the endorsement's "follow form" language, Granite State 1977-1979 incorporated the defense cost obligations set forth in Northbrook 1978.

AIG disputes Granite State's alleged defense obligations on the same grounds discussed relative to the American Home policy. AIG contends that the Liberty Mutual "Investigation, Defense, Settlement, Assistance, and Cooperation" provision has no application here by virtue of the fact that the subject asbestos claims are "covered" by "other insurance." AIG also contends that the "broad-as-underlying" endorsements pertain only to indemnification for judgments and settlements, and do not impose upon Granite State a duty to defend. To the extent Zurn and Hartford point to Liberty Mutual's practice of paying defense costs in addition to paying the

policy limits of its umbrella policies, AIG views this issue as an undeveloped factual issue that is legally irrelevant to matters of contract interpretation. With respect to Zurn's replacement of its underlying umbrella policy, AIG maintains that there is no evidence that the contracting parties intended this change to effect a transformation of that policy from one that provides no defense to a policy that does. While Endorsement No. 3 states that Granite State 1977-1979 "shall conform to" the new underlying policy (Northbrook 1978), AIG interprets this language as indicating merely that the Granite State policy "conformed" to the extent necessary to provide uninterrupted coverage consistent with the terms, limits and conditions as originally issued, notwithstanding the change in underlying umbrella coverage.

Having considered the parties' respective arguments and cited authorities, the Court concludes that Granite State is obligated under the terms of the 1977-1979 policy to pay Zurn's defense costs. For the reasons previously discussed, Liberty Mutual Umbrella 1977 obligates the insurer to pay defense costs outside of policy limits, while Northbrook 1978 obligates the insurer to pay defense costs within policy limits. The "following form" language in Granite State 1977-1979 demonstrates Granite State's intent to be bound by all of the terms in the underlying policies, including those pertaining to defense obligations. Moreover, the "broad-as-underlying" language in Endorsement No. 3 demonstrates Granite State's intent to provide as much "protection" to Zurn as is afforded to Zurn under the Liberty Mutual and Northbrook umbrella policies. In the Court's view, this "protection" includes payment of defense costs. Consistent with the Court's prior rulings, however, Granite State is only obligated to pay defense costs outside of policy limits relative to the policy period December 17, 1977 to April 1, 1978, during which time it was excess of Liberty Mutual 1977. For the period April 1, 1978 through April 1,

1979, Granite State is only obligated to pay defense costs within the policy limits, consistent with the incorporated terms of Northbrook 1978.

C.  Aetna 1974-1977

The Court next considers the provisions of Aetna 1974-1977, which lies directly above American Home 1974-1977 and identifies the latter as an underlying policy.  ECF No. 240-10. Pursuant to this policy, Aetna agreed to pay Zurn's "Excess Net Loss arising out of an . . . occurrence during the policy period, subject to the limits of liability . . . and to all of the terms of this policy." ECF No. 240-10 at 3.  "Excess Net Loss" is defined to mean

> that part of the total of all sums which the INSURED becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence, and which would be covered by the terms of the Controlling Underlying Insurance, if written without any limit of liability, less realized recoveries and salvages, which is in excess of any self-insured retention and the total of the applicable limits of liability of all [scheduled underlying insurance] whether or not such policies are in force.

*Id.*  Under the policy, "Loss shall not include any costs or expense in connection with the investigation or defense of claims or suits, or interest on any judgment after entry of the judgment."  *Id.*

The "Conditions" of Aetna 1974-1977 state that the insurer "shall not be liable for more than the amount of the limits stated . . . with respect to Excess Net Loss resulting from any one accident or occurrence . . . ."  *Id.* at 5.  Moreover, "Aetna Casualty shall not be called upon to assume charge of the settlement or defense" of any claims or suits against Zurn, but it is afforded "the right" and "the opportunity" to "associate" with Zurn or its underlying insurers "in the defense and control" of a claim or suit that "involves or appears reasonably likely to involve" Aetna. *Id.*

35

Notably, however, Aetna 1974-1977 also includes an endorsement amending the definition of "Underlying Policy." Like the broad-as-underlying endorsements in American Home 1974-1977 and Liberty Mutual 1974, the amending endorsement in Aetna 1974-1977 states that:

> Notwithstanding anything contained herein to the contrary, it is hereby understood and agreed that where policies listed as underlying are written under terms and conditions providing greater protection or indemnity to the insured than the terms and conditions of this policy, this insurance shall indemnify the insured upon the same terms, conditions and limitations of the applicable underlying insurance.

ECF No. 240-10 at 10.  The endorsement clarifies, however, that "in no event shall this policy provide any coverage for engineers or architects errors & omissions."  *Id.*

Hartford seeks a ruling from this Court declaring that Travelers must pay defense costs in addition to the liability limits under the terms of Aetna 1974-1977.  ECF No. 240.  Hartford's rationale is straightforward. Based upon its assertion that underlying American Home and Liberty Mutual Umbrella Policies provide defense costs in addition to policy limits, Hartford reasons that Aetna Excess 1974-1977 does the same, since it conforms to any "greater protection or indemnity" in the underlying policies.

Travelers opposes Hartford's motion on the grounds that Aetna 1974-1977 is clearly structured as an "Excess Overlayer Indemnity Policy" that only pays for Zurn's "Excess Net Loss," and "Excess Net Loss" is defined to include settlements or judgments, but not defense costs.  Moreover, Travelers insists that it has no obligation to pay more than the applicable limit of liability for covered "Excess Net Loss."  Travelers denies that the amending endorsement is a "follow form" endorsement.  Instead, Travelers argues, the endorsement's only effect is to broaden the scope of the indemnity coverage provided by the policy.

Thus, the central issue in dispute is whether the policy's "broad as underlying" endorsement evidences the contracting parties' intent to impose defense cost obligations on the insurer, notwithstanding the policy's express exclusion of defense costs from any calculation of the "excess net loss" that will be paid.

Although this question presents a closer call than in the context of the AIG policies, the Court cannot say that Hartford's (and Zurn's) proposed construction of Aetna 1974-1977 is unreasonable as a matter of law. The endorsement's opening phrase "notwithstanding anything contained herein to the contrary" clearly indicates that the endorsement overrides any conflicting terms that are part of the standard insurance policy. And its reference to "*anything* contained herein" is unequivocal. Thus, a fair reading of the endorsement suggests that its provisions take precedence over the standard contractual provisions that precede it. The endorsement clearly evidences an intention to provide "protection" to Zurn on par with any "protection" that is provided in the "underlying policies." The underlying policies include the Liberty Mutual Umbrella and Primary policies, both of which pay defense costs outside of policy limits. And the payment of defense costs outside of policy limits constitutes "greater protection" for Zurn than mere indemnity payments alone. Moreover, a provision dealing with defense costs can fairly be viewed as a "term or condition" of an insurance policy. In fact, Aetna 1974-1977's "Conditions" specifically address Aetna's responsibilities vis-a-vis lawsuits and claims, but the standard contract provides no defense obligation. The defense provisions in the underlying policies can therefore be construed as "terms and conditions" which provide "greater protection or indemnity" to Zurn than the "terms and conditions" of Aetna 1974-1977. Finally, the Court notes that the endorsement specifically excludes any coverage for errors and omissions by engineers or architects. Aetna could have written a more expansive exception to the endorsement

37

in order to clarify that payment of defense costs was not among the terms it was importing into Aetna 1974-1977; however, it did not do so. As Aetna did not clearly spell out its intent in this regard, the policy is reasonably capable of being construed in more than one sense, and the Court will therefore interpret the ambiguity in favor of more coverage. *Riccio,* 705 A.2d at 426 (ambiguous policy provisions must be construed in favor of the insured).

D. Aetna 1985

Hartford also requests a declaration that Travelers must pay defense costs in addition to policy limits under Aetna Policy No. 01 XN 5183 WCA ("Aetna 1985"). This policy was issued to Zurn as part of a quota share layer covering the period April 1, 1985 to April 1, 1986. Like the 1974-1977 policy, Aetna 1985 states that the insurer "will indemnify [Zurn] against Excess Net Loss arising out of an accident or occurrence during the policy period, subject to the limits of liability . . . and to all of the terms of this policy." ECF No. 240-25 at 3. Here again, "Excess Net Loss" pertains to sums which the Insured must pay as damages," and "Loss" expressly excludes legal costs or expenses. *Id.* The policy contains the same "Conditions" as are set forth in Aetna 1974-1977 pertaining to the "Limits of Liability" and "Assistance and Cooperation" with lawsuits. Thus, under Aetna 1985, "Aetna Casualty shall not be liable for more than the amount of the limits stated . . . with respect to Excess Net Loss . . . ." ECF No. 240-25 at 5. In addition, Aetna is not required to "assume charge of" the settlement or defense of a lawsuit, but has the right and the opportunity to "associate" with Zurn or Zurn's underlying insurers where a claim appears "reasonably likely" to involve Aetna. *Id.*

Like Aetna 1974-1977 the 1985 policy includes an amendatory endorsement. This provision, styled as a "Follow Form Endorsement," is slightly different from the endorsement included in the 1974-1977 policy. It states that:

> Notwithstanding any provision in this policy to the contrary, the insurance afforded by this policy shall follow the insuring agreement and coverage and is subject to the same warranties, terms, definitions, conditions and other provisions as are contained in the Controlling Insurance.  It is agreed however that the foregoing shall not apply as respects the following endorsements:
>
> Endorsement No. 2 Pollution Liability Exclusion Form XN 13179-C.

ECF No. 240-25 at 10.  The "Controlling Insurance" referred to in the Follow Form Endorsement is Aetna Umbrella Policy No. 03 XS 1790 SCA ("Aetna Umbrella 1983-1985").[9] Aetna Umbrella 1983-1985, in turn, contains the same "broad as underlying" endorsement as is contained in American Home 1974-1977, Aetna 1974-1977, Granite State 1977-1979, and the Liberty Mutual 1974-1978 Umbrella Policies.  *See* ECF No. 240-26 at 9.

The Court need not expound at length on the parties' positions relative to Aetna 1985, because they essentially mirror the arguments made with respect to Aetna 1974-1977.  At bottom, the parties dispute the meaning of the Follow Form Endorsement in Aetna 1985 and, specifically, whether it overrides other terms in the policy relating to defense costs.  Hartford asserts (and Zurn agrees) that the endorsement incorporates obligations for the insurer to pay defense costs because:  (i) Aetna 1985 follows form to the underlying umbrella policy (which is Aetna Umbrella 1983-1985 - the "Controlling Agreement"); (ii) the underlying umbrella policy provides coverage as broad as the underlying primary policy, *see* ECF No. 240-26 at 9; and (iii) the relevant primary policy (Aetna Policy No. 03 GL 1235 SRA) imposed a duty upon  Zurn's insurer to pay defense costs in addition to the policy's limits, *see* ECF No. 240-28 at 5.

---

[9] This umbrella policy had an original policy period of April 1, 1983 to April 1, 1986; however, the policy was cancelled on April 1, 1985 and replaced as of that date with Aetna Policy No. 03-XS-1797-SCA ("Aetna Umbrella 1985"), which imposes a duty upon the insurer to pay defense costs outside of policy limits.  *See* ECF No. 240-27 at 5.

Travelers opposes Hartford's motion on the same bases previously articulated. With respect to the "Follow Form Endorsement" in Aetna 1985, Travelers notes that the endorsement specifically references "the insurance afforded by this policy."  Travelers argues that it is "the insurance afforded" under Aetna 1985 -- i.e., indemnity for settlements and judgments only -- that is subject to the endorsement; therefore, any "warranties, terms, definitions, conditions and other provisions" incorporated from the "Controlling Insurance" must be viewed as part of an indemnity only policy.

Given the strong similarities between Aetna 1974-1977 and Aetna 1985, the Court's analysis and finding of ambiguity remains the same.  Travelers' construction of the Follow Form Endorsement is not unreasonable *per se*, but it is also not the only reasonable interpretation. Rather, the endorsement can be fairly construed as overriding the provisions of the standard policy and incorporating into Aetna 1985 the insurer's obligation to pay defense costs outside of policy limits, as set forth in Zurn's 1983-1986 primary policy and as incorporated into the 1983-1985 Travelers Umbrella Policy.  Given this ambiguity in Aetna 1985, the Court will construe the policy in Zurn's favor.  As a result, Hartford is entitled to a declaration that Travelers must pay defense costs outside of policy limits pursuant to Aetna 1985.

## V.   WHETHER CERTAIN POLICIES ARE EXCESS TO THE ROYAL AND NEW ENGLAND POLICIES WITH RESPECT TO DEFENSE COSTS (ECF No. 246)

### A.   Allstate's Motion for Partial Summary Judgment (ECF No. 246)

The Court will next address Allstate's motion for partial summary judgment on the issue of allocation of defense costs.  ECF No. 246.  At issue are six excess insurance policies issued by

Northbrook, namely:  Northbrook 1978, Northbrook 1979, Northbrook 1980, Northbrook 1981,

Northbrook 1982, and Northbrook 1983.  See ECF Nos. 247-2 through 247-7.  Allstate argues

that the Northbrook policies are excess to policies issued by Royal and New England, relative to

the insurers' duty to defend and/or reimburse defense costs.

Each of the Northbrook policies promises, subject to specified "limitations, terms and

conditions," to "indemnify the Insured for all sums which the Insured shall be obliged to pay by

reason of the liability imposed upon the Insured by law…for damages, direct or consequential

and expenses on account of: (a) Personal Injuries, including death at any time resulting

therefrom… ."  ECF Nos. 247-2 through 247-7.   In addition, Northbrook 1978 and 1979 contain

the following clause addressing "other insurance":

> If other valid and collectible insurance with any other Insurer is available to the
> Insured covering a loss also covered by this policy, other than insurance that is in
> excess of the insurance afforded by this policy, the insurance afforded by this policy
> shall be in excess of and shall not contribute with such other insurance.

ECF Nos. 247-2 and 247-3.  Northbrook 1980, 1981, 1982, and 1983 contain a slightly different

"other insurance" clause:

> Except as respects coverage written specifically as contributing insurance with this
> policy or to apply excess of this policy, this policy shall be excess insurance over
> any other insurance available to the Insured with respect to an occurrence covered
> hereunder.

ECF Nos. 247-4 through 247-7.

Allstate characterizes the latter two clauses as "true 'excess' other insurance" clauses.

ECF No. 249 at 2.  It contrasts them with the "other insurance" clauses contained in two policies

issued by Hartford's subsidiaries:  Royal 1983-1984 and New England 1984-1985.

It is undisputed that, except with respect to limits of liability and premium amounts, both

the Royal and New England policies "follow form" to an underlying umbrella policy issued by

Aetna for the time period April 1, 1980 through April 1, 1983 -- namely, Policy No. 03XS1790SCA[10] (at times, "Aetna Umbrella 1980-1983").          Relevant to the present dispute are certain provisions of the Aetna Umbrella policy, which are incorporated into the Royal and New England excess policies.

First, under Section 2.1 (entitled "Coverage"), Aetna Umbrella 1980-1983 states that, subject to certain non-relevant exclusions, the insurer will "pay on behalf of the insured the ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of . . . personal injury . . . to which this policy applies, caused by an occurrence . . . ." ECF No. 219-21 at 31 (original in capital letters).[11]

Next, Section 2.3 sets forth a provision entitled "Defense of Suits Not Covered by Other Insurance" which, by virtue of an amendatory endorsement, reads:

> (A) the company shall defend any suit seeking damages which are not payable on behalf of the insured under the terms of the policies of underlying insurance described in section 1 or any other available insurance
>
> (1) because such damages are not covered thereunder, or
> (2) because of exhaustion of an underlying limits of liability by payment of claims[ ]
>
> but which are payable under the terms of section 2.1 … even if any of the allegations of the suit are groundless, false o[r] fraudulent; but the company may make such investigation and settlement of any claim or suit as it deems expedient. However, the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payments of judgments or settlements.

------

[10] Although the New England policy's initial endorsement followed form to Aetna "Policy No. 03XS1787SCA," a subsequent endorsement corrected the policy number to read "Policy No. 03SX1790SCA."

[11] This language became effective April 1, 1984 through an amendatory endorsement.  As originally stated, Section 2.1 stated that "[t]he company will indemnify the insured for ultimate net loss in excess of the applicable underlying limit . . . ." ECF No. 219-21 at 3 (omitting bold print, indicating terms defined elsewhere in the policy).

ECF No. 219-21 at 33 (all caps omitted).

> Third, the Aetna Umbrella Policy contains the following "other insurance" clause:

> 6.7 Other Insurance. The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance available to the insured and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise, unless such other insurance specifically applies as excess insurance over the limits of liability provided in this policy.

ECF No. 219-21 at 5 (bold print, indicating defined terms, omitted).  The policy defines "ultimate net loss" as "the sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable either by adjudication or settlement with the written consent of the company, after making proper deduction for all recoveries and salvages collectible.  *Id.* at 58 (bold print omitted).

### 1.  *The Parties' Respective Positions*

Allstate argues that, based upon a comparison of the Aetna and Northbrook "other insurance" clauses, this Court should conclude that the Northbrook policies are excess policies to the Royal and New England policies when it comes to paying defense costs.  Allstate reasons that the Aetna policy's "other insurance" provision -- which is incorporated into the Royal and New England policies -- pertains only to "ultimate net loss," which includes indemnity costs only and excludes defense costs.  By contrast, Allstate argues, the Northbrook "other insurance" clauses apply broadly to *both* indemnity and defense costs.  As a result, Northbrook concludes, the Northbrook Policies must be construed as "excess" of the Royal and New England policies for purposes of allocating defense costs for the underlying asbestos claims.

Hartford opposes Allstate's position on allocation of defense costs, except insofar as Allstate's motion relates to Northbrook 1983-1984.  As to the latter policy, Hartford concedes

that Northbrook 1983-1984 is a fifth-layer excess policy, and thus inherently excess to the Royal Policy, which is a second-layer excess policy. See ECF No. 285 at 4-5. Based on this concession, Allstate's motion will be granted insofar as it seeks a declaration that its defense cost obligations under Northbrook 1983-1984 are excess to any payments Zurn may receive under the Royal Policy.

As to the remaining Northbrook policies (i.e., those covering the time period April 1, 1978 through April 1, 1983), Hartford observes that these policies all predate the coverage period provided by Royal 1983-1984 and New England 1984-1985. As a result, Hartford argues, the "other insurance" clauses in Northbrook 1978-79, 1979-80, 1980-81, 1981-82 and 1982-83 have no application vis-a-vis the Royal and New England policies, because "other insurance" exists only as among policies provide *concurrent* coverage. Beyond this, Hartford denies that the "other insurance" clauses in the Royal and New England policies apply only to indemnity costs. Rather, Hartford says, its "other insurance clauses" are properly understood as making the Royal and New England policies excess to the 1978-1983 Northbrook policies in all respect. To the extent the Northbrook and Hartford policies each purport to be excess of the other, Hartford maintains that the policies are mutually repugnant under Pennsylvania law, and neither insurer's "other insurance" provisions are to be given any effect.

In its reply, Northbrook disputes that, under Pennsylvania law, "other insurance" clauses must have concurrent effective periods in order to be applicable. Northbrook contends that its position (that an "other insurance" clause can be effective as to a consecutive or non-concurrent policy) is established by *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502 (Pa. 1993) and *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440 (3d Cir. 1996). Northbrook also cites *Pac. Indem. Co. v. Linn*, 766 F.2d 754, 767-68 (3d Cir. 1985), for the proposition that,

under Pennsylvania law, successive policies can be concurrent for purposes of applying other insurance clauses.

### 2. Analysis

Presently, the Court need not resolve the parties' dispute about whether "other insurance" clauses are applicable vis-a-vis consecutive policies in the context of asbestos personal injury cases. Even assuming for the moment that they are, the Court is not persuaded that the relevant policy language establishes Northbrook's defense obligations as excess to Hartford's under the Royal and New England policies.

Both sides appear to agree that the "other insurance" clauses in the various Northbrook policies purport to render those policies excess to other "valid and collectible" or "available" insurance. Their disagreement centers around their competing interpretations of the "other insurance" clause set forth in Aetna Umbrella 1983-1985, to which both the Royal and New England policies follow form. Although Allstate contends that the Aetna clause pertains only to indemnity, not defense costs, the Court does not agree.

As noted, the relevant provision in the Aetna Umbrella policy states that

> The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance available to the insured and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance specifically applies as excess insurance over the limits of liability provided in this policy.

ECF No. 219-21 at 5. Allstate focuses on the phrase "applicable to any part of ultimate net loss," as dispositive language; then, because "ultimate net loss" is defined in terms of "sums actually paid or payable in cash in the settlement or satisfaction of any claim or suit" -- a definition that does not include defense costs, Allstate assumes that the Aetna policy purports to be excess to other insurance only as it relates to settlements or judgments. But the reference to "ultimate net

loss" merely establishes the prerequisite that there be an identity of covered risk in the competing policies -- that is, the competing policies must both cover at least some "part of [the insured's] ultimate net loss."  The Court therefore agrees with Hartford's view that referenced language merely establishes the relevance of the competing "other" insurance by specifying that it covers the claim against the insured; the Northbrook policies do the same thing by referring to other insurance that "'cover[s] a loss also covered by this policy'" or other insurance "'available to the insured with respect to an occurrence covered hereunder.'"  ECF No. 285 at 12.  Assuming that commonality, "[t]he insurance afforded" by the Hartford policies -- which includes defense costs -- is "excess insurance" over other "insurance available to the insured."

In sum, both the 1978-1983 Northbrook policies and Royal/ New England policies purport to be excess over "other" available insurance with respect to payments made toward judgments, settlements, and defense costs.  Because the Northbrook and Hartford policies each claim to be excess over the other, they are mutually repugnant, and the "other insurance" clauses are ineffective.  Each insurer must therefore share in the cost of Zurn's defense as to asbestos personal injury claims for which they are both on risk.  Accordingly, Allstate's motion seeking a declaration that it is excess to the Hartford policies relative to defense costs will be denied.

B.  AIG's Joinder in Allstate's Motion (ECF No. 230)

We reach the same conclusion with respect to the American Home and Granite State 1977-1979 policies.  In its omnibus brief in opposition, AIG adopts the position advanced by Allstate relative to allocation of defense costs.  That is, AIG argues that any obligations that American Home or Granite State may have relative to Zurn's defense are excess to Hartford's obligations.  As explained, the "other insurance" provision in the Royal and New England policies is not narrower than the "other insurance" clauses in the Northbrook policies.  That is,

the clause in the Hartford policies does not purport to make Royal and New England excess to others *only* with respect to payments in satisfaction of personal injury claims. Instead, as discussed, the intent is to make Hartford's insurers excess with respect to defense costs as well. To the extent the American Home and Granite State 1977-1979 policies purport to do the same, they conflict with the competing "other insurance" clauses in the Hartford policies. Those provisions therefore cancel each other out, as they are mutually repugnant, and each insurer must share in the cost of defending Zurn where both the AIG and Hartford policies are on risk. To the extent AIG joins in Allstate's motion, AIG's motion is denied.

### VI.    CONCLUSION

For the reasons set forth above, the Court will grant Zurn's motion for partial summary judgment to the extent Zurn seeks a declaration that defense costs must be paid in addition to liability limits under American Home 1974-1977, Granite State 1977-1979 (but only for the time period December 17, 1977 to April 1, 1978), and Granite State 1985. The Court will deny Zurn's motion for partial summary judgment insofar as Zurn seeks a declaration that defense costs must be paid in addition to policy limits under the Northbrook policies covering the period April 1, 1978 to April 1, 1983, and under Granite State 1977-1979 (for the period April 1, 1978 to April 1, 1979).

The Court will grant Hartford's motion for partial summary judgment to the extent Hartford seeks a declaration that defense costs must be paid in addition to policy limits under American Home 1974-1977, Granite State 1977-1979 (but only for the time period December 17, 1977 to April 1, 1978), Granite State 1985, Aetna 1974 -1977, and Aetna 1985. The Court will deny Hartford's motion for partial summary judgment insofar as Hartford seeks a

declaration that defense costs must be paid in addition to policy limits under the Northbrook

policies covering the period April 1, 1978 to April 1, 1983, and under Granite State 1977-1979

(for the period April 1, 1978 to April 1, 1979).

The Court will deny American Home's motion for partial summary judgment on the issue

of defense and defense costs.

The Court will grant Allstate's motion for partial summary judgment regarding the limit

of liability of Northbrook 1978.

Finally, the Court will grant Allstate's motion for partial summary judgment regarding

allocation of defense costs insofar as Allstate seeks a declaration that Northbrook Insurance

Company Policy No. 63-009-121, covering the period April 1, 1983 to April 1, 1984, is excess of

Royal Indemnity Company Policy No. RED 102439, issued for the same policy period; in all

other respects that motion will be denied.

SUSAN PARADISE BAXTER
United States District Judge