IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZURN INDUSTRIES, LLC,<br>as Successor in Interest to<br>Zurn Industries, Inc., <br><br>    Plaintiff,<br><br>    v.<br><br>ALLSTATE INSURANCE COMPANY,<br>individually and as successor in interest<br>to Northbrook Excess and Surplus<br>Insurance Company (formerly<br>Northbrook Insurance Company), *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:18-cv-299-SPB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION REGARDING RULE 56 MOTIONS
FILED AT ECF NOS. 229, 235, AND 251**

  In this civil action, Zurn Industries, LLC, as Successor in Interest to Zurn Industries, Inc. ("Zurn"), and its various insurers seek declaratory judgments clarifying the insurance companies' obligations relative to Zurn's involvement in thousands of asbestos-related personal injury lawsuits. This Memorandum Opinion addresses several Rule 56 motions filed by American Home Assurance Company and Granite State Insurance Company (collectively, "AIG"), First State Insurance Company and New England Insurance Company (collectively, "Hartford"), and Travelers Casualty and Surety Company ("Travelers"), individually and as successor in interest to the Aetna Casualty and Surety Company ("Aetna"). These motions concern the issue of whether the liability limits of certain multi-year excess insurance policies apply on an annualized basis.

1

I. **BACKGROUND**

Zurn is a company historically engaged in the business of, among other things, manufacturing, selling and distributing boilers. Because of its use over the years of products that allegedly contained asbestos, Zurn has been named as a defendant in thousands of asbestos-related bodily injury lawsuits.

Over the years, Zurn insured against these risks through numerous layered insurance policies. From April 1, 1974 through April 1, 1979, Zurn was insured under a series of general liability policies issued by Liberty Mutual. Above these primary policies lay a series of umbrella excess liability policies, which were also issued by Liberty Mutual for the periods April 1, 1974 to April 1, 1975 (the "1974 Liberty Mutual Umbrella [LMU] Policy"), April 1, 1975 to April 1, 1976 (the "1975 LMU Policy"), April 1, 1976 to April 1, 1977 (the "1976 LMU Policy"), and April 1, 1977 to April 1, 1978 (the "1977 LMU Policy"). For the period April 1, 1978 through April 1, 1979, Zurn obtained secondary coverage through Northbrook Policy No. 63-004-463 (the "Northbrook Umbrella Policy"). Each of these 1-year umbrella policies had liability limits of $9 million.

At issue are three excess insurance policies covering the same time period that Zurn entered into with American Home Assurance Company ("American Home"), Granite State Insurance Company ("Granite State"), and Aetna. American Home Policy Number SCLE-80-65386 (the "American Home Policy") covers the period December 17, 1974 to December 17, 1977 and lies directly above the 1974, 1975, 1976, and 1977 LMU policies. Granite State Policy Number SCLD-80-93353 (the "Granite State Policy") covers the period December 17, 1977 through April 1, 1979; it lies directly above the 1977 LMU policy and the 1978 Northbrook

Umbrella Policy. Directly above the American Home Policy, and covering the same period, lies Aetna Policy Number 01 XN 673 WCA (the "Aetna Policy").

The sole issue addressed by this Memorandum Opinion concerns the amount of indemnity limits available to Zurn under the American Home, Granite State, and Aetna excess policies. The declarations pages of the American Home and Granite State Policies set forth a "Limit of Liability" of $5 million for each policy. In its Amended Complaint, Zurn alleged that the American Home and Granite State policies provide $5 million in coverage on an annualized basis, suggesting that a total of $15 million is available under the 3-year American Home policy and that $10 million is available under the 470-day Granite State policy. On this point, Hartford is in agreement with Zurn. To that end, Hartford has moved for partial summary judgment, asking that the Court declare, as a matter of law, that the policy limits of the American Home and Granite State policies apply on an annualized basis. Not surprisingly, AIG -- on behalf of its member companies American Home and Granite State -- disputes this interpretation. Accordingly, AIG has filed a cross-motion for summary judgment arguing that, as a matter of law, the maximum limit available to indemnify Zurn for its asbestos liabilities is $5 million under the American Home policy and, the maximum "per occurrence" limit under the Granite State policy is $5 million.

In a related Rule 56 motion, Travelers asks this Court to declare, as a matter of law, that the 1974 Aetna Policy is subject to a single $5 million "per occurrence" limit for the applicable 3-year term. Zurn opposes Travelers' motion for summary judgment and contends that the $5 million limit applies for each of the three years covered by the policy.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, an award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if a reasonable jury could find for the non-moving party; a factual dispute is "material" if it will affect the outcome of the trial under the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party must support its position by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In conducting a Rule 56 analysis, the court must construe the record in the light most favorable to the non-moving party while drawing all reasonable inferences in that party's favor. *Bowers v. NCAA*, 475 F.3d 524, 535 (3d Cir. 2007). "Summary judgment may be granted based on the interpretation of a contract only if 'the contract is so clear that it can be read only one way." *Battaglia v. McKendry*, 233 F.3d 720, 722 (3d Cir. 2000) (internal quotation marks and citation omitted).

## III. GOVERNING LEGAL PRINCIPLES

"Pennsylvania requires its courts to examine the applicable provisions of [an] insurance policy to ascertain the intent of the parties and determine coverage."[1] *Persichini v. Nationwide*

---

[1] All of the parties to this dispute agree that Pennsylvania law controls the Court's analysis.

4

*Gen. Ins. Co.*, No. 2:21-CV-1775, 2023 WL 8481375, at *3 (W.D. Pa. Dec. 7, 2023) (citing *Gallagher v. GEICO Indem. Co.*, 201 A.3d 131, 137 (Pa. 2019)). "[W]hen the language of the policy is clear and unambiguous, a court is required to give effect to that language." *Id.* (quoting *Gallagher*, 201 A.3d at 137) (internal quotation marks omitted). "When the language is ambiguous, however, courts must construe it 'in favor of the insured and against the insurer, the drafter of the agreement.'" *Id.* (quoting *Prudential Prop. & Cas. Ins. v. Sartno*, 903 A.2d 1170, 1177 (Pa. 2006)). Words or provisions are ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). "A word is not ambiguous, however, simply because it is undefined." *Greenwood Racing Inc. v. Am. Guar. & Liab. Ins.*, No. 21-1682, 2022 WL 4133295, at *3 (E.D. Pa. Sept. 12, 2022) (citation omitted). Moreover, the court "may not torture the language of the policy to create ambiguity where none exists." *McMahon v. Med. Protective Co.*, 92 F. Supp. 3d 367, 376 (W.D. Pa. 2015).

## IV. DISCUSSION

### A. American Home Policy No. SCLE-80-65386

The Court will first address the parties' cross-motions as they relate to the American Home Policy. The declaration page of the American Home Policy provides that "subject to all the terms and conditions set forth below ... the insurance afforded by this policy shall follow all the terms and conditions of Policy No. LE1-181-014745-174 issued by LIBERTY MUTUAL INS. CO. [*i.e.*, the 1974 LMU Policy] including all renewals and rewrites thereof." ECF No. 236-2 at 2. The "terms and conditions" of the American Home Policy list "ZURN INDUSTRIES INC." as the insured party for the 3-year period December 17, 1974 to December 17, 1977. *Id.* The coverage is described as "EXCESS THIRD PARTY LIABILITY

INCLUDING PRODUCTS." *Id.* The Limit of Liability is "$5,000,000.00 EXCESS OF $9,000,000.00 INTERIM EXCESS OF PRIMARY." *Id.* The premium amount is "$5,000.00 ANNUALLY." *Id.*

AIG contends that, because there is no mention of annualization on the face of the declarations page, the Court's analysis should end there, and the Court should conclude that the American Home Policy unambiguously provides only a single $5 million limit over the entire three-year policy period. This argument is unpersuasive, as the declaration page is extremely "bare bones" and unambiguously states that the policy will follow form to the underlying 1974 LMU Policy (Number LE1-181-014745-174). ECF No. 236-2 at 2. Therefore, the Court must look to the underlying Liberty Mutual umbrella policy for further guidance.

The 1974 LMU Policy provides the following liability limits, "subject to all of the terms of this policy having reference thereto":

| | |
|---|---|
| Aggregate products - completed operations | $9,000,000 |
| Aggregate property damage | $9,000,000 |
| Aggregate advertising injury or damage | $9,000,000 |
| Aggregate occupational disease | $9,000,000 |

ECF No. 236-4 at 2.

Regarding "Limits of Liability," the 1974 LMU Policy states the following[2]:

> Regardless of the number of insureds under this policy or the number of persons or organizations who sustain personal injury, . . . the company's liability is limited as follows:
>
> Each Occurrence - The limit of liability stated in the declarations as applicable to "each occurrence" is the limit of the company's liability for all damages, direct and

---

[2] Certain words in the policy appear in bold print, indicating that they are defined elsewhere in the policy. For present purposes, the Court has excluded any bold typeface.

6

> consequential, because of all personal injury, property damage and advertising injury or damage sustained by one or more persons or organizations as the result of any one occurrence.
>
> Aggregates - The limits of liability stated in the declarations as (a) "aggregate products - completed operations", (b) "aggregate property damages", (c) "aggregate advertising injury or damages" and (d) "aggregate occupational disease" are, respectively, the total limits of the company's liability for all damages, direct and consequential, because of the following occurring during any one annual period during which this policy is in force: (a) all personal injury arising out of the products-completed operations hazard, (b) all property damage, (c) all advertising injury or damages and (d) all occupational disease sustained by employees of the named insured.
>
> For the purpose of determining the limits of the company's liability:
>
> (1) all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions . . .
>
> shall be considered as the result of one and the same occurrence.
>
> Non-Cumulation of Liability -- Same Occurrence -- If the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs partly before and partly within any annual period of this policy, the each occurrence limit and the applicable aggregate limit or limits of this policy shall be reduced by the amount of each payment made by the company with respect to such occurrence, either under a previous policy or policies of which this is a replacement, or under this policy with respect to previous annual periods thereof.

ECF No. 236-4 at 68. All of the ensuing Liberty Mutual umbrella policies contained materially identical language regarding their "Limits of Liability." *See* ECF Nos. 229-5 at 70 (1975 LMU Policy); 229-7 at 72 (1976 LMU Policy), and 236-7 at 60 (1977 LMU Policy).

In this Court's view, the unambiguous intent of the Liberty Mutual umbrella policies was to provide separate aggregate liability limits on an annualized basis for each of the policy years in question. This is evidenced by the contractual language expressly stating that the "aggregate" liability limits stated on the declarations page represent the "total limits of the company's liability for all damages . . . because of the following occurring ***during any one annual period during which this policy is in force* . . . .**" ECF No. 236-4 at 68. Because the American Home

7

policy expressly follows form to the underlying Liberty Mutual umbrella policies, it follows that the $5 million limit in the American Home policy should be annualized as well, meaning that the American Home Policy provides $5 million in aggregate limits for each of the policy years it covers, or $15 million in maximum aggregate limits.

At the same time, however, it is equally clear that the Liberty Mutual umbrella policies do *not* annualize the limits of liability as they relate to a particular "occurrence." The term "occurrence" is defined in the LMU Policies as: "injurious exposure to conditions, which results in personal injury, property damages or advertising injury or damage neither expected nor intended from the standpoint of the insured." *See, e.g.*, ECF No. 236-4 at 69. Whereas the policy expressly indicates that aggregate limits are to be calculated on an annual basis, no such language is present in the provisions relating to the liability limits for "each occurrence."[3] Under standard rules of contract construction, the Court assumes this omission was deliberate. *See Neuhard v. Range Res.-Appalachia, LLC*, 29 F. Supp. 3d 461, 478 (M.D. Pa. 2014) ("The doctrine of *expressio unius est exclusio alterius* instructs that when certain words are used in a contract and other words omitted, it implies the intentional exclusion of the omitted terms.") citing *Linan–Faye Const. Co., Inc. v. Hous. Auth. of City of Camden*, 49 F.3d 915, 936 (3d Cir.1995); BLACK'S LAW DICTIONARY (9th ed.2009)). This construction is supported by the "non-cumulation" clauses in each LMU Policy which, in practical terms, ensure that Zurn

---

[3] The declarations page of the 1974 LMU Policy does not state any liability limit as it relates to each "occurrence"; however, construing this ambiguity in favor of the insured as we must, *Persichini v. Nationwide Gen. Ins. Co.*, 2023 WL 8481375, at *3, the Court assumes that the 1974 LMU Policy provided coverage for each "occurrence" up to the aggregate $9 million limit. This construction is consistent with the terms of the ensuing Liberty Mutual Umbrella Policies, each of which expressly listed the "per occurrence" limits as $9 million -- identical to each policy's $9 million aggregate limit. *See* ECF Nos. 229-5 at 2 (1975 LMU Policy); 229-7 at 2 (1976 LMU Policy), and 236-7 at 2 (1977 LMU Policy).

would never be indemnified more than $9 million for any single "occurrence," even where the "occurrence" gives rise to injury or damages in multiple policy years.

At the time the American Home Policy was issued, the contracting parties were plainly on notice of the terms of the 1974 LMU Policy and stated their intent to adhere to its terms and conditions, except for the obvious change in the amount of liability coverage that was being purchased. The logical reason for arranging Zurn's insurance coverage in this manner was to provide consistency and clarity relative to the various insurers' indemnity obligations. *See Union Carbide Corp. v. Affiliated FM Ins. Co.*, 16 N.Y.3d 419, 424, 947 N.E.2d 111, 113 (2011) (noting that "follow-the-form" clauses "serve the important purpose of allowing an insured . . . that deals with many insurers for the same risk to obtain uniform coverage, and to know, without a minute policy-by-policy analysis, the nature and extent of that coverage"; court finding it "implausible that an insured with as large and complicated an insurance program as [the plaintiff] would have bargained for policies that differed, as between primary and excess layers, in the time over which policy limits were spread"). Thus, when the American Home and underlying LMU Policies are read together, the terms unambiguously provide for annualization of the American Home policy's $5 million aggregate policy limits, while also providing a single $5 million limit for each covered "occurrence."

This construction is not only clear from the language itself but is also consistent with the principle that courts should "interpret [a] policy so as to avoid ambiguities and give effect to all of its provisions." *Branzino, Inc. v. Seneca Ins. Co., Inc.*, No. CV 20-4912, 2024 WL 453614, at *3 (E.D. Pa. Feb. 6, 2024) (citing *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 321 (3d Cir. 2011)). However, even if the terms of the American Home Policy could be considered ambiguous as to whether the policy limits, in the aggregate, were meant to be applied on an

annual basis, the Court would be constrained to interpret the ambiguity in favor of Zurn, allowing for greater insurance coverage. *See Prudential Prop. & Cas. Ins.*, 903 A.2d at 1177.

In support of its Rule 56 arguments, Hartford focuses on the declaration page of the American Homes policy, and especially the follow form clause, which pertains not only to the initial 1974 LMU Policy but also to "all renewals and rewrites thereof." Hartford insists this evidences the parties' intent that the American Home Policy would explicitly follow form to three separate LMU Policies and, *thus, three distinct sets of limits*. Zurn has not moved for summary judgment on this point but has filed a brief generally agreeing with Hartford's construction.

In the Court's view, the reference to "renewals and rewrites" merely reflects an acknowledgment that there was a difference in the period of coverage afforded by the American Home Policy (a 3-year policy) as compared to the underlying LMU policy (a 1-year policy), and that Zurn would need to obtain additional umbrella coverage for the ensuing years after the initial LMU policy expired. The reference to "all renewals and rewrites" further reflects the parties' intention that, at all times during the pendency of the American Home Policy, there would be consistency between the American Home Policy and the relevant underlying policy. The phrase does *not*, in this Court's view, reflect an intention that the American Homes Policy would be treated as essentially three separate annual policies, each with a $5 million limit for the same "occurrence." On the contrary, as noted, each of the LMU Policies in effect from April 1, 1975 through April 1, 1978 have the same non-cumulation clause and same non-annualized "occurrence" limitation on liability. Again, this reflects the parties' unambiguous intent and understanding that Zurn could collect no more than $5 million for each occurrence during the entire 3-year policy period.

Hartford also makes note of the fact that the American Homes Policy required the payment of annual premiums in the amount of $5,000. This term can be viewed as consistent with the fact that the aggregate limits of the policy were annualized; however, it does not follow that the "each occurrence" limits were thereby annualized, given the express contractual language to the contrary.

The cases relied on by Hartford are not to the contrary. In both *Travelers Casualty & Surety Company v. Ace American Reinsurance Company*, 201 F. App'x 40 (2d Cir. 2006), and *Union Carbide Corporation v. Affiliated FM Insurance Company*, 16 N.Y.3d 419, 947 N.E. 2d 111 (2011), the courts interpreted the relevant policy language as expressing the parties' intent to make the aggregate limits of the excess insurance available on an annual basis. That is the same result reached here.

AIG, for its part, has cited numerous cases purportedly standing for the proposition that there can be no annualization of policy limits unless the policy terms expressly so provide. *See, e.g., Greene, Tweed & Co. v. Hartford Acc. & Indem. Co.*, CIV.A. 03-3637, 2006 WL 1050110, at *9-10 (E.D. Pa. Apr. 21, 2006); *Gen. Refractories Co. v. Allstate Ins. Co.*, CIV. A. 89-7924, 1994 WL 246274, at *3 (E.D. Pa. June 8, 1994); *Air Products & Chemicals, Inc. v. Hartford Acc. & Indem. Co.*, CIV. A. 86-7501, 1989 WL 73656, at *2 (E.D. Pa. June 30, 1989), *aff'd in part and vacated in part on other grounds*, 25 F.3d 177 (3d Cir. 1994). In each of these cases, however, the courts simply interpreted the policy language as written, which is no different than what this Court has done in this case. None of the cited decisions imply that annualization of aggregate limits is improper or contrary to the policy language at issue here.

In sum, the Court construes the unambiguous terms of the American Home policy in a manner consistent with the underlying umbrella policies, to which the American Home policy

11

follows form. This allows Zurn to collect an aggregate of $5 million in policy proceeds during each of the three annual periods covered by the policy, i.e., up to $15 million total, but only $5 million maximum for each "occurrence" occurring during the life of the policy.

### B. Granite State Policy No. SCLD-80-93353

When the American Home Policy expired on December 17, 1977, it was replaced by the Granite State Policy, which is described on its declarations page as a "RENEWAL OF SCLE 80-65386" – the expiring American Home Policy. ECF No. 236-3 at 2. The opening paragraph of the Granite State Policy is identical to the opening paragraph of the American Home Policy, except the number of the underlying policy which the Granite State Policy "follows" is "TBA issued by LIBERTY MUTUAL INSURANCE COMPANY." Notwithstanding this discrepancy, it is undisputed that the underlying policy as of December 17, 1977 was Liberty Mutual policy number LE1-181-014745-177 (the "1977 LMU Policy"), which was itself a renewal of previous LMU policies.

Like the American Home Policy, the Granite State Policy contains minimal terms and conditions. The declarations page indicates that the named insured is "ZURN INDUSTRIES, INC. & SUBSIDIARIES & AFFILIATES." ECF No. 236-3 at 2. Zurn's corporate headquarters is listed as the address of record. *Id.* The policy period is stated as "December 17, 1977 to April 1, 1979" -- a period of 470 days (or 1.28767123 years). *Id.* The remaining "terms" are as follows:

> COVERAGE: EXCESS LIABILITY INSURANCE $5,000,000.
>
> LIMIT OF LIABILITY: $5,000,000 EACH OCCURRENCE SUBJECT TO AN AGGREGATE OF $5,000,000. EXCESS OF $9,000,000. EXCESS OF PRIMARY
>
> PREMIUM: $25,000.00

      RATE: FLAT CHARGE

*Id.* Subject to the foregoing terms, the Granite State Policy expressly followed "all the terms and conditions" of the underlying 1977 LMU Policy. *Id.*

When the 1977 LMU Policy expired on April 1, 1978, Zurn obtained new umbrella coverage through Northbrook Umbrella Liability Policy number 63 004 463 (the "Northbrook Policy"), which covered the period April 1, 1978 through April 1, 1979. ECF Nos. 236-8 and 236-9.[4] In an endorsement effective April 1, 1978, Granite State agreed that "the terms and conditions" of the Granite State Policy would "conform to" the Northbrook Policy. ECF No. 236-3 at 5. Thus, at all times during which the Granite State Policy was in effect, it followed the underlying umbrella policies, subject to the "terms and conditions" on the Granite State declarations page.

As with the American Home Policy, AIG and Hartford take differing positions concerning whether the limits of the Granite State Policy apply on an annual basis or only once for the entire policy period. Hartford contends that, because the Granite State Policy follows form to the underlying policy "including all renewals and rewrites thereof," and because the two underlying policies were written for separate 12-month periods, this means that the Granite State Policy follows form to two separate policies and therefore has two separate policy limits. AIG

---

[4] The parties have submitted two versions of this policy, one which was produced by Zurn, ECF No. 236-8, and the other of which was produced by Allstate Insurance Company, as successor in interest to Northbrook Excess and Surplus Insurance Company (formerly Northbrook Insurance Company), ECF No. 236-9. Only the "Zurn" version filed at ECF No. 236-8 contains the declarations page, but certain portions of the policy language are more legible in the "Allstate" version filed at ECF No. 236-9. For present purposes, no party has disputed the authenticity, accuracy, or material similarity of the two versions of the Northbrook Policy.

13

does not directly dispute annualization as it relates to aggregate policy limits, but it *does* insist that there is only one $5 million limit available "per occurrence" under the Granite State Policy.

The Court agrees that the aggregate limits of the Granite State Policy were intended to apply on an annualized basis. At the time the Granite State Policy was issued, it agreed to follow form to the underlying LMU Policy (i.e., the 1977 LMU Policy), which contained the same "Limits of Liability" provisions discussed above relative to the 1974 LMU Policy. Specifically, the incorporated LMU "Limits of Liability" provision, which the Granite State Policy follows, provides that the aggregate limits of liability, as set forth on the LMU declaration page,[5] are "the total limits of the company's liability for all damage" arising because of personal injury, property damages, etc. "during any one annual period during which this policy is in force . . . ." ECF No. 236-7 at 60. Thus, at the time the Granite State Policy was issued, it specifically followed form to an underlying policy that expressly contemplated the policy's aggregate limits would be calculated on an annualized basis.

As noted, Zurn replaced the underlying 1977 LMU Policy with the Northbrook Policy as of April 1, 1978. Through an endorsement effective that same date, Granite State agreed that the terms and conditions of its excess policy would "conform" to the Northbrook Policy. ECF No.

---

[5] The declarations page of the 1977 LMU Policy provides the following liability limits, "subject to all of the terms of th[e] policy having reference thereto":

| | |
|---|---|
| Each occurrence | $9,000,000. |
| Aggregate products -- completed operations | $9,000,000. |
| Aggregate property damage | $9,000,000. |
| Aggregate advertising injury or damage | $9,000,000. |
| Aggregate occupational disease | $9,000,000. |

ECF No. 236-7 at 2.

14

236-3 at 5.  The relevant limits of the Northbrook Policy were $9,000,000 "each occurrence" and $9,000,000 "in the aggregate *for each annual period where applicable.*"  ECF No. 236-8 at 2 (emphasis added).  Thus, the policy drafters contemplated that, where a multi-year policy was issued, the aggregate limits would apply on an annual basis.  This is consistent with the policy's "Limit of Liability" provision, which states that the limits available for "each Occurrence" are "subject to a limit as stated in Item 2(b) of the Declarations in the aggregate . . . *for each annual period during the currency of this policy* . . . ."  ECF No. 236-9 at 3 (emphasis added).  Further, the policy clarifies that

> There is no limit to the number of Occurrences for which claims may be made, except that the [aggregate] Limit of Liability stated in Item 2(b) of the Declarations is the total limit of the Company's liability for all Ultimate Net Loss in respect of all Personal Injury and Property Damage which occurs during the policy period and arising out of the products hazard or the completed operations hazard or both combined.  *If this policy is issued for more than one year, this aggregate limit of liability applies separately to each consecutive annual period of this policy, or if the last consecutive period id less than 12 months, to such period of less than 12 months.*

*Id.* (emphasis added).  Thus, the unambiguous language of the Northbrook Policy confirms that the contracting parties intended the aggregate policy limits to apply on an annualized basis.

As discussed, AIG does not appear to dispute this point.  Instead, AIG argues only that the "per occurrence" limits under the Granite State Policy are *not* annualized and, therefore, Zurn cannot recover more than $5 million under the policy for "each occurrence."

After review of the relevant policy language, the Court agrees with AIG that the Granite State Policy provides only one $5,000,000 recovery for "each occurrence" during the 470-day policy period.  Both the Granite State Policy and the underlying LMU policy provide liability limits on an aggregate and "occurrence" basis.  But while the underlying LMU expressly defines *aggregate* limits as the "total limits" of the insurer's liability "for all damages" because of

personal injury "occurring *during any one annual period* during which [the] policy is in force[,]" ECF No. 236-87 at 60 (emphasis added), the policy omits this language when addressing liability limits for "each occurrence." *Id.* As with the 1974 LMU Policy, the Court infers that this omission was intentional and that *only* the aggregate limits apply on an annual basis. Given that the Granite State Policy unambiguously "follow[s] all the terms and conditions" of the underlying LMU Policy, the Court must conclude that Granite State, like Liberty Mutual, agreed to provide only one $5,000,000 limit for "each occurrence" during the life of the policy.

The terms of the Northbrook Policy, which succeeded the 1977 LMU Policy, further support this conclusion. The Granite State endorsement dated April 1, 1978 expressly states that the terms and conditions of the Granite State Policy "shall conform to" the Northbrook Policy. ECF No. 236-3 at 5. And as discussed, the Northbrook Policy contains numerous references to annualized aggregate limits but conspicuously omits such language from the provisions discussing the liability limits for "each Occurrence." Read together, these provisions unambiguously express the parties' intention that Granite State would pay only one $5 million limit for "each Occurrence" during the life of the policy. The Court recognizes that, like the American Home Policy, the Granite State Policy's follow form clause applies to "all renewals and rewrites" of the underlying policy. But in light of the unambiguous policy language cited above, the "all renewals and rewrites" phrase cannot reasonably be interpreted as giving rise to multiple "per occurrence" liability limits.

### C. AETNA Policy NO. 01 XN 673 WCA

Travelers has separately moved for summary judgment regarding its Twenty First Affirmative Defense to Hartford's Amended Cross-Claim, Counterclaim and Third-Party Complaint. To that end, Travelers seeks a declaration that the Aetna Policy is subject to a single

16

$5 million "per occurrence" limit for the entire three-year policy period rather than a $5 million "per occurrence" limit for each individual year of the policy period. Only Zurn has taken a position in opposition to Traveler's motion, arguing that a $15 million limit should apply.

As noted, the Aetna Policy lies directly above the American Home Policy for the same coverage period of December 17, 1974 to December 17, 1978. The declarations page of the Aetna Policy 

Travelers contends that its proposed interpretation of the Aetna Policy involves a "very straightforward application of clear policy terms." ECF No. 264 at 6. The Court is constrained to agree. The plain language of the Aetna Policy declarations page

[redacted]

Notably, only Zurn has responded to Travelers' motion. As it did in response to the AIG Defendants' motion, Zurn contests the proposition that the applicable policy limits for each "occurrence" are not annualized. To that end, Zurn points to an endorsement in the Aetna Policy which states:

> Notwithstanding anything contained herein to the contrary, it is hereby understood and agreed that where policies listed as underlying are written under terms and conditions providing greater protection or indemnity to the insured than the terms and conditions of this policy, this insurance shall indemnify the insured upon the same terms, conditions and limitations of the applicable underlying insurance.

Zurn argues that, to the extent the underlying American Home Policy provides "greater protection or indemnity" to Zurn than the terms of the Aetna Policy, the amendatory endorsement requires Travelers to indemnify Zurn upon the more favorable American Home Policy "terms, conditions and limitations."

As previously discussed, however, the Court has determined that the American Home Policy provides for only one $5 million liability limit for each "occurrence" under the policy. Although the aggregate liability limits are annualized, the limits available for each "occurrence" are not. Therefore, the amendatory endorsement in the Aetna Policy does not advance Zurn's

position because Traveler's proposed interpretation of the Aetna policy affords coverage as broad as that which is provided by the American Home Policy.[6]

## V. CONCLUSION

Based upon the foregoing reasons, the Court concludes that the three excess policies in question provide aggregate limits on an annualized basis but also provide only one limit for each "occurrence" during the applicable policy term. Based on this conclusion, Travelers' motion for partial summary judgment will be granted. The cross-motions of AIG and Hartford will be granted in part, consistent with the Court's determination, and otherwise denied.

An appropriate Order follows.

_____
Susan Paradise Baxter
United States District Judge

---

[6] In its reply brief, Travelers attempts to distinguish the American Home Policy from the Aetna Policy on the basis that the American Home Policy does not provide a separate "per occurrence" limit. ECF No. 371. As discussed, however, the Court interprets the American Home Policy as effectively establishing a $5 million liability limit for "each occurrence" covered by the policy. Section 3 of the Aetna Policy ("Schedule of Underlying Insurance") suggests this is consistent with how Zurn and Aetna understood the American Home Policy. *See* ECF No. 264-1 at 7.