**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ZURN INDUSTRIES, LLC,                )
as Successor in Interest to          )
Zurn Industries, Inc.,               )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        Case No. 1:18-cv-299-SPB
                                     )
ALLSTATE INSURANCE COMPANY,   )
individually and as successor in interest   )
to Northbrook Excess and Surplus     )
Insurance Company (formerly          )
Northbrook Insurance Company), *et al.*,   )
                                     )
                Defendants.          )

**MEMORANDUM OPINION RE: MOTIONS at ECF Nos. 493, 496, and 533**

In this civil action, Zurn Industries, LLC ("Zurn") and its various insurers seek clarification concerning the insurance companies' respective obligations relative to Zurn's involvement in ongoing asbestos-related personal injury litigation. Pending before the Court are three motions for partial summary judgment filed by, respectively, Granite State Insurance Company ("Granite State"), ECF No. 493, Zurn, ECF No. 496, and First State Insurance Company and New England Insurance Company (collectively, "Hartford"), ECF No. 533. Each of these motions seek declarations from the Court regarding the effect, if any, of "non-cumulation" clauses in particular insurance policies. The Court addresses these motions below.

## I.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, an award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is

1

"genuine" if a reasonable jury could find for the non-moving party; a factual dispute is "material" if it will affect the outcome of the trial under the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether a genuine issue of material fact remains for trial, the court must view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). These same principles apply when the court concurrently resolves cross-motions for summary judgment. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008); *Johnson v. Federal Exp. Corp.*, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014) (citing authority).

## II.    APPLICABLE LAW

The interpretation of an insurance policy is a question of law properly decided by the court. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). To that end, "Pennsylvania requires its courts to examine the applicable provisions of [an] insurance policy to ascertain the intent of the parties and determine coverage."[1] *Persichini v. Nationwide Gen. Ins. Co.*, 705 F. Supp. 3d 473, 477 (W.D. Pa. Dec. 7, 2023) (citing *Gallagher v. GEICO Indent. Co.*, 201 A.3d 131, 137 (Pa. 2019)). "[W]hen the language of the policy is clear and unambiguous, a court is required to give effect to that language." *Id.* (quoting *Gallagher*, 201 A.3d at 137) (internal quotation marks omitted). "When the language is ambiguous, however, courts must construe it 'in favor of the insured and against the insurer, the drafter of the agreement.'" *Id.* at 477-78 (quoting *Prudential Prop. & Cas. Ins. v. Sartno*, 903 A.2d 1170, 1177 (Pa. 2006)); *see*

---

[1] The parties to this case have agreed that Pennsylvania law controls the Court's analysis.

2

*also Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 335 n.8 (3d Cir. 2005) (quoting *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs., Ass'n Ins. Co.,* 517 A.2d 910, 913 (Pa. 1986))). Words or provisions are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). "A word is not ambiguous, however, simply because it is undefined," *Greenwood Racing Inc. v. Am. Guar. & Liab. Ins.*, No. 21-1682, 2022 WL 4133295, at *3 (E.D. Pa. Sept. 12, 2022) (citation omitted), and a court "may not torture the language of the policy to create ambiguity where none exists." *McMahon v. Med. Protective Co.*, 92 F. Supp. 3d 367, 376 (W.D. Pa. 2015).

## III.    HARTFORD'S RULE 56 MOTION AT ECF NO. 533

The Court first turns to the motion for summary judgment filed by Hartford at ECF No. 533. Hartford's motion addresses the non-cumulation clause ("NCC") in certain excess insurance policies that were issued to Zurn by Northbrook Excess and Surplus Insurance Company (formerly "Northbrook Insurance Company" and referred to hereafter as "Northbrook").

### A.  Background

During times relevant to this litigation, Zurn was insured through a series of layered commercial insurance policies, including the following umbrella or second-layer excess insurance policies issued by Northbrook for the period April 1, 1978 to April 1, 1983:

| Policy | Policy No. | Policy Period | Attaches Above | Aggregate Limit |
|---|---|---|---|---|
| 1978 Northbrook Umbrella Policy | 63 004 463 | April 1, 1978 to April 1, 1979 | $2 million | $9 million |
| 1979 Northbrook Excess Policy | 63 005 622 | April 1, 1979 to April 1, 1980 | $7 million | $20 million |
| 1980 Northbrook Excess Policy | 63 006 579 | April 1 1980 to April 1, 1981 | $12 million | $15 million |

3

| 1981 Northbrook Excess Policy | 63 007 775 | April 1, 1981 to April 1, 1982 | $12 million | $15 million |
| 1982 Northbrook Excess Policy | 63 008 633 | April 1, 1982 to April 1, 1983 | $12 million | $15 million |

ECF No. 541, ¶1. Each of the 1979-1982 Northbrook Excess Policies include the following NCC (or a materially identical NCC) that ostensibly reduces the policy's limits by amounts paid under other "prior insurance":

### PRIOR INSURANCE AND NONCUMULATION OF LIABILITY

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

ECF No. 541, ¶2; *see also* ECF No. 219-8 at 2.

At all times relevant to this litigation, Allstate Insurance Company ("Allstate"), a former Defendant in this civil action, was responsible for Northbrook's obligations under the aforementioned policies. When Zurn sought defense and indemnity coverage from Allstate under these policies, a dispute arose regarding the effect of the NCCs. Although the five Northbrook policies provide an aggregate limit of $74 million, Allstate initially argued that Zurn could not recover more than $20 million. Allstate reasoned that any amounts payable under the 1979 Excess Policy would be offset by the $9 million that was payable under the 1978 Umbrella policy (thereby reducing Zurn's available coverage under the 1979 Excess Policy to $11 million), and the limits of the 1980, 1981, and 1982 Excess Policies would be completely set off by the $20 million that was payable under the 1978 and 1979 policies.

Zurn contested Allstate's position, and to that end, it filed a motion for partial summary judgment in October 2020 seeking a declaration that all of the NCCs in the Northbrook policies are unenforceable under Pennsylvania law, making Allstate liable for the entire $74 million

4

aggregate limit.  Alternatively, Zurn argued that Allstate should at least be liable for the $44 million available under the 1978 Umbrella Policy and the 1979 and 1980 Excess Policies. Zurn's reasoning was that "the limit of a given policy may be reduced only by payments made under a previous excess policy in the same layer, with the same attachment point."  *See* ECF No. 223 at 22-23 (citations omitted).  Zurn contended that, because the 1978 Umbrella Policy, the 1979 Excess Policy, and the 1980 Excess Policy all have different attachment points and/or provide different "layers" of insurance coverage to Zurn, the NCCs in the 1979 and 1980 policies were unenforceable.

Allstate opposed Zurn's motion but continued to defend and indemnify Zurn until it had reportedly exhausted the limits of both the 1978 Umbrella Policy and the 1979 Excess Policy, which collectively totaled $29 million.  Then, in early 2025, Allstate entered into a confidential settlement agreement with Zurn to resolve all issues concerning its liability under the Northbrook policies.  Allstate was dismissed from the case and is therefore no longer a litigating party.

Nevertheless, Allstate's settlement with Zurn raises questions about how the liability of the remaining litigating insurers should be apportioned.  The U.S. Court of Appeals for the Third Circuit addressed this issue in *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440 (3d Cir. 1996).  As in this case, the excess insurance policies at issue in *Koppers* applied to "all sums" which the insured became legally obligated to pay as the result of an indivisible, progressive harm (*i.e.*, environmental property damage).  *Id*. at 1450.  Regarding the effect of settlement, the court observed in *Koppers* that

> [an insured's] settlement with the primary insurer functionally "exhausts" primary coverage and therefore triggers the excess policy—though by settling the policyholder loses any right to coverage of the difference between the settlement amount and the primary policy's limits. The excess insurer cannot be made liable for any part of this difference because the excess insurer never agreed to pay for losses below a specified floor (*i.e.*, below the limits of the underlying primary policies).

98 F.3d at 1454.  The court went on to predict that the Pennsylvania Supreme Court would hold that

> non-settling excess insurers are jointly and severally liable for the full amount of the loss in excess of: the sum of (1) the policy limits of the directly underlying, "exhausted" primary policies, and (2) the combined pro rata shares of other settling (primary and excess) insurers. The beneficent consequences of this formula are that the insured bears the risk of settling too low while the non-settling insurers bear the risk of being unable to redistribute equitably among themselves the burden of paying the balance (if, for example, some of their number are insolvent).

*Id.* at 1455.

Pursuant to this "apportioned share set-off" rule, Zurn must absorb any deficiency that may result from it settling with an insurer for less than the insurer's apportioned share.  Also, the applicable limits of the Northbrook policies must be established in order to determine the other litigating insurers' respective shares of Zurn's defense and indemnity costs in the underlying asbestos litigation.

All of this brings us to Hartford's pending motion for partial summary judgment, which asks the Court to rule, as a matter of law, that the applicable combined aggregate limits of the Northbrook policies total $44 million.  In other words, Hartford seeks a declaration that Zurn was entitled to recover from Allstate the full limits of:  the 1978 Umbrella Policy ($9 million), the 1979 Excess Policy ($20 million), and the 1980 Excess Policy ($15 million). And more specifically, Hartford seeks a declaration that the NCCs in the 1979 and 1980 policies did not diminish the insurance proceeds that were available to Zurn under those same policies.

In support of its motion, Hartford cites arguments that Zurn previously asserted about the effect of the NCCs when Allstate was actively litigating its liability under the Northbrook policies.  According to Hartford, it

recognizes that Zurn and Allstate had a legitimate dispute as to whether the combined aggregate limits of the 1978-1983 Northbrook Umbrella and Excess Policies total $44 million or $74 million, after accounting for the Northbrook non-cumulation provisions. Accordingly, Hartford does not seek a ruling that Allstate was obligated to pay, and that Zurn's other insurers are thus entitled to a *Koppers* credit for, the full $74 million Zurn claimed. But like Zurn, Hartford is aware of no case in which a court applying Pennsylvania law has approved applying payments under one policy to reduce the limits of a subsequent policy that attaches at a higher dollar amount. Hartford is entitled to and seeks the same relief that Zurn itself repeatedly requested: a ruling that, as a matter of law, the applicable combined aggregate limits of the 1978-1983 Northbrook Umbrella and Excess Policies total $44 million, after accounting for non-cumulation provisions.

ECF No. 534 at 17.

Zurn presently opposes Hartford's motion. It argues that, in light of the payments Allstate has already made under the 1978 Umbrella Policy and the 1979 Excess Policy, any declaratory relief that Hartford seeks relative to the 1979 policy is moot. And as to the 1980 Excess Policy, Zurn now insists that the NCC is enforceable and reduces the policy's $15 million liability limit to zero as a result of Allstate's satisfaction of the $20 million limit in the 1979 Excess Policy.

Granite State has responded to Hartford's motion for partial summary judgment with three main points. First, based on *Koppers*, Granite State concurs with Hartford that the applicable limits of the Northbrook policies must be established notwithstanding Allstate's settlement with Zurn. Second, Granite State disputes Hartford's assertion that Allstate's payments under the Northbrook 1978 and 1979 policies did *not* reduce the limits of its liability under the later Northbrook policies. Stated differently, Granite State agrees with Zurn that the NCCs in the 1980-1982 Northbrook Excess Policies effectively reduced the limits of those policies commensurate with payments that were made under the prior 1978 and 1979 Northbrook policies. Third, to the extent this Court finds otherwise, Granite State argues that Zurn must

absorb any deficiency in its settlement with Allstate that fell below the available Northbrook policy limits.

### B. Analysis

At the outset, the Court takes note of certain matters about which there appears to be no genuine dispute. First, Zurn, Hartford, and Granite State all seem to acknowledge that, pursuant to *Koppers*, Zurn is responsible for the shortfall, if any, between the aggregate amounts it could have recovered under the Northbrook policies and the amount it ultimately obtained from Allstate through its settlement agreement. In fact, the Court previously stated as much in its July 11, 2025 Order. *See* ECF No. 527 at 2, ¶6 ("To the extent Zurn's settlement with Northbrook falls below the amount of Northbrook's apportioned share of liability, the non-settling co-Defendant insurers are entitled to apply that deficiency toward any future adverse judgments. Thus, consistent with this Court's prior rulings and the decision by the United States Court of Appeals for the Third Circuit in *Koppers, supra*, Zurn must absorb any deficiency in its settlement.").

Next, all parties seem to acknowledge that, for all intents and purposes, only the 1980 Northbrook Excess Policy is at issue. Because Allstate paid at least $29 million in combined defense and indemnity costs under the 1978 and 1979 policies[2] (thereby exhausting the limits of those policies), any declaration by the Court relative to the limits available under the 1979 policy would serve no purpose. In other words, even though the 1979 policy contained an NCC, the effect of that provision is of no legal moment because Allstate ultimately abandoned any attempt

---

[2] There was a separate dispute in this case as to whether, under the Northbrook policies, any defense costs Allstate paid on Zurn's behalf eroded the limits of the subject policies. The Court previously ruled that defense costs *did* erode the limits of the Northbrook policies. *See* ECF Nos. 414, 415. Accordingly, that issue is settled for present purposes.

8

to enforce it.  Accordingly, that aspect of Hartford's motion is moot.  *See Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (explaining that mootness is "a doctrine that ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit, and which is concerned with the court's ability to grant effective relief") (internal quotation marks and citation omitted).

Additionally, Hartford does not challenge the enforceability of the NCCs in the 1981 and 1982 Northbrook Excess Policies.  As discussed in more detail below, Hartford centers its analysis on the singular fact that the 1980 Northbrook Excess Policy has a different attachment point than the 1979 Northbrook Excess Policy.  None of the parties currently dispute that an NCC is enforceable when applied to payments made by the same insurer under a prior policy with the same attachment point and within the same layer of insurance coverage.  Accordingly, Zurn, Granite State, and Hartford all appear to agree that both the 1981 and 1982 Northbrook Excess Policies contained enforceable NCCs that would have reduced the amounts payable under those policies commensurate with the amounts Allstate paid under the 1980 Excess Policy, since all three of those excess policies operated as third-layer insurance policies with an identical $12 million attachment point.

In sum, only the $15 million limit of the 1980 Northbrook Excess Policy is in dispute.  As to this disputed matter, Hartford seeks a declaration that the NCC in the 1980 Excess Policy is unenforceable and, therefore, Zurn was entitled to receive the limits of that policy.  Hartford's theory is that the NCC in the 1980 Northbrook Excess Policy does not apply to payments made under the 1979 Excess Policy because the 1979 policy had a lower $7 million attachment point.  Both Zurn and Granite State argue that this lower attachment point is of no legal moment, especially because both the 1979 and 1980 policies were third-tier excess policies in the same

9

*layer* of insurance.  Two decisions inform the parties' debate:  *Olin Corporation v. American Home Assurance Company*, 704 F.3d 89 (2d Cir. 2012), and *Air & Liquid Systems Corporation v. Allianz Underwriters Insurance Company*, Civ. Action No. 11-247, 2013 WL 5436934 (W.D. Pa. Sept. 27, 2013).

  *1.  Olin Corporation v. American Home Assurance Company*

   In *Olin*, the U.S. Court of Appeals for the Second Circuit addressed the effect of an NCC that was essentially identical to the clause at issue in the 1980 Northbrook Excess Policy.  Olin Corporation, a manufacturer of industrial chemicals, incurred costs in remediating environmental contamination at one of its plant sites, and it sought indemnification from its insurers.  Olin's layered insurance program included two excess insurance policies issued by American Home Assurance Company for the periods 1966-69 and 1969-72.  Each American Home policy covered ten percent of up to $10 million in damages in excess of $30.3 million for the three-year policy period.  Thus, each policy provided a maximum of $1 million in coverage and was triggered only if the damages attributable to the policy exceeded the $30.3 million attachment point.  Olin did not have any policies beside the two American Home policies that insured against losses in excess of $30.3 million; thus, all of its other excess policies attached at lower dollar amount. Importantly, both American Home policies followed the terms of underlying policies that included the following "Prior Insurance and Non-Cumulation of Lability" clause:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof, the limit of liability hereon . . . shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

704 F.3d at 94.

   The court in *Olin* was called upon to determine (i) the amount damages that should be assigned to the policies pursuant to a "continuing coverage" provision, and (ii) whether this

amount would exceed the $30.3 million attachment point, thereby triggering American Home's indemnity obligations. After determining that American Home's indemnity obligations under the polices *were* triggered, the court next considered the effect of the NCC in those policies.

American Home argued that the NCC prevented it from having any responsibility under either policy, because the damages at issue were covered "in whole or in part" by Olin's earlier insurance policies. The court disagreed and determined that the NCC

> [did] not apply to prior insurance policies at a lower level of excess coverage. An excess insurance policy, such as the American Home policies here, is not triggered unless the coverage limits of lower-level policies have first been exhausted. Reducing American Home's liability on an excess policy at the $30.3 million level because of damages paid by a policy, for example, at the $20 million level would conflict with the terms of the higher-level excess policy, since the intent of purchasing insurance at the $30.3 million level is to be indemnified only when lower-level policies are unable to fully indemnify a particular loss and the total damages reach that higher-level policy's attachment point. American Home's $30.3 million excess policy insures against a different loss than an excess policy at the $20 million level: a loss in excess of $30.3 million. Thus we conclude that the [NCC] reduces American Home's liability only to the extent that a prior insurance policy at the same level of coverage, here $30.3 million, indemnifies for a loss that is also covered by an American Home policy. This accords with Condition C's apparent purpose of sweeping a continuing loss into the earliest triggered policy, with that policy then fully indemnifying the insured for that loss.[ ] As a result, only one of the American Home policies here indemnifies Olin.

704 F.3d at 104 (internal footnote omitted).

Based on its interpretation of the NCC, the court concluded that

> the most Olin can recover from the two American Home policies is the policy limit of one policy, $1 million. The record before the district court established that Olin did not have any insurance at the $30.3 million level until the 1966–69 policy. Because no prior policy exists from which Olin could recover damages in excess of $30.3 million, Olin's recovery from the 1966–69 policy cannot be reduced by its recovery under any other policy.[ ] Since the 1966–69 policy is at the same $30.3 million level as the 1969–72 policy, though, any amount Olin recovers from the former reduces its recovery under the latter according to the terms of the [NCC].

*Id.* at 104-05 (internal footnote omitted).

11

### 2.  Air & Liquid Systems Corporation v. Allianz Underwriters Insurance Company

In *Air & Liquid Systems Corporation* ("*Air & Liquid Systems*"), the district court considered the effect of an NCC that applied to fifteen excess insurance policies.  The NCC was materially identical to the ones at issue both here and in *Olin*.[3]  Unlike the *Olin* court, however, which rendered its decision under New York law, the court in *Air & Liquid Systems* analyzed the clause under Pennsylvania law.  The court initially noted that, in *Liberty Mutual Insurance Co. v. Treesdale, Inc.*, 418 F.3d 330 (3d Cir. 2005), the U.S. Court of Appeals for the Third Circuit declared "'anti-stacking clauses' to be 'enforceable under Pennsylvania law as long as they are clear and unambiguous.'" 2013 WL 5436934, at *26 (quoting *Treesdale*, 418 F.3d at 341).

At the same time, however, the court acknowledged that "Pennsylvania law disfavors escape clauses," which "'purport[ ] to relieve the insurer from any obligation to the insured if other coverage is available.'" 2013 WL 5436934, at *27 (quoting *Bowers v. Estate of Feathers*, 671 A.2d 695, 699 (Pa. Super Ct. 1995)).  The court explained that "[t]he status of the non-cumulation clause as an escape clause depends upon whether, under the particular circumstances, its operation would 'relieve the insurer from *any* obligation to the insured.'"  *Id.* (quoting *Bowers*, 671 A.2d at 699) (emphasis in the original).

---

[3] The provision stated:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof the limit of liability hereon as stated in Item 6 of the Declarations shall be reduced by any amounts due to the Insured on account of such loss under such prior excess insurance.

2013 WL 5436934, at *25.

The court went on to conclude that the NCC would be enforceable "if the phrase 'any other excess policy' is construed to include *only* other excess policies issued by the *same insurer.*'" 2013 WL 5436934, at *28 (citing *Greene, Tweed & Co., Inc. v. Hartford Accident & Indemnity Co.*, Civil Action No. 03-3637, 2006 WL 1050110 (E.D. Pa. Apr. 21, 2006) (emphasis in the original)). Accordingly, the court interpreted the NCC in the subject policies in a manner that would "reduce the limits of liability available under an excess policy by amounts paid to the insured entity *by the same insurer* during a previous policy period for amounts attributable to the same 'loss.'" *Id*. at *28 (emphasis in the original). The court added that

> Since the clauses apply only in other "excess" policies, they may be invoked only where a particular insurer has previously paid sums for the same "loss" under an earlier *excess* policy. … They cannot be utilized by an insurer to reduce the applicable limits of liability by amounts paid at lower layers of coverage.

*Id*. at *28 (citing *Olin Corp*, 704 F.3d at 103-05) (emphasis in the original).

### 3. The Parties' Arguments

Hartford supports its Rule 56 motion mostly by pointing to arguments that Zurn previously asserted when Zurn and Allstate were actively litigating Allstate's liability under the Northbrook policies. Relevantly, Zurn filed a partial motion for summary judgment in 2020 in which it argued two points. First, Zurn argued for the invalidation of the NCCs in all Northbrook policies on the basis that they operated as escape clauses. Second, even assuming those clauses could be construed narrowly, as in *Air & Liquid Systems*, to apply only to prior payments made by the *same* insurer (here, Northbrook), Zurn argued that, at the very least, Allstate would still be liable for an aggregate of $44 million under the limits of the 1978, 1979, and 1980 Northbrook policies. Relying on *Olin* and *Air & Liquid Systems,* Zurn basically argued that the limit of a given policy could only be reduced by payments made by the insurer under a

previous excess policy in the same layer, with the same attachment point. ECF No. 223 at 22-23, 27-29. Zurn thus took the position that payments made under the 1978 Northbrook Umbrella Policy did not reduce Allstate's obligations under the Northbrook Excess Policies because the 1978 Umbrella policy operated at a lower layer of coverage. *Id*. And Zurn further argued that payments made under the 1979 Northbrook Excess Policy did not reduce the limits of the 1980 policy, because the 1979 policy had a lower attachment point. *Id*. at 25, 27-29.

In 2024, Zurn reiterated these arguments in its response to the AIG Insurer's "Status Report." *See* ECF No. 477. Relying on the reasoning of *Air & Liquid Systems* and *Olin*, Zurn posited that the Northbrook NCCs "would not reduce the limits of any of Northbrook 1980-1983 by payments made under either Northbrook 1978 or Northbrook 1979 because those policies attach at much lower levels than Northbrook 1980-1983." *Id*. at 7. Zurn concluded that "[t]he earlier policies therefore insure against different risks, such that it would . . . conflict with the terms of Northbrook 1980-1983 to reduce their limits by amounts paid under Northbrook 1978 and Northbrook 1979." *Id.*

Hartford now contends that, "like Zurn," it "is aware of no case in which a court applying Pennsylvania law has approved applying payments under one policy to reduce the limits of a subsequent policy that attaches at a higher dollar amount." ECF No. 534 at 17. Hartford insists it is "entitled to" the same relief that Zurn itself previously requested, *i.e.*, a ruling that, "as a matter of law, the applicable combined aggregate limits of the 1978-1983 Northbrook Umbrella and Excess Policies total $44 million, after accounting for non-cumulation provisions." *Id.*

Zurn counters that Hartford is simply copying Zurn's prior arguments because it does not want to "fully endorse the arguments that might contradict positions Hartford has taken in other suits or will take in the future." ECF No. 540 at 5. Zurn insists that neither *Olin* nor *Air &*

14

*Liquid Systems* supports the position Hartford is now taking, *i.e.*, that two policies must share the same attachment point in order for a NCC to be enforceable.  According to Zurn,

> *Air & Liquid Systems* instead says the policies must be in the same "layer of coverage." 2013 WL 5436934, at *28. And *Olin* says the policies must insure the same "loss" by providing the same "level of coverage." 704 F.3d at 104.
>
> Northbrook 1979 and Northbrook 1980 (like Northbrook 1981 and Northbrook 1982) undisputedly satisfy these conditions. Northbrook 1979 and Northbrook 1980 are "excess" policies. (Zurn Resp. to HT SOF ¶ 1.) Each sits in the second layer, above an umbrella policy and a primary policy. (Zurn Resp. to HT SOF ¶ 19.) And each insures a loss in excess of $12 million. Northbrook 1979 starts paying at a lower level. It attaches excess of $7 million. (Zurn Resp. to HT SOF ¶ 1.) But it continues paying until its $20 million limit is exhausted. Northbrook 1979 therefore insures the same loss as Northbrook 1980 (and Northbrook 1981 and Northbrook 1982), which attaches excess of $12 million in underlying limits. (*Id.*) When Allstate had paid $5 million under Northbrook 1979, its remaining $15 million limit matched exactly the limits of Northbrook 1980 and both policies then sat excess of $12 million in underlying paid limits. (*Id.*) As a result, both policies then clearly existed in the same "layer" and at the same "level of coverage" under *Air & Liquid Systems* and *Olin*.

ECF No. 540 at 8.[4]

_____

[4] Although Zurn now advocates an interpretation of the Northbrook policies that it formerly opposed, the Court does not believe Zurn is judicially estopped from doing so.

> To warrant judicial estoppel, three elements must exist: "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one [it] asserted in a prior proceeding; (2) the party changed [its] position in bad faith, *i.e.*, in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." . . . Additionally, judicial estoppel does not apply when a party's initial position was not "accepted or adopted by a court or agency." . . .

*In re ESML Holdings Inc.*, 135 F.4th 80, 92 (3d Cir. 2025) (internal citation omitted).  In this case, the position Zurn previously advocated relative to the NCCs in the Northbrook policies was never "accepted or adopted" by the Court, because the Court did not issue a ruling on the parties' previous Rule 56 motions addressing the NCCs.  Furthermore, judicial estoppel is "often the harshest remedy," and therefore "should only be applied to avoid a miscarriage of justice." *Id.* (internal quotation marks and citation omitted).  The Court does not believe that circumstances warrant application of the doctrine here. Relevantly, the issue at hand concerns the interpretation of a contract, which is a pure issue of law for the Court to decide; therefore, Zurn's prior

Granite State contends that neither the language of the Northbrook policies nor applicable Pennsylvania law supports Hartford's position, because the Northbrook policy NCC "doesn't mention attachment points at all, and the *Air & Liquid Systems* opinion speaks only of attachment *layers*, not dollar amounts." ECF No. 544 at 4 (emphasis in the original). To the extent matching insurance "layers" are relevant to the enforceability of a NCC, Granite State insists that the 1979-1982 Northbrook policies satisfy this requirement, because they "all are *second-layer* excess policies, situated and attaching directly above Zurn's umbrella-layer excess policies, which policies are situated and attach directly above Zurn's primary-layer policies." *Id.* (emphasis in the original).

As for *Olin*, Granite State urges the Court not to "import[ ]" the reasoning of that decision "into Pennsylvania's non-cumulation jurisprudence." ECF No. 544 at 5 n. 1. Granite State views *Olin* as having diminished relevance here, because the decision was decided under New York law and involved an insurance scenario wherein the American Home policies attached at a dollar amount and layer higher than *all* other policies, such that *no* prior policy existed at that layer. Granite State notes that the *Olin* court interpreted the NCC as potentially reducing limits based on payments made by *any* other insurer, not just payments made by American Homes. Given this understanding, "the effect of *also* permitting a reduction in limits between policies of different layers would have been an evisceration of coverage available to Olin – a result that would have created the sort of 'escape clause' that Pennsylvania law forbids." *Id.* at 5. (emphasis in the original). According to Granite State, these circumstances render *Olin's* "'layers' protocol" irrelevant to Pennsylvania's non-cumulation jurisprudence. *Id.*

––––––––––––––––––––––––––

advocacy in favor of a different contractual interpretation is not something that was likely to mislead the Court or result in a miscarriage of justice.

16

Next, Granite State urges the Court to reject the view that the earlier and later Northbrook policies "insure against different risks." ECF No. 544 at 5 (citing ECF No. 534 at 16-17). Granite State reasons that the 1979-82 Northbrook policies pay for liability "caused by or arising out of each occurrence," not "each risk," and no party has argued that Zurn's asbestos bodily injury liabilities constitute different "occurrences" in different policy years. *See id.* at 5. Granite State further posits that the NCC specifically addresses "loss," *id.,* and [p]ursuant to Pennsylvania's continuous trigger rule of asbestos liabilities under occurrence-based general liability policies, any claimant whose date of first exposure to Zurn's products triggers the [1979 Northbrook Excess Policy] necessarily triggers the later Northbrook second-layer excess policies." *Id.* at 6. According to Granite State, "[a]ll such policies cover 'such loss,' . . . but the non-cumulation provision in the later policies prevents the 'stacking' of the multiple second-layer excess polices' limits for that same 'loss.'" *Id.*

### 4. The Court's Analysis

Having fully considered the parties' respective arguments, the Court concludes as a matter of law that the NCC in the 1980 Northbrook Excess Policy was enforceable and operated to reduce the limits of that policy commensurate with payments made under the 1979 Northbrook Excess Policy. The Court begins its analysis, as it must, with an examination of the relevant contractual language in order to ascertain the parties' intent. *See Persichini*, 2023 WL 8481375, at *3: *Gallagher*, 201 A.3d at 137.

As discussed, the NCC (entitled "Prior Insurance and Noncumulation of Liability") provides as follows:

> It is agreed that if any loss covered hereunder is also covered in whole or in part
> under any other excess policy issued to the Insured prior to the inception date hereof

the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

ECF No. 541, ¶2; *see also* ECF No. 219-8 at 2, §IV(A). The plain language of this clause indicates that it applies only to "any loss covered hereunder," meaning any "loss" covered by the 1980 Northbrook Excess Policy. The 1980 policy indemnifies Zurn for "all sums" Zurn became obligated to pay by reason of its "liability" for "damages ... and expenses" on account of "personal injuries" or "death" that was "caused by or arising out of" an "occurrence."[5] The limit of the policy was $15 million "ultimate net loss in all in respect of each occurrence[.]" ECF No. 219-8 at 2, § II(c). The policy was situated above a $10 million umbrella policy, which in turn was situated above a $2 million primary policy. *See* ECF No. 219-2. Because Northbrook's liability under the 1980 Excess Policy attached only after the underlying umbrella policy was exhausted, Northbrook was liable only for losses in excess of $12 million, and up to the $15 million limit of the 1980 policy. Thus, the "loss covered" under the 1980 Northbrook Excess Policy included sums that Zurn had to pay in excess of $12 million and up to $27 million for injuries that triggered the policy period.

For such "covered losses," the NCC operates to reduce the 1980 policy's $15 million liability limit if the loss "is also covered in whole or in part under any other excess policy issued" to Zurn by Northbrook "prior to the inception date" of April 1, 1980. The 1979 Northbrook Policy is a prior "excess policy" with a $20 million liability limit situated above a $5 million umbrella policy and a $2 million primary policy. The 1979 Northbrook Excess Policy thus

---

[5] The 1980 Northbrook Policy adopts the definitions of the underlying umbrella policy, Aetna Excess Indemnity (Umbrella) Policy No. 03 XS 1787 SCA, *see* ECF Nos. 219-2 and 219-8 at 3, ¶IV(B), pursuant to which an "occurrence" includes "continuous or repeated exposure to conditions" which results in personal injury. ECF No. 219-11 at 6, ¶5.9.

covered Zurn's losses in excess of $7 million and up to $27 million for the policy period April 1, 1979 to April 1, 1980. Because the 1979 Policy also expressly provided "continuing coverage" for personal injury that was still "continuing at the time" of the policy's termination on April 1, 1980, ECF No. 219-6 at 3, this necessarily means that the 1979 Northbrook Policy covered "in whole or in part" Zurn's "losses" in excess of $12 million and up to $27 million under the 1980 Northbrook Policy. The same result obtains in light of the "multiple-trigger" theory of liability espoused in J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502, 507 (Pa. 1993), whereby "every insurer which was on the risk at any time during the development of a claimant's asbestos-related disease has an obligation to indemnify" the insured.

In sum, under the terms of the NCC, the $15 million limits available under the 1980 Excess Policy were reduced by "any amounts due to [Zurn] on account of such loss under" the 1979 Excess Policy. ECF No. 219-8 at 2, §IV(A). Allstate's payments under the 1979 Policy thereby reduced its obligations under the 1980 Policy. And since the amounts paid by Allstate under the earlier policy coincided with the full limits of the 1980 policy, Zurn was not entitled to any further indemnity once the limits of the 1979 policy were exhausted.

Although the decisions in *Olin* and *Air & Liquid Systems* are not binding authority, they are consistent with the Court's ruling herein. The court in *Air & Liquid Systems* interpreted the subject NCC to mean that it could be "invoked only where a particular insurer has previously paid sums for the same 'loss' under an earlier *excess* policy," rather than at "lower layers of coverage." 2013 WL 5436934, at *28 (emphasis in the original). This Court agrees that, because the materially identical NCC at issue in this case expressly references losses covered by "any other excess policy," only payments that were owing or paid to Zurn under a prior Northbrook "excess policy" could reduce the limits available under the 1980 Excess Policy. As

discussed, the Northbrook 1979 policy is a prior "excess policy" and satisfies that condition of the NCC.

The court in *Olin* treated the precise dollar attachment point as the critical inquiry, as it held that the subject NCC reduced American Homes' liability "only to the extent that a prior insurance policy at the same level of coverage, here $30.3 million, indemnifies for a loss that is also covered by an American Home policy." 704 F.3d at 104. Because no other insurer had issued a policy with coverage at the $30.3 million level, there was no prior policy that covered the same "loss" as the American Home policies (i.e., liability payments in the $30.3 to $31.3 million range). While *Olin* is not binding authority within this judicial circuit, its reasoning is persuasive. The *Olin* court interpreted the NCC and "continuing coverage" clauses as "sweeping a continuing loss in the earliest triggered policy, with that policy then fully indemnifying the insured for that loss." 704 F.3d at 104. In somewhat similar fashion, the NCC in the 1980 Northbrook Excess Policy evidences the parties' intent to "sweep" Zurn's continuing losses into the Northbrook 1979 Policy, with the limits of that policy fully indemnifying Zurn.

For all of the foregoing reasons, the Court will dismiss Hartford's Rule 56 motion as moot insofar as Hartford seeks a declaration that the limits of the 1979 Northbrook Excess Policy cannot be reduced by amounts due or payments made under the 1978 Northbrook Umbrella policy. The Court will deny Hartford's motion insofar as Hartford seeks a declaration that the limits of the 1980 Northbrook Excess Policy cannot be reduced by amounts due or payments made under the 1979 Northbrook Excess policy. The Court will likewise deny Hartford's request for a declaration that the combined aggregate limits of the 1978-1983 Northbrook Umbrella and Excess Policies total $44 million, after accounting for non-cumulation provisions.

20

**IV.    GRANITE STATE'S RULE 56 MOTION AT ECF NO. 493**

The Court turns next to the motion for partial summary judgment filed by Granite State at ECF No. 496.  This motion concerns the effect, if any, of a NCC contained in a quota share policy that Granite State issued for the period April 1, 1985 to April 1, 1986.

*A.  Background*

As discussed, Zurn insured itself at times relevant to this litigation through a series of layered policies issued by various commercial insurers.  Relevant to the instant motion are two policies issued by Granite State.

The first is a $5 million excess insurance policy (No. SCLD-80-93353) issued by Granite State for the period December 17, 1977 to April 1, 1979 (hereafter, the "1977 Policy").  This policy was excess to two consecutive umbrella policies: a $9 million Liberty Mutual umbrella policy for the time period April 1, 1977 to April 1, 1978, and the $9 million Northbrook Umbrella Policy discussed in the previous section, which covered the time period April 1, 1978 to April 1, 1979.  In turn, the Liberty Mutual umbrella policy was situated above a $1 million Liberty Mutual primary insurance policy covering the period April 1, 1977 to April 1, 1978.  The Northbrook Umbrella Policy was situated above a $2 million Liberty Mutual primary insurance policy covering the period April 1, 1978 to April 1, 1979.  Thus, the Granite State 1977 Policy was a third-tier insurance policy that was excess to two consecutive umbrella policies and two consecutive primary policies.

The second relevant Granite State policy is a quota-share policy issued by Granite State for the period April 1, 1985 to April 1986 (hereafter, the "1985 Policy").  Under this policy, Granite State agreed to pay $5 million toward the policy's overall $20 million limits.  The 1985 Policy sat above a $20 million umbrella policy issued by the Aetna Casualty and Surety

Company ("Aetna") for the same time period. The Aetna umbrella policy in turn sat above a $2 million primary insurance policy that covered the same time period. Thus, like Granite State's 1977 Policy, the 1985 Policy was a third-tier insurance policy that was excess to the underlying umbrella and primary policies.

The Granite State 1985 Policy consists of a declarations page, a schedule, preprinted form language under the headings "INSURING AGREEMENTS," "CONDITIONS," and "EXCLUSIONS," and numerous endorsements. ECF No. 219-18; ECF No. 499, ¶¶10-11. The "INSURING AGREEMENTS" portion of the policy includes separate sub-headings entitled "I. Coverage" and "II. Limit of Liability - Underlying Limits." ECF No. 219-18; ECF No. 499, ¶12.

The NCC in the Granite State 1985 Policy is set forth as part of the policy "CONDITIONS" and provides, in relevant part, as follows:

> [ ] PRIOR INSURANCE AND NON CUMULATION OF LIABILITY.
>
> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Items 5 and 6 of the Schedule shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

ECF No. 219-18 at 3; ECF No. 499, ¶¶13-14.

Endorsement No. 2 to the Granite State 1985 Policy is dated July 21, 1985 but was effective as of April 1, 1985. ECF No. 219-18; ECF No. 499, ¶15. That endorsement states:

> THIS POLICY IS WARRANTED TO THE EXACT TERMS AND CONDITIONS OF THE LEAD UMBRELLA[.] EXCEPT WITH RESPECT TO YOUR SPECIFIC LIMIT OF LIABILITY AND PREMIUM, ALL PREPRINTED TERMS AND CONDITIONS HEREON ARE DELETED TO THE EXTENT THAT THEY VARY FROM OR ARE INCONSISTENT WITH THE TERMS AND CONDITIONS OF THE LEAD UMBRELLA.

ECF No. 219-18; ECF No. 499, ¶16. "The Lead Umbrella" referenced in Endorsement No. 2 is Policy No. 03XS1790SCA, issued by Aetna for the period April 1, 1983 to April 1, 1985

22

(hereafter, the "Aetna 1983-1985 Umbrella Policy"). ECF No. 219-18; ECF No. 219-21; ECF No. 499, ¶¶6, 17.

In June of 1986, Endorsement No. 2 was deleted and replaced by Endorsement No. 5. *See* ECF No. 219-18; ECF No. 499, ¶18. Like Endorsement No. 2, Endorsement No. 5 was backdated to an effective date of April 1, 1985. *Id.* Endorsement No. 5 is titled "Following Form Endorsement" and states:

> IN CONSIDERATION OF THE PREMIUM PAID IT IS HEREBY AGREED THAT EXCEPT ONLY WITH RESPECT FOR POLICY PERIOD, PREMIUM, LIMIT OF LIABILITY AND ANY SPECIFIC GRANITE STATE INSURANCE COMPANY ENDORSEMENTS, THIS POLICY IS HEREBY AMENDED TO FOLLOW ALL THE TERMS, CONDITIONS, DEFINITIONS AND EXCLUSIONS OF THE FIRST LAYER UMBRELLA POLICY 03-XS-1790-SCA ISSUED BY AETNA CASUALTY AND SURETY COMPANY.
>
> IT IS FURTHER UNDERSTOOD AND AGREED THAT ENDORSEMENT NO. 2 IS DELETED IN ITS ENTIRETY.

ECF No. 219-18; ECF No. 499, ¶19. Thus, Endorsement No. 5, like Endorsement No. 2, recognized the Aetna 1983-1985 Umbrella Policy as the controlling underlying policy to which the Granite State 1985 Policy follows form. ECF No. 219-18 at 10; ECF No. 499, ¶17.

Notably, the Aetna 1983-1985 Umbrella Policy includes no "Condition" titled "Prior Insurance and Non Cumulation of Liability." ECF No. 219-21; ECF No. 499, ¶7. Nor does the Aetna 1983-1985 Umbrella Policy include any alternative version of a "non-cumulation" condition, clause, or provision. ECF No. 219-21; ECF No. 499, ¶8.

Thus, a question arises as to whether the preprinted NCC in the Granite State 1985 Policy remains a part of that policy or whether that provision was amended out of the policy by virtue of Endorsement No. 5. If the NCC remains a part of the Granite State 1985 Policy, a second question arises concerning the extent to which the NCC reduces any amounts available to Zurn under the policy.

23

Granite State insists that the NCC remain intact and should be given full effect, thereby reducing Zurn's recovery under the Granite State 1985 Policy by amounts owing or paid under the Granite State 1977 Policy. Granite State offers three arguments in support of this position. First, it argues that the NCC is not an impermissible "escape clause," because the clause merely reduces, but does not eliminate, its payment obligations under the two policies. Second, it argues that Endorsement No. 5 in the 1985 Policy did not amend the NCC out of the policy. Granite State reasons that the NCC relates to the amounts and limits of liability in the policy; therefore, because Endorsement No. 5 did not alter the 1985 Policy's "Limit of Liability," the NCC remains part of the contract. Third, Granite State argues that there are no other impediments to application of the NCC because: (i) there is no contractual language requiring that the 1985 Policy be a "replacement" or "renewal" of the 1977 Policy in order for the NCC to have effect, *cf. Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330 (3d Cir. 2005) (NCC effectively reduced the liability limits of an insurance policy commensurate with prior payments made by the insurer under a "policy or policies of which this policy is a replacement"); and (ii) there is no support for the proposition that the two Granite State policies must share the same dollar-amount attachment point in order for the NCC to have effect. Granite State filed its pending motion for partial summary judgment to request a ruling from this Court that conforms to its interpretation of the 1985 Policy. ECF No. 493.

Zurn opposes Granite State's motion and argues that the limits of the Granite State 1985 Policy are *not* reduced by amounts due or payments made under the 1977 Policy. According to Zurn, Endorsement No. 5 effectively deletes the NCC from the Granite State 1985 Policy by conforming the terms of that policy to the terms of the Aetna 1983-1985 Umbrella Policy, which does not contain such a provision. Zurn has filed its own motion for partial summary judgment

24

asking that the Court adopt its interpretation of the 1985 Policy as a matter of law. *See* ECF No. 496.[6]

### B. Analysis

As noted, Granite State has offered three arguments in support of its request that the Court declare the limits of its 1985 Policy reduced by payments made under the 1977 Policy. Ultimately, the Court need address only the third reason, because the Court's analysis on that point is dispositive.

As Granite State points out, the NCC in the 1985 Policy is essentially identical to the NCC in the *Air & Liquid Systems* case, *see* ECF No. 474 at 4 n.8, which was also materially identical to the NCC in the Northbrook 1980 Excess Policy -- the subject of the Court's prior analysis. Granite State insists there is no support, either contractually or under Pennsylvania law, for the proposition that the two Granite State policies must share the same dollar-amount attachment point in order for the NCC in the 1985 Policy to have effect. The Court finds that its prior analysis concerning Hartford's Rule 56 motion dictates a contrary conclusion.

As Granite State correctly observes, "[t]he polestar of the court's inquiry is the language of the insurance policy," *Treesdale*, 418 F.3d at 335, and "when the language of the policy is

_____

[6] Hartford has filed an omnibus response that does not directly engage the issues raised by Zurn and Granite State. While Hartford does not endorse Granite State's interpretation of the 1985 Policy, Hartford indicates that its "principal interest here remains ensuring, as a matter of fairness, that it receives at least as favorable treatment as Granite State." ECF No. 501 at 4. Thus, if Granite State prevails on its arguments concerning the interplay between its NCC and "follow form" provision, then Hartford believes the same results should obtain relative to its own obligations under an insurance policy issued by New England Insurance Company, which is similarly "warranted to the exact terms and conditions" of the same underlying umbrella policy, "except with respect to Limit of Liability[.]" *See id.* (quoting ECF No. 234, ¶¶ 23-24). As the New England policy is the subject of Zurn's Rule 56 motion, the Court addresses Hartford's omnibus response in more detail relative to that motion.

clear and unambiguous, a court is required to give effect to that language." *Gallagher,* 201 A.3d at 137. Like the Northbrook NCC, the Granite State NCC applies only with respect to a "loss" that is covered under the 1985 Policy and also covered "in whole or in part" under a prior excess policy. The Granite State 1985 Policy provides up to $5 million in coverage for Zurn's losses in excess of $22 million (the $2 million primary policy and the $20 million umbrella policy). The Granite State 1977 Policy provided $ 5 million in coverage for losses in excess of $10 million during the period December 17, 1977 to April 1, 1978 and losses in excess of $11 million during the period April 1, 1978 to April 1, 1979. The limits of the 1977 Policy thus maxed out during these respective time periods when Zurn's losses exceeded either $15 million (during the earlier coverage period) or $16 million (during the latter coverage period). Because the 1977 Policy did not cover "in whole or in part" any portion of Zurn's losses that were covered by the 1985 Policy, Granite State's payments under the earlier policy did not reduce its obligations under the later policy.[7]

Granite State's arguments to the contrary mirror their argument in opposition to Hartford's motion for partial summary judgment. Accordingly, there is no reason to repeat the Court's analysis here. For the reasons previously discussed, even assuming that Endorsement Number 5 did not amend the NCC out of the Granite State 1985 Policy, the NCC did not operate to reduce the limits of the 1985 Policy commensurate with payments made under the prior 1977 Policy. For this reason, Granite State's motion for partial summary judgment must be denied.

---

[7] The provisions of the Granite State 1985 Policy, ECF No. 219-18, are the same in all respects material to the Court's analysis of the Northbrook 1980 Excess Policy, ECF No. 219-8. Additionally, the provisions of the underlying Aetna 1983 Umbrella Policy, ECF No. 219-21, are the same in all respects material to the Court's analysis of the underlying Aetna 1980 Umbrella Policy, ECF No. 219-11.

26

## V.    ZURN'S RULE 56 MOTION AT ECF NO. 496

Finally, the Court turns to the motion for partial summary judgment filed by Zurn.  This motion addresses the NCCs in two policies: (i) a $15 million excess insurance policy that Zurn purchased from New England Insurance Company for the period April 1, 1984 to April 1, 1985 (the "New England Policy"), and (ii) the Granite State 1985 Policy discussed above.  Zurn asks the Court to declare, as a matter of law, that the limits of these two policies are *not* reduced by amounts due or payments made under other policies covering earlier policy years.  The Court has previously discussed the Granite State 1985 Policy above and need not repeat that discussion here.

The New England Policy is a third-tier excess insurance policy that is situated above the Aetna 1983-85 Umbrella Policy, which in turn sits above a $2 million primary insurance policy.  In the year prior to the effective date of the New England Policy (*i.e.*, from April 1, 1983 to April 1, 1984), Zurn held a third-tier excess insurance policy issued by the Royal Indemnity Company (the "Royal Policy").  *See* ECF No. 219-22.  Like the New England Policy, the Royal Policy had a $15 million limit and sat above the same Aetna 1983-85 Umbrella Policy and the same primary insurance policy.  The Royal and New England Policies therefore have identical policy limits and identical $12 million attachment points.  Both the New England Insurance Company and the Royal Indemnity Company are affiliates of Hartford.

The New England Policy consists of a preprinted form and various amendatory endorsements.  *See* ECF No. 219-20.  Pursuant to Endorsement No. 2, the parties agreed to conform the New England Policy "to the exact terms and conditions as the Underlying Umbrella

27

Liability policy," *i.e.*, the Aetna 1983-85 Umbrella Policy,[8] "except with respect to Limit of Liability and premium." ECF No. 219-20 at 8. Endorsement No. 2 also deletes "[a]ll preprinted terms and conditions . . . to the extent that they vary from or are inconsistent with" the Aetna 1983-85 Umbrella Policy. *Id.*

Whereas the preprinted conditions of the New England Policy contained an NCC, the Aetna 1983-85 Umbrella Policy does not. *Cf.* ECF No. 219-20 at 3, ECF No. 219-21. As a result, Zurn contends that the NCC in the New England Policy, like the NCC in the Granite State 1985 Policy, was deleted by amendment. Zurn therefore asks the Court to declare, as a matter of law, that the limits of the New England and Granite State 1985 Policies are not reduced by amounts due or payments made under any other policies covering earlier policy years.

Based on the record before the Court, the declarations Zurn requests are warranted, though not necessarily for the reasons Zurn presently advocates. The Court has already determined that the language of the NCC in the Granite State 1985 Policy does not reduce the liability limits of that policy based on amounts that were owed or paid under the Granite State 1977 Policy. And Granite State has not argued that the limits of its 1985 Policy should be reduced by amounts owed or paid under any other policies, including the excess insurance policy that American Home Assurance Company (like Granite State, an AIG affiliate) issued to Zurn for the period December 17, 1974 to December 17, 1977. *See* ECF No. 219-12. Even if Granite State did so, its argument would be unavailing, since Granite State and American Home are not

_____

[8] Although Endorsement No. 2 identifies the "Underlying Umbrella Liability Policy" as Aetna Policy "No. 03XS1787SCA," Endorsement No. 5 clarifies that the reference to "Policy No. 03XS1787SCA" is corrected to be "Policy No. 03XS1790SCA" (the Aetna 1983-85 Umbrella Policy). *See* ECF No. 219-20 at 8, 12. Endorsement No. 5 also backdates this correction to the start of the policy period (*i.e.,* April 1, 1984). *Id.* at 12.

28

the same "insurer." *Cf. Air & Liquid Systems,* 2013 WL 5436934, at *28 (concluding that non-cumulation clauses were "enforceable if the phrase 'any other excess policy' is construed to include *only* other excess policies issued by the *same insurer*") (emphasis in the original).

As for Hartford, it states only that, "if the Court finds Granite State is entitled to apply the non-cumulation provision in Granite State 1985, including based on payments made by American Home under American Home 1974, then the Court should also find that Hartford is entitled to apply the non-cumulation provision in the New England Policy based on payments made by First State Insurance Company (which, like New England, is a Hartford affiliate) under the Royal Policy." ECF No. 501 at 2 n.2. But as noted, Granite State does not seek a ruling that it is entitled to apply payments made by American Home to reduce the limits of Granite State 1985, nor does the Court have any grounds before it that would justify such a ruling. Accordingly, Hartford's request in that regard is moot. But even if the NCC in the New England Policy remains a part of that policy (because it was *not* amended out by Endorsement No. 2), the Court cannot construe the NCC in a manner that makes it enforceable vis-a-vis payments made or owing under the Royal Policy, because the New England and Royal Policies were not issued to Zurn by the same "insurer." *Cf. Air & Liquid systems, supra,* at *28.

## VI.   CONCLUSION

Based upon the foregoing discussion, the motion for partial summary judgment filed by Hartford will be dismissed as moot insofar as it relates to the non-cumulation provisions in the 1978 Northbrook Umbrella Policy and the 1979 Northbrook Excess Policy. The motion will otherwise be denied, as the Court has found that the limits of the Northbrook 1980 Excess Policy were reduced by amounts paid or owed under the Northbrook 1979 Excess Policy. Granite State's motion for partial summary judgment will be denied, as the Court has found that the

29

limits of the Granite State 1985 Policy are not reduced by amounts paid or owed under the Granite State 1977 Policy. Zurn's motion for partial summary judgment will be granted, as the Court has determined that neither the limits of the Granite State 1985 Policy nor the limits of the New England Policy were reduced by amounts paid or owed under prior insurance policies.

Susan Paradise Baxter
United States District Judge